**Reference number: 46T 17/2006 -**

*State coat of arms*

**CZECH REPUBLIC**

# JUDGMENT
# IN THE NAME OF THE REPUBLIC

The Municipal Court in Prague, in a Chamber comprising the President of the Chamber JUDr. Dušan Paška and the assessors Marie Nuderová and Ing. Stanislav Matas, handed down a ruling in a trial held on 9 July 2010 **as follows:**

The defendants

### 1) Viktor Kožený,

born 28 June 1963 in Prague, Czech Republic, a citizen of the Republic of Ireland, residing at the Bahamas, Nassay-Lyford Lay N-776, also registered at the address Dublin, 18 Careyfort Hall, Careyfort Avenue, Blackrock, County Dublin, Republic of Ireland, last registered as permanently resident in the Czech Republic at Praha 6-Dejvice, Zelená 1740/22,

### 2) Ing. Boris Vostrý, Csc.,

born 25 August 1947 in Znojmo, Czech Republic, a citizen of Belize, residing at Belize City, Gavriely PO BOX 2284, also at the address 504 Marina Towers, Belize City, and in other states, last registered as permanently resident in the Czech Republic at Praha 6-Březnov, Santoriova 28/13,

who are prosecuted as fugitives pursuant to Section 302 et seq. of the Code of Criminal Procedure,

**are guilty of the following:**

## I.  Viktor Kožený

in 1995 and 1996, both in Prague and in Nassau, Commonwealth of the Bahamas, as a person holding powers of attorney authorizing him, without further restrictive conditions, to engage in comprehensive decision-making on purchases sales of securities from the portfolios of investment funds, namely Harvardský dividendový investiční fond a.s., registration number 44269595, having its registered office at Praha 4, Ohradní 65, Harvardský contrariánský investiční fond, a.s., registration number 45312117, having its registered office at Praha 4, Ohradní 65, Harvardský růstový investiční fond, a.s., registration number 44268777, having its registered office at Praha 4, Ohradní 65, Harvardský diamantový investiční fond, a.s., registration number 45312125, having its registered office at Praha 4, Ohradní 65, Harvardský investiční fond menších společností, a.s. registration number 45312109, having its registered office at Praha 4, Ohradní 65, Harvardský arbitrážní investiční fond a.s. registration number 45312095, having its registered office at Praha 4, Ohradní 65, all of which managed by Harvard Cupital and Consulting, a.s., now in liquidation, as the manager pursuant to Act No 248/1992, with the intention of transferring, without the knowledge or consent of the shareholders of the investment funds, liquid publicly tradable shares from the portfolio of the said Harvard investment funds (the "HIF") to other persons at a loss and without adequate consideration, and securing the satisfaction of the claims thus arising by consolidation thereof as a result of the merger of the HIF and SKLO UNION, akciová společnost Teplice, as the holder of the corresponding obligations, into Harvardský průmyslový holding, a.s., now in liquidation, Reg. No 44269595, having its registered office at Praha 4, Ohradní 65 ("HPH"), by accepting shares of Daventree Limited, company registered in Cyprus, and, by consolidation, "liquidating" the obligations of the assignees of shares from the portfolio of the Harvard investment funds, issued instructions to execute purposefully loss-making transfers of liquid and publicly tradable securities from the portfolio of the said investment funds in such a manner that those transfers were made solely for the benefit of offshore companies registered in Cyprus and interrelated through assets and persons, on whose behalf he was also acting, intentionally and deliberately, without any reasonable or liquid consideration for the securities transferred, instead of which he accepted, inter alia, the specially issued promissory notes of Stratton Investments Company Limited, registered in Cyprus, or the publicly non-tradable securities of Daventree Limited, registered in Cyprus, the value of which was not verifiable, and thereby the aforementioned person drained the following assets from the portfolios of the Harvard investment funds, taking part in individual transfers as follows:

1.  on 8 August 1995, on behalf of Harvardský contrariánský investiční fond a.s. ("HCIF"), he entered into a securities transfer agreement with Stratton Investments Copany Limited, registered in Cyprus ("Stratton"), represented by Michael Dingman, pursuant to which 1,081 shares of Spolana, a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 379,431. Part of the price, in the amount of CZK 19,017.10, was paid by Stratton in cash, while in respect of the remaining part, in the amount of CZK 360,413.90, Viktor Kožený accepted a promissory note from that company issued under Bahamas law; this part of the price, in the amount of

continued 46T 17/2006

CZK 360,413.90, was never paid by Stratton to HCIF,

2. on 4 August 1995, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 3,184 shares of SKLO UNION, akciová společnost Teplice, were transferred from the HCIF portfolio for an agreed transfer price of CZK 1,385,040. Part of the price, in the amount of CZK 69,418.27, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 1,315,621.73, Viktor Kožený accepted a promissory note from that company issued under Bahamas law; this part of the price, in the amount of CZK 1,315,621.73, was never paid by Stratton to HCIF,

3. on 2 August 1995, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 3,300 shares of Biocel Paskov a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 2,303,400. Part of the price, in the amount of CZK 115,446.52, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 2,187,953.48, Viktor Kožený accepted a promissory note from that company issued under Bahamas law; this part of the price, in the amount of CZK 2,187,953.48, was never paid by Stratton to HCIF,

4. on 14 August 1995, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 250 shares of Moravské Naftové Doly, a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 142,500. Part of the price, in the amount of CZK 7,155.19, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 135,344.81, Viktor Kožený accepted a promissory note from that company issued under Bahamas law; this part of the price, in the amount of CZK 135,344.81, was never paid by Stratton to HCIF,

5. on 4 January 1996, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,630 shares of Biocel Paskov a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 3,734,600. Part of the price, in the amount of CZK 186,730, was to be paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 3,547,870, he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HCIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

6. on 4 January 1996, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,550 shares in Spolana, a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 2,295,000. Part of the price, in the amount of CZK 114,750, was to be paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 2,180,250, Viktor Kožený accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HCIF either the amount that was to be paid

in cash upon transfer of the securities or the amount for which the promissory note was issued,

7.  on 10 January 1996, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,286 shares of SEPAP a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 3,369,030. That amount was to be paid by Stratton in cash; none of the purchase price was ever paid,

8.  on 10 January 1996, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,100 shares of Česká námořní plavba a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 4,200,000. That amount was to be paid by Stratton in cash; none of the purchase price was ever paid,

9.  on 4 January 1996, on behalf of HCIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,500 shares of Moravské naftové doly, a.s. were transferred from the HCIF portfolio for an agreed transfer price of CZK 2,750,000. Part of the price, in the amount of CZK 137,500, was to be paid by Stratton in cash, while in respect of the part in the amount of CZK 2,612,500 Viktor Kožený accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HCIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

the HCIF general ledger also records partial payments, not specified in any further detail, from Stratton in the total amount of CZK 438,960, after deduction of which the conduct described above in paragraphs 1 to 9 evidently caused HCIF damage in the amount of CZK 26,845,239,

10. on an unknown date in 1996, Viktor Kožený, on behalf of Harvardská contrariánská společnost, a.s. ("HCS"), issued a Multiple Order Ticket to Sell, constituting an order to sell a total of eight issues of securities from the HCS portfolio, including 1,144 shares in SKLO UNION, akciová společnost Teplice, for a selling price of CZK 406.120. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HCS, represented by the then chairwoman of the board of directors, JUDr. Jana Sainerová, and HUSKY Trading Co., Ltd., registred in Cyprus ("HUSKY"), represented by the director, Polakis K. Sarris, pursuant to which eight issues of shares from the HCS portfolio were sold, including the aforementioned 1,144 shares in SKLO UNION a.s., Teplice, for a price of CZK 406,120; HUSKY never paid any of the selling price of that issue of shares or the selling price of other issues transferred under that agreement,

11. on an unknown date in 1996, Viktor Kožený, on behalf of HCS, issued a Multiple Order Ticket to Sell, constituting an order to sell a total of eight issues of securities from the HCS portfolio, including 2,193 shares of SEPAP, a.s., for a selling price of

continued                                                                        46T 17/2006

CZK 2,949,585. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HCS, represented by the then chairwoman of the board of directors, JUDr. Jana Sainerová, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HCS portfolio were sold, including the aforementioned 2,193 shares in SEPAP, for CZK 2,949,585; HUSKY never paid any of the selling price of that issue or the selling price of other issues transferred under that agreement,

12. on an unknown date in 1996, Viktor Kožen, on behalf of HCS, issued a Multiple Order Ticket to Sell, constituting an order to sell eight issues of securities from the HCS portfolio, including 2,600 shares of FATRA a.s., for a selling price of CZK 2,886,000. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HCS, represented by the then chairwoman of the board of directors, JUDr. Jana Sainerová, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HCS portfolio were sold, including the aforementioned 2,600 shares in FATRA, for CZK 2,886,000; HUSKY never paid any of the selling price of that issue or the selling price of other issues transferred under that agreement,

13. on an unknown date in 1996, Viktor Kožen1, on behalf of HCS, issued a Multiple Order Ticket to Sell, constituting an order to sell a total of eight issues of securities from the HCS portfolio, including 136 shares of CRYSTALEX a.s., for a selling price of CZK 90,440. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HCS, represented by the then chairwoman of the board of directors, JUDr. Jana Sainerová, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HCS portfolio were sold, including the aforementioned 136 shares in CRYSTALEX a.s., for CZK 90,440; HUSKY never paid any of the selling price of that issue or the selling price of other issues transferred under that agreement,

14. on an unknown date in 1996, Viktor Kožen1, on behalf of HCS, issued a Multiple Order Ticket to Sell, constituting an order to sell a total of eight issues of securities from the HCS portfolio, including 332 shares of ISC MUZO a.s., for a selling price of CZK 304,112. On the basis of that order to sell, a securities transfer agreement was concluded between HCIF, represented by the then chairwoman of the board of directors, JUDr. Jana Sainerová, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HCS portfolio were sold, including the aforementioned 332 shares in ISC MUZO a.s., for CZK 304,112; HUSKY never paid any of the selling price of that issue or the selling price of other issues transferred under that agreement,

15. on 4 August 1995, on behalf of Harvardský investiční fond menších společností a.s. ("HIFMS"), he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,316 shares of SKLO UNION, akciová společnost Teplice, were transferred from the HIFMS portfolio for an agreed transfer price of CZK 1,007,460. Part of the price, in the amount of CZK 50,493.94, was paid

by Stratton v in cash, while in respect of the remaining part of the price, in the amount of CZK 956,966.06, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HIFMS,

16. on 17 October 1995, on behalf of HIFMS, Viktor Koženy entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 1,472 shares of SEPAP a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 2,362,560. He accepted a promissory note from that company issued under Bahamas law for the amount in full; this amount was never paid by Stratton to HIFMS,

17. on 14 August 1995, on behalf of HIFMS, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 250 shares of Moravské Naftové Doly, a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 142,500. Part of the price, in the amount of CZK 7,155.19, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 135,344.81, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HIFMS,

18. on 8 August 1995, on behalf of HIFMS, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 1,317 shares of Spolana, a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 462,267. Part of the price, in the amount of CZK 23,168.84, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 439,098.16, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HIFMS,

19. on 2 August 1995, on behalf of HIFMS, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,400 shares of Biocel Paskov a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 1,675,200. Part of the price, in the amount of CZK 83,961.10, was paid by Stratton in cash, while in respect of the remaining part of the purchase price, in the amount of CZK 1,691,238.90, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HIFMS,

20. on 4 January 1996, on behalf of HIFMS, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 1,890 shares of Biocel Paskov, a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 2,683,800. Part of the price, in the amount of CZK 134,190, was to be paid by Stratton in cash, while in respect of the amount of CZK 2,549,610 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HIFMS either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

21. on 4 January 1996, on behalf of HIFMS, he entered into a securities transfer

agreement with Stratton, represented by Michael Dingman, pursuant to which 1,500 shares of Moravské Naftové Doly, a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 1,650,000. Part of the price, in the amount of CZK 82,500, was to be paid by Stratton in cash, while in respect of the part of the price in the amount of CZK 1,567,500 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HIFMS either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

22. on 6 October 1995, on behalf of HIFMS, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 800 shares of Česká námořní plavba a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 2,448,000. He accepted a promissory note from that company issued under Bahamas law for this amount; this amount was never paid by Stratton to HIFMS,

23. on 4 January 1996, on behalf of HIFMS, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 1,640 shares of Spolana, a.s. were transferred from the HIFMS portfolio for an agreed transfer price of CZK 1,476,000. He accepted a promissory note from that company issued under Bahamas law for this amount; this amount was never paid by Stratton to HIFMS,
the HIFMS general ledger also records partial payments, not specified in any further detail, from Stratton in the total amount of CZK 290,490, after deduction of which the conduct described above in paragraphs 15 to 23 evidently caused HIFMS damage in the amount of CZK 16,948,571,

24. on an unknown date in 1996, on behalf of Harvardský spolek menších společností, a.s. ("HSMS"), he issued a bulk order, referred to as a Multiple Order Ticket to Sell, for the sale of a total of eight issues of securities from the HSMS portfolio, including 1,730 shares of FATRA a.s., for a selling price of CZK 1,920,300. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HSMS, represented by the then chairman of the board of directors, JUDr. Petr Paciorek, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HSMS portfolio were sold, including the aforementioned 1,730 shares in FATRA, a.s. for CZK 1,920,300; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

25. on an unknown date in 1996, on behalf of HSMS, he issued a bulk order, referred to as a Multiple Order Ticket to Sell, for the sale of a total of eight issues of securities from the HSMS portfolio, including 280 shares of ISC MUZO a.s., for a selling price of CZK 256,480. On the basis of that order to sell, a securities transfer agreement was concluded between HSMS, represented by the then chairman of the board of directors, JUDr. Petr Paciorek, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HIFMS portfolio were sold, including the aforementioned 280 shares in ISC MUZO a.s., for CZK 256,480; HUSKY never paid

any of the selling price of that issue or the selling price of other issues transferred under that agreement,

26. on an unknown date in 1996, on behalf of HSMS, he issued a bulk order, referred to as a Multiple Order Ticket to Sell, for the sale of eight issues of securities from the HSMS portfolio, including 1,420 shares of SEPAP a.s., for a selling price of CZK 1,909,900. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HSMS, represented by the then chairman of the board of directors, JUDr. Petr Paciorek, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HSMS portfolio were sold, including the aforementioned 1,420 shares in SEPAP a.s. for CZK 1,909,900; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

27. on an unknown date in 1996, on behalf of HSMS, he issued a bulk order, referred to as a Multiple Order Ticket to Sell, for the sale of a total of eight issues of securities from the HSMS portfolio, including 725 shares of SKLO UNION, akciová společnost Teplice, for a selling price of CZK 257,375. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HSMS, represented by the then chairman of the board of directors, JUDr. Petr Paciorek, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HSMS portfolio were sold, including the aforementioned 725 shares in SKLO UNION, akciová společnost Teplice for CZK 257,375; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

28. on 2 August 1995, on behalf of Harvardský arbitrážní investiční fond a.s. ("HAIF"), he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 780 shares of Biocel Paskov a.s. were transferred from the HAIF portfolio for an agreed transfer price of CZK 544,440. Part of the price, in the amount of CZK 27,287.36, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 517,152.64, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HAIF,

29. on 4 August 1995, on behalf of HAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 752 shares of SKLO UNION, akciová společnost Teplice, were transferred from the HAIF portfolio for an agreed transfer price of CZK 327,120. Part of the price, in the amount of CZK 16,395.27, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 310,724.73, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HAIF,

30. on 8 August 1995, on behalf of HAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 629 shares of Spolana, a.s. were transferred from the HAIF portfolio for an agreed transfer price of CZK 220,779. Part of the price, in the amount of CZK 11,065.45, was paid by Stratton

in cash, while in respect of the amount of CZK 209,713.55, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HAIF,

31. on 4 January 1996, on behalf of HAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 920 shares of Biocel Paskov a.s. were transferred from the HAIF portfolio for an agreed transfer price of CZK 1,606,400. Part of the price, in the amount of CZK 65,320, was to be paid by StrattonS Ltd. in cash, while in respect of the amount of CZK 1,241,080 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HAIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

32. on 4 January 1996, on behalf of HAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 870 shares of Spolana, a.s. were transferred from the HAIF portfolio for an agreed transfer price of CZK 783,000. Part of the price, in the amount of CZK 39,150, was to be paid by Stratton in cash, while in respect of the amount of CZK 743,850 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HAIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

33. on 10 January 1996, on behalf of HAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 829 shares of SEPAP a.s. were transferred from the HAIF portfolio for an agreed transfer price of CZK 1,303,545. None of that amount was ever paid by Stratton,

34. on 4 January 1996, on behalf of HAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 910 shares of Moravské naftové doly, a.s. were transferred from the HAIF portfolio for an agreed transfer price of CZK 1,001,000. Part of the price, in the amount of CZK 50,050, was to be paid by Stratton in cash, while in respect of the amount of CZK 950,950 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HAIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

the HAIF general ledger also records partial payments, not specified in any further detail, from Stratton in the total amount of CZK 154,520, after deduction of which the conduct described above in paragraphs 28 to 34 evidently caused HAIF damage in the amount of CZK 10,106,275,

35. on an unknown date in 1996, on behalf of Harvardská arbitrážní společnost, a.s. ("HAS"), he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 11 June 1996, a total of seven issues of securities from the HAS portfolio were sold, including 1,174 shares of SKLO UNION, akciová společnost Teplice, for a selling price of CZK 1,232,700. Presumably, on the basis of that order to

sell, a securities transfer agreement was concluded between HAS and HUSKY, pursuant to which seven issues from the HAS portfolio were sold, including the aforementioned 1,174 shares of SKLO UNION, akciová společnost Teplice, for CZK 1,232,700; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

36. on an unknown date in 1996, on behalf of HAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 5 June 1996, a total of seven issues of securities from the HAS portfolio were sold, including 420 shares of SEPAP, a.s., for a selling price of CZK 1,050,000. Presumably, on the basis of that order to sell, a securities transfer agreement was concluded between HAS and HUSKY, pursuant to which the same seven issues from the HAS portfolio were sold, including the aforementioned 420 shares of SEPAP, a.s. for a price, with regard to that issue, of CZK 1,050,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

37. on an unknown date in 1996, on behalf of HAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of seven issues of securities from the HAS portfolio were sold, including 770 shares of FATRA a.s., for a selling price of CZK 1,386,000. Presumably, on the basis of that order to sell, a securities transfer agreement was concluded between HAS and HUSKY, pursuant to which seven issues from the HAS portfolio were sold, including the aforementioned 770 shares of FATRA a.s., for a price of CZK 1,386,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

38. on an unknown date in 1996, on behalf of HAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of seven issues of securities from the HAS portfolio were sold, including 660 shares of Pražská Teplárenská a.s., for a selling price of CZK 891,000. Presumably, on the basis of that order to sell, a securities transfer agreement was concluded between HAS and HUSKY, pursuant to which seven issues from the HAS portfolio were sold, including the aforementioned 660 shares of Pražská Teplárenská a.s., for a price of CZK 891,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

39. on an unknown date in 1996, on behalf of HAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of seven issues of securities from the HAS portfolio were sold, including 120 shares of CRYSTALEX a.s., for a selling price of CZK 96,000. Presumably, on the basis of that order to sell, a securities transfer agreement was concluded between HAS and HUSKY, pursuant to which seven issues from the HAS portfolio were sold, including the aforementioned 120 shares of CRYSTALEX a.s., for a price of CZK 96,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

40. on an unknown date in 1996, on behalf of HAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of seven issues of securities from the HAS portfolio were sold, including 160 shares of ISC MUZO a.s., for a selling price of CZK 146,560. Presumably, on the basis of that order to sell, a securities transfer agreement was concluded between HAS and HUSKY, pursuant to which seven issues from the HAS portfolio were sold, including the aforementioned 160 shares of ISC MUZO a.s., for a price of CZK 146,560; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

41. on 2 August 1995, on behalf of Harvardský diamantový investiční fond a.s. ("HDIAIF"), he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 4,350 shares of Biocel Paskov a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 3,036,300. Part of the price, in the amount of CZK 152,179.50, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 2,884,120.50, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIAIF,

42. on 14 August 1995, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 332 shares of Moravské Naftové Doly, a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 189,240. Part of the price, in the amount of CZK 9,502.09, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 179,737.91, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIAIF,

43. on 8 August 1995, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,333 shares of Spolana a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 818,883. Part of the price, in the amount of CZK 41,047, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 777,836, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIAIF,

44. on 4 August 1995, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 4,198 shares of SKLO UNION, akciová společnost Teplice were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 1,826,130. Part of the price, in the amount of CZK 91,526, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 1,734,604.28, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIAIF,

45. on 10 January 1996, on behalf of HDIAIF, he entered into a securities transfer

agreement with Stratton, represented by Michael Dingman, pursuant to which 2,100 shares of Česká námořní plavba a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 4,200,000. None of that amount was ever paid by Stratton,

46. on 17 October 1995, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 3,071 shares of SEPAP a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 4,928,955. He accepted a promissory note from Stratton issued under Bahamas law for this amount; this amount was never paid by Stratton to HDIAIF,

47. on 4 January 1996, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 3,440 shares of Spolana a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 3,096,000. The amount of CZK 154,800 was to be paid by Stratton in cash, while in respect of the amount of CZK 2,941,200 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIAIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

48. on 4 January 1996, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 4,060 shares of Biocel Paskov a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 5,765,200. The amount of CZK 288,260 was to be paid by Stratton in cash, while in respect of the amount of CZK 5,476,940 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIAIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

49. on 4 January 1996, on behalf of HDIAIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 2,600 shares of Moravské Naftové Doly, a.s. were transferred from the HDIAIF portfolio for an agreed transfer price of CZK 2,860,000. The amount of CZK 143,000 was to be paid by Stratton in cash, while in respect of the amount of CZK 2,717,000 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIAIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued;

the HDIAIF general ledger also records partial payments, not specified in any further detail, from Stratton in the total amount of CZK 586,060, after deduction of which the conduct described above in paragraphs 41 to 49 evidently caused HDIAMIF damage in the amount of CZK 35,337,675,

50. on an unknown date in 1996, on behalf of Harvardská diamantová společnost, a.s. ("HDIAS"), he issued a bulk order to sell, referred to as a Multiple Order Ticket to

Sell, further to which, on 5 June 1996, a total of eight issues of securities from the HDIAS portfolio were sold, including 3,000 shares of SEPAP a.s., for a selling price of CZK 4,035,000. On the basis of that order to sell, a securities transfer agreement was concluded between HDIAS, represented by the then chairman of the board of directors, JUDr. Libor Dopita, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HDIAS portfolio were sold, including the aforementioned 3,000 shares of SEPAP a.s. for CZK 4,035,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

51. on an unknown date in 1996, on behalf of HDIAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of eight issues of securities from the HDIAS portfolio were sold, including 3,800 shares of FATRA a.s., for a selling price of CZK 4,218,000. On the basis of that order to sell, a securities transfer agreement was concluded no later than 14 June 1996 between HDIAS, represented by the then chairman of the board of directors, JUDr. Libor Dopita, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HDIAS portfolio were sold, including the aforementioned 3,800 shares of FATRA a.s. for CZK 4,218,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

52. on an unknown date in 1996, on behalf of HDIAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of eight issues of securities from the portfolio were sold, including 228 shares of CRYSTALEX a.s., for a selling price of CZK 151,620. On the basis of that order to sell, a securities transfer agreement was concluded between HDIAS, represented by the then chairman of the board of directors, JUDr. Libor Dopita, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HDIAS portfolio were sold, including the aforementioned 228 shares of CRYSTALEX a.s. for CZK 151,620; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

53. on an unknown date in 1996, on behalf of HDIAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 7 June 1996, a total of eight issues of securities from the portfolio were sold, including 572 shares of ISC MUZO a.s., for a selling price of CZK 523,952. On the basis of that order to sell, a securities transfer agreement was concluded between HDIAS, represented by the then chairman of the board of directors, JUDr. Libor Dopita, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the portfolio were sold, including the aforementioned 572 shares of ISC MUZO a.s. for CZK 523,952; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

54. on an unknown date, on behalf of HDIAS, he issued a bulk order to sell, referred to as a Multiple Order Ticket to Sell, further to which, on 11 June 1996, a total of eight issues of securities from the HDIAS portfolio were sold, including 1,602 shares of

SKLO UNION, akciová společnost Teplice, for a selling price of CZK 568,710. On the basis of that order to sell, a securities transfer agreement was concluded between HDIAS, represented by the then chairman of the board of directors, JUDr. Libor Dopita, and HUSKY, represented by the director, Polakis K. Sarris, pursuant to which eight issues from the HDIAS portfolio were sold, including the aforementioned 1,602 shares of SKLO UNION, akciová společnost Teplice, for CZK 568,710; HUSKY Ltd. never paid any of the selling price of that issue or other issues transferred under that agreement,

55. on 6 October 1995, on behalf of Harvardský růstový investiční fond a.s., he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 110,382 shares of Česká námořní plavba a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 231,802,200. He accepted a promissory note from Stratton issued under Bahamas law for this amount; this amount was never paid by Stratton to HRIF,

56. on 4 January 1996, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 187,918 shares of Spolana a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 169,126,200. The amount of CZK 8,456,310 was to be paid by Stratton in cash, while in respect of the amount of CZK 160,669,890 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HRIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

57. on 4 January 1996, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael DINGMAN, pursuant to which 35,500 shares of Spolana a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 31,950,000. The amount of CZK 1,597,500 was to be paid by Stratton in cash, while in respect of the amount of CZK 30,352,500 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HRIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

58. on 4 January 1996, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael DINGMAN, pursuant to which 191,907 shares of Biocel Paskov a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 249,479,100. The amount of CZK 12,473,955 was to be paid by Stratton in cash, while in respect of the amount of CZK 237,005,145 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HRIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

59. on 14 August 1995, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 60,418 shares of Moravské Naftové Doly, a.s. were transferred from the HRIF portfolio for an agreed

transfer price of CZK 34,438,260. Part of the price, in the amount of CZK 1,171,481, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 32,716.779, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HRIF,

60. on 1 August 1995, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 93,737 shares of Moravské Chemické Závody a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 53,898,775. Of the agreed price, Stratton paid only a part in the amount of CZK 29,482,338; the difference between the agreed amount and the partial payment, i.e. CZK 24,406,437, was never paid by Stratton to HRIF,

61. on 8 August 1995, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 307,806 shares of Spolana, a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 108,039,906. Part of the price, in the amount of CZK 5,414,965.28, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 102,624.940.72, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HRIF,

62. on 4 August 1995, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 267,333 shares of SKLO UNION, akciová společnost Teplice, were transferred from the HRIF portfolio for an agreed transfer price of CZK 116,289,855. Part of the price, in the amount of CZK 5,828,453, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 110,461.401.88, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HRIF,

63. on 2 August 1995, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 284,245 shares of Biocel Paskov, a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 198,403,010. Part of the price, in the amount of CZK 9,943,968, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 188,459.041.60, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HRIF,

64. on 10 January 1996, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 305,906 shares of SEPAP a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 490,979,130. None of that amount was ever paid by Stratton,

65. on 10 January 1996, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 102,820 shares of

Česká námořní plavba a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 205,640,000. None of that amount was ever paid by Stratton,

66. on 4 January 1996, on behalf of HRIF, he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 28,595 shares of Moravské Naftové Doly, a.s. were transferred from the HRIF portfolio for an agreed transfer price of CZK 31,454,500. Part of the price in the amount of CZK 1,572,780 was to be paid by Stratton in cash, while in respect of the remaining amount of CZK 29,882,820 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HRIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued;

the HRIF general ledger also records partial payments, not specified in any further detail, from Stratton in the total amount of CZK 24,100,545, after deduction of which the conduct described above in paragraphs 55 to 66 evidently caused HRIF damage in the amount of CZK 2,214,745,621,

67. on 14 June 1996, on behalf of Harvardská finanční společnost, a.s. ("HFS"), he issued an order to sell securities, resulting in the sale of 358,672 shares of SKLO UNION, akciová společnost Teplice, without specification of the selling price. On the basis of that order to sell, on 14 June 1996 a securities transfer agreement was concluded between HFS, represented by the then chairman of the board of directors, Ing. Jiří Bednář, and HUSKY, represented by Viktor Kožený, pursuant to which four issues from the HFS portfolio were sold, including the aforementioned 358,672 shares of SKLO UNION, akciová společnost Teplice, for CZK 358,672,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

68. on an unknown date in 1996, on behalf of HFS, he issued an order to sell securities, resulting in the sale of 5,000 shares of Komerční banka a.s., without specification of the selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HRIF, represented by the then chairman of the board of directors, Ing. Jiří Bednář, and HUSKY, represented by Viktor Kožený, pursuant to which, on 6 June 1996, four issues from the HRIF portfolio were sold, including the aforementioned 5,000 shares of Komerční banka a.s. for a price of CZK 11,075,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

69. on 2 August 1995, on behalf of Harvardský dividendový investiční fond a.s. ("HDIF"), he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 326,959 shares of Biocel Paskov a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 228,217,382. Part of the price, in the amount of CZK 11,438.266.15, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 216,799,115.85, he accepted a promissory note from that company issued under

continued                                                              **46T 17/2006**

Bahamas law; this amount was never paid by Stratton to HDIF,

70. on 14 August 1995, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, registered in Cyprus, represented by Michael Dingman, pursuant to which 86,344 shares of Moravské Naftové doly, a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 49,216,080. Part of the price, in the amount of CZK 2,471,230.51, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 46,744.849.49, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIF,

71. on 1 August 1995, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 126,999 shares of Moravské Chemické Závody a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 73,024,425. Stratton paid only a part of the price, in the amount of CZK 30,855,750; the difference between the agreed amount and the partial payment, i.e. CZK 42,168,675, was never paid by Stratton to HDIF,

72. on 8 August 1995, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 490,625 shares of Spolana, a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 172,209,375. Part of the price, in the amount of CZK 8,631,142.15, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 163,578,232.85, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIF,

73. on 4 August 1995, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 572,832 shares of SKLO UNION, akciová společnost Teplice, were transferred from the HDIF portfolio for an agreed transfer price of CZK 249,181,920. Part of the price, in the amount of CZK 12,489,009.80, was paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 236,692,910.20, he accepted a promissory note from that company issued under Bahamas law; this amount was never paid by Stratton to HDIF,

74. on 10 January 1996, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 134,100 shares of Česká námořní plavba a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 268,200,000. That amount was to be paid within six months of the transfer of securities on the Stock Exchange; this amount was never paid by Stratton Ltd. to HDIF,

75. on 17 October 1995, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 405,174 shares of SEPAP a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 650,304,270. He accepted a promissory note from Stratton issued under

Bahamas law for this amount; this amount was never paid by Stratton to HDIF,

76. on 4 January 1996, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, established in Cyprus, represented by Michael Dingman, pursuant to which 34,165 shares of Spolana a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 30,748,500. The amount of CZK 1,537,425 was to be paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 29,211,075 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

77. on 4 January 1996, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 281,877 shares of Spolana a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 253,689,300. The amount of CZK 12,684,465 was to be paid by Stratton in cash, while in respect of the amount of CZK 241,004,835 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

78. on 6 October 1995, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 165,994 shares of Česká námořní plavba a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 348,587,400. He accepted a promissory note from that company issued under Bahamas law for this amount; this amount was never paid by Stratton to HDIF,

79. on 4 January 1996, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 245,098 shares of Biocel Paskov a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 318,627,400. The amount of CZK 15,931,370 was to be paid by Stratton in cash, while in respect of the amount of CZK 302,696,030 he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

80. on 4 January 1996, on behalf of HDIF, he entered into a securities transfer agreement with Stratton, represented by Michael Dingman, pursuant to which 9,273 shares of Moravské naftové doly a.s. were transferred from the HDIF portfolio for an agreed transfer price of CZK 10,200,300. The amount of CZK 500,015 was to be paid by Stratton in cash, while in respect of the remaining part of the price, in the amount of CZK 9,690,285, he accepted a promissory note from that company issued under Bahamas law; Stratton never paid to HDIF either the amount that was to be paid in cash upon transfer of the securities or the amount for which the promissory note was issued,

the HDIF general ledger also records partial payments, not specified in any further detail, from Stratton in the total amount of CZK 30,663,275, after deduction of which the conduct described above in paragraphs 69 to 80 evidently caused HDIF damage in the amount of CZK 5,732,329,008,

81. on an unknown date in 1996, on behalf of Harvardský průmyslový holding, a.s. ("HPH"), he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 4,385 shares of Biocel Paskov a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 4,385 shares of Biocel Paskov a.s., for a price of CZK 5,262,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

82. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 3,313 shares of Poštovní tiskárna cenin a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 3,313 shares of Poštovní tiskárna cenin a.s., for a price of CZK 3,313,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

83. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale of 4,501 shares of ISC MUZO a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 4,501 shares of ISC MUZO a.s., for a price of CZK 4,501,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

84. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 5,000 shares of Komerční banka a.s., without a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 5,000 shares of Komerční banka a.s., for a price of CZK 11,075,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

continued                                                                                          46T 17/2006

85. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 14,642 shares of ČEZ 2 a.s., with a specification of the limit selling price. On the basis of that order to sell, a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 14,642 shares of ČEZ 2 a.s., for a price of CZK 16,325,830; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

86. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 65,389 shares of CRYSTALEX a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 65,389 shares of CRYSTALEX a.s., for a price of CZK 52,311,200; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

87. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 100,640 shares of OSPAP a.s., without a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HDIF portfolio were sold, including the aforementioned 100,640 shares of OSPAP a.s., for a price of CZK 40,256,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

88. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 52,873 shares of Moravské Naftové Doly a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor KOŽENÝ, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 52,873 shares of Moravské Naftové Doly a.s., for a price of CZK 79,309,500; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

89. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 110,786 shares of FATRA a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH

portfolio were sold, including the aforementioned 110,786 shares of FATRA a.s., for a price of CZK 199,414,800; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

90. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 5 June 1996, of 660,960 shares of SEPAP a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožen, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 660,960 shares of SEPAP a.s., for a price of CZK 1,388,016,000; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

91. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 11 June 1996, of 518,543 shares of SKLO UNION, akciová společnost Teplice, with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožen} pursuant to which 14 issues from the HDIF portfolio were sold, including the aforementioned 518,543 shares of SKLO UNION, akciová společnost Teplice, for a price of CZK 259,271,500; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

92. on an unknown date in 1996, on behalf of HPH, he issued an order to sell securities, resulting in the sale, on 6 June 1996, of 827,864 shares of Pražská Teplárenská a.s., with a specification of the limit selling price. On the basis of that order to sell, on 6 June 1996 a securities transfer agreement was concluded between HPH, represented by the then chairwoman of the board of directors, JUDr. Marie Králiková, and HUSKY, represented by Viktor Kožený, pursuant to which 14 issues from the HPH portfolio were sold, including the aforementioned 827,864 shares of Pražská Teplárenská a.s., for a price of CZK 1,117,616,400; HUSKY never paid any of the selling price of that issue or other issues transferred under that agreement,

and thus transferred, from the portfolios of the six Harvard investment funds, the securities of leading Czech companies in a value of CZK 8,211,559,152, but for actual consideration paid in the amount of CZK 175,246,763, causing damage of CZK 8,036,312,389 to the Harvard investment funds and their successor, Harvardský průmyslový holding a.s., established in Prague,

## II. Viktor Kožen

in 1995 and 1996, both in Prague and in Nassau, Commonwealth of the Bahamas, as a person holding powers of attorney authorizing him, as the universal agent of Harvard Cupital and Consulting a.s., now in liquidation ("HCC"), decided on purchases and sales

**46T 17/2006**

of securities from the portfolios of the investment funds Harvardský dividendový investiční fond a.s., Reg. No 44269595, having its registered office at Praha 4, Ohradní 65, Harvardský růstový investiční fond, a.s., Reg. No 44268777, having its registered office at the same address, Harvardský contrariánský investiční fond, a.s., Reg. No 45312117, having its registered office at the same address, Harvardský diamantový investiční fond, a.s., Reg. No 45312125, having its registered office at the same address, Harvardský investiční fond menších společností, a.s. Reg. No 45312109, having its registered office at the same address, Harvardský arbitrážní investiční fond a.s. Reg. No 45312095, having its registered office at the same address, managed by HCC as the manager pursuant to Act No 248/1992, in such a manner that

### Partial act 93

he issued and signed, on 16 March 1995, as the "fund manager" of Harvardský růstový investiční fond a.s. ("HRIF") an order to purchase 319,815 shares of SPT TELECOM, a.s. for the HRIF portfolio for a limit price of CZK 2,710 per share; pursuant to this order, on the same day, i.e. 16 March 1995, a purchase contract was concluded between HRIF as the buyer and Zenko Trading Co., Ltd.. ("ZENKO"), as the seller, which was signed on behalf of HRIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HRIF purchases the aforementioned shares of SPT TELECOM, a.s. for a purchase price of CZK 866,698,650. He subsequently issued and signed, on 23 March 1995, as the "fund manager", an order on behalf of HRIF for the sale of 319,815 shares in SPT TELECOM, a.s. for the HRIF portfolio at a limit price CZK 2,215 per share; pursuant to this order, on the same day, i.e. 23 March 1995, a purchase contract was concluded between HRIF as the seller and ZENKO as the buyer, which was signed on behalf of HRIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HRIF sells the aforementioned number of shares of SPT TELECOM, a.s. for the selling price of CZK 708,390,225, thus causing damage of CZK 158,308,425 to HRIF,

### Partial act 94

he issued and signed, on 16 March 1995, as the "fund manager" of Harvardský dividendový investiční fond a.s. ("HDIF") an order to purchase 183,302 shares of SPT TELECOM, a.s. for the HDIF portfolio for a limit price of CZK 2,710 per share; pursuant to this order, on the same day, i.e. 16 March 1995, a purchase contract was concluded between HDIF as the buyer and ZENKO as the seller, which was signed on behalf of HDIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HDIF purchases the aforementioned shares of SPT TELECOM, a.s. for a purchase price of CZK 496,748,420. He subsequently issued and signed, on 23 March 1995, as the "fund manager", an order on behalf of HDIF for the sale of 183,302 shares in SPT TELECOM, a.s. for the HDIF portfolio at a limit price CZK 2,215 per share; pursuant to this order, on the same day, i.e. 23 March 1995, a purchase contract was concluded between HDIF as the seller and ZENKO as the buyer, which was signed on behalf of HDIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HDIF sells the aforementioned number of shares of SPT TELECOM, a.s. for the selling price of CZK 406,013,930, thus causing damage of CZK 90,734,490 to HDIF,

continued                                                         46T 17/2006

**Partial act 95**

he issued and signed, on 16 March 1995, as the "fund manager" of Harvardský diamantový investiční fond a.s. ("HDIAIF") an order to purchase 3,150 shares of SPT TELECOM, a.s. for the HDIAIF portfolio for a limit price of CZK 2,710 per share; pursuant to this order, on the same day, i.e. 16 March 1995, a purchase contract was concluded between HDIAIF as the buyer and ZENKO as the seller, which was signed on behalf of HDIAIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Širpký. Under that contract, HDIAMIF purchases the aforementioned shares of SPT TELECOM, a.s. for a purchase price of CZK 8,536,500. He subsequently issued and signed, on 23 March 1995, as the "fund manager", an order on behalf of HDIAIF for the sale of 3,150 shares in SPT TELECOM, a.s. for the HDIAIF portfolio at a limit price CZK 2,215 per share; pursuant to this order, on the same day, i.e. 23 March 1995, a purchase contract was concluded between HDIAIF as the seller and ZENKO as the buyer, which was signed on behalf of HDIAIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HDIAF sells the aforementioned number of shares of SPT TELECOM, a.s. for the selling price of CZK 6,977,250, thus causing damage of CZK 1,559,250 to HDIF,

**Partial act 96**

he issued and signed, on 16 March 1995, as the "fund manager" of Harvardský contrariánský investiční fond a.s. ("HCIF") an order to purchase 1,890 shares of SPT TELECOM, a.s. for the HCIF portfolio for a limit price of CZK 2,710 per share; pursuant to this order, on the same day, i.e. 16 March 1995, a purchase contract was concluded between HCIF as the buyer and ZENKO as the seller, which was signed on behalf of HCIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HCIF purchases the aforementioned shares of SPT TELECOM, a.s. for a purchase price of CZK 5,121,900. He subsequently issued and signed, on 23 March 1995, as the "fund manager", an order on behalf of HCIF for the sale of 1,890 shares in SPT TELECOM, a.s. for the HCIF portfolio at a limit price CZK 2,215 per share; pursuant to this order, on the same day, i.e. 23 March 1995, a purchase contract was concluded between HCIF as the seller and ZENKO as the buyer, which was signed on behalf of HCIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HCIF sells the aforementioned number of shares of SPT TELECOM, a.s. for the selling price of CZK 4,186,350, thus causing damage of CZK 935,550 to HCIF,

**Partial act 97**

he issued and signed, on 16 March 1995, as the "fund manager" of Harvardský arbitrážní investiční fond a.s. ("HAIF") an order to purchase 1,805 shares of SPT TELECOM, a.s. for the HAIF portfolio for a limit price of CZK 2,710 per share; pursuant to this order, on the same day, i.e. 16 March 1995, a purchase contract was concluded between HAIF as the buyer and ZENKO as the seller, which was signed on behalf of HAIF by Viktor Kožený and on behalf of ZENKO by Kožený's associate Juraj Široký. Under that contract, HAIF purchases the aforementioned shares of SPT TELECOM, a.s. for a purchase price of CZK 4,891,550. He subsequently issued and signed, on 23 March 1995,

as the "fund manager", an order on behalf of HAIF for the sale of 1,805 shares in SPT TELECOM, a.s. for the HAIF portfolio at a limit price CZK 2,215 per share; pursuant to this order, on the same day, i.e. 23 March 1995, a purchase contract was concluded between HAIF as the seller and ZENKO as the buyer, which was signed on behalf of HAIF by Viktor Koženy and on behalf of ZENKO by Koženy's associate Juraj Široký. Under that contract, HAIF sells the aforementioned number of shares of SPT TELECOM, a.s. for the selling price of CZK 3,998,075, thus causing damage of CZK 893,475 to HDIF,

### Partial act 98

he issued and signed, on 16 March 1995, as the "fund manager" of Harvardský investiční fond menších společností a.s. ("HIFMS") an order to purchase 499 shares of SPT TELECOM, a.s. for the HIFMS portfolio for a limit price of CZK 2,710 per share; pursuant to this order, on the same day, i.e. 16 March 1995, a purchase contract was concluded between HIFMS as the buyer and ZENKO as the seller, which was signed on behalf of HIFMS by Viktor Koženy and on behalf of ZENKO by Koženy's associate Juraj Široký. Under that contract, HIFMS purchases the aforementioned shares of SPT TELECOM, a.s. for a purchase price of CZK 1,352,290. He subsequently issued and signed, on 23 March 1995, as the "fund manager", an order on behalf of HIFMS for the sale of 499 shares in SPT TELECOM, a.s. for the HIFMS portfolio at a limit price CZK 2,215 per share; pursuant to this order, on the same day, i.e. 23 March 1995, a purchase contract was concluded between HIFMS as the seller and ZENKO as the buyer, which was signed on behalf of HIFMS by Viktor Koženy and on behalf of ZENKO by Koženy's associate Juraj Široký. Under that contract, HIFMS sells the aforementioned number of shares of SPT TELECOM, a.s. for the selling price of CZK 1,105,285, thus causing damage of CZK 247,005 to HDIF,

and, by means of the above securities transfers (numbered 93 to 98), he caused the Harvard investment funds and their successor, Harvardský průmyslový holding a.s., established in Prague, damage totalling CZK 252,678,195.

### III. Ing. Boris Vostrý, Csc.,

as the chairman of the board of directors of SKLO UNION, akciová společnost TEPLICE ("SU Teplice"), Reg. No 00012726, having its registered office at Teplice, Sklářská 450, purchased securities and immediately afterwards sold the same shares from the portfolio at a lower price, in all cases to the same person, with the intention of thereby deliberately making a loss and thus drawing from the portfolio of SU Teplice liquid securities and funds without receipt of appropriate consideration and, in individual transactions, he acted in such a manner that, with regard to the following securities:

### 99. CRYSTALEX a.s. (ISIN – CZ000508925),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 60,853 shares of CRYSTALEX for the SU Teplice portfolio for a limit price of CZK 800 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 48,682,400. He subsequently issued and signed, not later than 31 May 1996, an

order on behalf of SU Teplice to sell 60,853 shares of CRYSTALEX at a price of CZK 665 per share; pursuant to this order, on the same day, i.e. 31 May 1995, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 40,467,245, thus causing damage of CZK 8,215,155 to SU Teplice,

### 100. ČEZ 2 a.s. (ISIN – CZ0005104950)

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 10,000 shares of ČEZ 2 for the SU Teplice portfolio for a limit price of CZK 1,115 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares in ČEZ 2 for a purchase price of CZK 11,150,000. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU Teplice to sell 10,000 shares of ČEZ 2 at a price of CZK 1,000 per share; pursuant to this order, on the same day, i.e. 31 May 1995, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 10,000,000, thus causing damage of CZK 1,150,000 to SU Teplice,

### 101. FATRA a.s. (ISIN – CZ0008414256),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 52,028 shares of FATRA for the SU Teplice portfolio for a limit price of CZK 1,800 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 93,650,400. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU Teplice to sell 52,028 shares of FATRA at a price of CZK 1,140 per share; pursuant to this order, on the same day, i.e. 31 May 1995, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 59,311,920, thus causing damage of CZK 34,338,480 to SU Teplice,

### 102. ISC MUZO a.s. (ISIN – CZ0008413655),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 1,844 shares of ISC MUZO for the SU Teplice portfolio for a limit price of CZK 1,000 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 1,844,000. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU Teplice to sell 1,844 shares of ISC MUZO at a price of CZK 916 per share; pursuant to this order, on the same day, i.e. 31 May 1995, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 1,689,104, thus causing damage of CZK 154,896 to SU Teplice,

### 103. OSPAP a.s. (ISIN – CZ0005010355),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 41,184 shares of OSPAP for the SU Teplice portfolio for a limit price of CZK 1,000 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 41,184,000. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU Teplice to sell 41,184 shares of OSPAP at a price of CZK 42.30 per share; pursuant to this order, on the same day, i.e. 31 May 1996, the aforementioned

number of shares were sold, without a purchase contract, for the selling price of CZK 1,742,083.20, thus causing damage of CZK 39,441,916.80 to SU Teplice,

### 104. POŠTOVNÍ TISKÁRNA CENIN a.s. (ISIN – CZ0008439254),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 1,650 shares of POŠTOVNÍ TISKÁRNA CENIN for the SU Teplice portfolio for a limit price of CZK 1,000 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 1,650,000. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU Teplice to sell shares at a price of CZK 312 per share; pursuant to this order, on the same day, i.e. 31 May 1996, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 514,800, thus causing damage of CZK 1,135,200 to SU Teplice,

### 105. PRAŽSKÁ TEPLÁRENSKÁ a.s. (ISIN – CS0008439659),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 351,654 shares of PRAŽSKÁ TEPLÁRENSKÁ for the SU Teplice portfolio for a limit price of CZK 1,350 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 474,732,900. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU Teplice to sell 351,654 shares of PRAŽSKÁ TEPLÁRENSKÁ at a price of CZK 836 per share; pursuant to this order, on the same day, i.e. 31 May 1996, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 293,982,744, thus causing damage of CZK 180,750,156 to SU Teplice,

### 106. SEPAP a.s. (ISIN – CS0005012954),

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 286,860 shares of SEPAP for the SU Teplice portfolio for a limit price of CZK 2,100 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 602,406,000. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU TEPLICE to sell 286,860 shares of SEPAP at a price of CZK 1,385 per share; pursuant to this order, on the same day, i.e. 31 May 1996, the aforementioned number of shares were sold, without a purchase contract, for the selling price of CZK 397,301,100, thus causing damage of CZK 205,104,900 to SU Teplice,

### 107. KAUČUK a.s. (ISIN – CZ0005097659)

he issued and signed, not later than 30 May 1996, an order on behalf of SU Teplice for the purchase of 2,000 shares of KAUČUK for the SU Teplice portfolio for a limit price of CZK 1,500 per share; the transaction was executed without a purchase contract, and thus SU Teplice purchased the aforesaid number of shares for a purchase price of CZK 3,000,000. He subsequently issued and signed, not later than 31 May 1996, an order on behalf of SU TEPLICE to sell 2,000 shares of KAUČUK at a price of CZK 1,240 per share; pursuant to this order, on the same day, i.e. 31 May 1996, the aforementioned number of shares were sold, without a purchase contract, for the selling price of

continued                                                           **46T 17/2006**

CZK 2,480,000, thus causing damage of CZK 520,000 to SU Teplice,

he set the price of such transfers for the benefit of and on behalf of the SU Teplice portfolio and was aware of the fact that the result of these transfers was a loss to SU Teplice of CZK 514,034,424.74 and an unjustified advantage for other companies, in particular Harvardský průmyslový holding a.s., Reg. No 44269595 while, at the same time, he was a member of the board of directors of Harvardská finanční společnost, Reg. No 44268777, and the attacks under paragraphs 99 to 107 resulted in a loss to SU Teplice and its legal successor, Harvardský průmyslový holding a.s. v likvidaci, of CZK 514,034,424.74,

**IV. Ing. Boris Vostrý, Csc.,**

in the period from 1 February 1996 to 30 May 1996, Ing. Boris VOSTRÝ, as chairman of the board of directors only of SU Teplice, intending to take over and, by subsequent consolidation as a result of SU Teplice's integration into Harvardský průmyslový holding a.s. and by receiving publicly non-tradable shares in Daventree Ltd., registered in Cyprus, to "liquidate" the obligations of the assignees of shares from the portfolio of Harvard investment funds arising from transactions carried out by Viktor Kožený on the account of HIF and designated under numbers 1 to 92, and, simultaneously, intending to transfer liquid publicly tradable shares in the SU Teplice portfolio to other persons at a loss and without adequate consideration, gave instructions, on behalf of SU Teplice, to a securities trader, i.e. Harvardská burzovní společnost a.s. ("HBS"), having its registered office at Ohradní 65, Michle, Praha 4, to sell shares from the SU Teplice portfolio worth approximately CZK 5.6 billion in such a manner that:

**partial attack 108:**
on 25 January 1996, he signed, on behalf of Sklo Union Teplice ("SU Teplice"), an agreement with Stratton, represented by Michael Dingman, pursuant to which Stratton transferred to SU TEPLICE 193,055 shares of Moravské Naftové Doly a.s., 1,387,552 shares of Spolana a.s., and 1,241,710 shares of Biocel Paskov a.s., and, as consideration, SU Teplice assumed obligations from Stratton arising from promissory notes issued by STRATTON originally in favour of the Harvard investment funds in relation to the transactions referred to above under numbers HCIF 1 to 7,9, HIFMS 15 to 23, HAIF 28 to 32, 34, HDIAIF 41 to 44, 46 to 49, HRIF 55 to 59, 61 to 63, 66, HDIF 69 ,70,72,73,75 to 80, including the obligation to indemnify STRATTON in respect of any of the requirements associated with the above promissory notes; subsequently, on 2 February 1996, he signed a share transfer agreement between SU Teplice and the Cypriot company Harms Holdings Co. Ltd.. ("HARMS"), pursuant to which SU TEPLICE transferred to HARMS 193,055 shares of Moravské Naftové Doly a.s., 1,387,552 shares of Spolana a.s., and 1,241,710 shares of Biocel Paskov a.s., with a total market value of CZK 5,635,721,720, and, as consideration, received 54,999,999 publicly non-tradable shares of HARMS; as a result of these two transactions, SU Teplice became the holder of obligations under promissory notes in relation to Harvard investment funds controlled by the same persons, and of foreign publicly non-tradable shares, worsening its economic situation and the value of its shares; on 30 June 1996, with the same intention, Ing. Boris

continued                                                          **46T 17/2006**

Vostrý signed a contract on behalf of SU Teplice with Daventree Limited, represented by Viktor Kožený, pursuant to which SU Teplice transferred to Daventree Limited, registered in Cyprus, 9,995 shares of Union Lesní Brána a.s. at a price of CZK 10,000 per share and a total price of CZK 99,950,000, 7,707 shares of VÚSU a.s. at a price of CZK 10,000 per share and a total price of CZK 77,070,000, 11,722 shares of Union Heřmanova Huť a.s. at a price of CZK 10,000 per share and a total price of CZK 117,220,000, 9,151 shares of INTESUNION a.s. at a price of CZK 10,000 per share and a total price of CZK 91,510,000, 32,517 shares of AVIRUNION a.s. at a price of CZK 10,000 per share and a total price of CZK 325,170,000, 101,372 shares of GLAVUNION a.s. at a price of CZK 9,300 per share and a total price of CZK 942,760,000, 8,909 shares of SKLOEXPORT a.s. at a price of CZK 10,000 per share and a total price of CZK 89,090,000, 54,999,999 shares of HARMS at a price of CZK 10,000 per share and a total price of CZK 5,635,722,000, and thus shares with an aggregate price of CZK 7,378,492,000; SU Teplice also transferred to Daventree Limited obligations in the amount of approximately CZK 3.4 billion which had taken over from Stratton, HUSKY and Ral Al Khaiman, registered in Cyprus, resulting in their purposeful fulfilment by consolidation, although Daventree Limited did not hold the assets, the transfer of which gave rise to the claims and obligations; after setting off the value of the obligations transferred, with a nominal value of CZK 3.4 billion, the purchase price of the shares, at a price of CZK 7.3 billion, was settled when Daventree Limited transferred to SU Teplice 91,299,598 of its own shares at a stated nominal value of CZK 4,506,402,654.22 at a price of CZK 49.36 per share; in this way, the claims of the Harvard investment funds were consolidated, within the entity Daventree Limited, with the corresponding obligations of their debtors and the legal successors of those debtors; this resulted in the intended situation where obligations were not fulfilled by those persons whose actions had resulted in them, and therefore SU Teplice, and its legal successor Harvardský průmyslový holding a.s. v likvidaci, incurred a loss of CZK 7,378,491,720,

**wherefore: Viktor Kožený**, by his actions under paragraphs 1 to 92 and also under paragraphs 93 to 98, enriched himself and others to the detriment of another person's assets in that he misled someone and thus caused large-scale damage to another person's assets, and **Boris Vostrý**, by his actions under paragraphs 97 to 107 and also under paragraph 108, enriched himself and others to the detriment of another person's assets in that he misled someone and thus caused large-scale damage to another person's assets,

### thereby resulting in the commission

by both defendants of the crime of fraud pursuant to Section 209(1), (5)(a) of the Criminal Code, as amended by Act No 40/2009,

### and each defendant is sentenced

pursuant to Section 209(5) of the Criminal Code to imprisonment of **10 (ten) years**,

in accordance with Section 56(1)(c) of the Criminal Code they shall serve their sentence in a prison **especially guarded**.

**46T 17/2006**

Pursuant to Section 228(1) of the Code of Criminal Procedure, the defendants are **ordered** to pay compensation for damage to the victim, Harvardský průmyslový holding, a.s. – v likvidaci, Praha 4, Ohradní 65, namely:

the defendant Viktor Kožený shall pay CZK 8,289,933,074.05 and interest on account of late payment pursuant to Government Regulation No 163/2005 for the period from 13 February 2008 to 9 May 2010 in the amount of CZK 1,750,595,387.70 and thereafter until full payment, and

the defendant Ing. Boris Vostrý, CSc. shall pay CZK 7,892,526,144.74 and interest on account of late payment pursuant to Government Regulation No 163/2005 for the period from 13 February 2008 to 9 May 2010 in the amount of CZK 1,666,674,476.34 and thereafter until full payment.

### *Ratio decidendi*:

By an indictment of the prosecuting attorney of the High Prosecuting Attorney's Office in Prague dated 15 June 2006, Ref. 2 VZV 14/2001 — 4995, defendant Viktor Kožený was indicted for two crimes of fraud pursuant to Section 250(1)(4), as amended by Act No. 152/1995 Coll., and defendant Ing. Boris Vostrý was indicted for a crime of breach of trust pursuant to Section 255(1)(2)(a),(b) of the Criminal Code, as amended by Act No. 152/1995 Coll., and a crime of fraud pursuant to Section 250(1)(4) of the Criminal Code, as amended by Act No. 152/1995 Coll. They allegedly committed the crimes by the total of 110 separate acts. The indictment contains 411 sheets and comprises the 132 folder of the criminal file, each of the previous files comprising several hundred sheets numbered separately in each file – there is no overview of the file but the criminal file is estimated to comprise more than 60,000 pages before filing the indictment. The criminal file contains, as an attachment, the total of 39 boxes containing more than 400 folders with additional documentary evidence gathered during the search of other premises and land plots. In the course of the judicial proceedings, additional 13 folders with the total of over 3,000 pages were created before announcement of the judgment. The file material gathered in the preparatory proceeding is rather chaotic, some of the documentary evidence repeats even in several copies; there is also a great deal of evidence entirely irrelevant to the specific acts referred to in the indictment, and it is very time consuming to sort it out. Moreover, the proceeding is pending against Viktor Kožený and Ing. Boris Vostrý as fugitives from justice, and this is why the presiding judge dealt with this criminal case only when he had free time after he had completed the tasks arising from his appointments in the appellate boards of the Municipal Court in Prague. By way of introduction, this serves as an explanation of the unusual duration of the judicial proceeding, which exceeds four years, and also the relatively long intervals between the individual acts within the judicial proceedings. With reference to the considerable amount of the file material gathered (great part of it being rather very chaotic), in the *ratio decidendi*, the court is to only deal with such evidence which relates to the conduct described in the verdict of guilt; while the *ratio decidendi* does not deal with any other evidence (mainly documentary) although presented during the trial.

The first acts in this criminal case vis-à-vis the defendants, Viktor Kožený and Ing. Boris Vostrý, were taken on 18 September 2001 when the then examiner of the Police of the Czech Republic notified both defendants of the well-founded suspicion of their committing a crime of fraud pursuant to Section 250(1)(4) of the Criminal Code, and inquired whether they were willing to cooperate with the authorities involved in the criminal proceedings and take delivery of the notice of accusation that had been prepared.  Following the amendment of the Code of Criminal Procedure, implemented by Act No. 265/2001 Coll., on 1 February 2002, the Police Executive drafted a resolution pursuant to Section 160(1) of the Code of Criminal Procedure concerning institution of a criminal prosecution of Viktor Kožený and Ing. Boris Vostrý for a crime of fraud; however, the delivery of these resolutions to the defendants failed, although the address of their residence abroad was and still is known and the defendants communicated with the Police examiner (defendant Kožený via facsimile and defendant Vostrý in writing via his defense counsel).  Delivery of the resolutions concerning the institution of the criminal proceedings failed even via the Bahamian or Belizean judicial authorities, which were addressed by the Supreme Prosecuting Attorney's Office in Brno with requests seeking international legal assistance.  As the non-cooperation of the Bahamian and Belizean judicial authorities was attributable to the defendants' initiative, the authorities involved in the preparatory proceedings arrived at the conclusion that the defendants avoided criminal prosecution by staying abroad, and this is why it was resolved in respect of both defendants that a further proceeding would be held against them as fugitives from justice pursuant to Section 302 *et seq*. of the Code of Criminal Procedure.  Both defendants contested this procedure of the authorities involved in the preparatory proceeding via their defense counsels by filings with the Constitutional Court, with the constitutional complaint of Viktor Kožený having been rejected by resolution of the Constitutional Court of the Czech Republic dated 9 March 2004, File No. IV.ÚS 590/2003, and the proposal of Ing. Boris Vostrý having been rejected by resolution of the Constitutional Court of the Czech Republic dated 20 April 2004, File No. II. ÚS 517/2003.  As to the details of the proceeding against fugitives from justice, please refer to both resolutions of the Constitutional Court above, which rely on Articles 239 — 249 and Articles 250 —256 of File 3/125 of the Police file.

The proceeding against fugitives from justice has been pending since the commencement of the criminal prosecution of both defendants; neither of them was interrogated in this proceeding as the accused or defendant. Numerous statements given to the mass media by Viktor Kožený following the commencement of the criminal prosecution, and the content of a petition of Viktor Kožený filed with the European Court of Human Rights, a copy of which could be found on Articles 360 — 428 of folder No. 110/125 of the Police file, reveal that Viktor Kožený considered his criminal prosecution as politically motivated and commenced at the instruction of Miloš Zeman, the Prime Minister at the time.  Defendant Kožený further claimed that he was being prosecuted to corrupt his reputation in order to prevent him from being further politically active in the Czech Republic because he was a symbol of the mass coupon privatization; as early as in 1992, there were already efforts to bring him into disrepute, and, after being unjustly prosecuted in connection with the activities of the ex-communist agent Wallis, he left the country in 1994.  In his petition to the European Court of Human Rights, defendant Kožený further claimed that the conduct for which the Police accused him at the time did not (and in certain cases still does not) constitute a crime – the sale of Czech publicly tradable shares abroad for due consideration for a market price,

followed by the purchase of publicly non-tradable shares of a foreign Cypriot company not registered in the Czech Republic does not constitute fraud. Even the inability to secure a promissory note when due does not constitute fraud because the promissory notes were subsequently the subject of out-of-court settlement.

,

Also defendant Boris Vostrý does not feel guilty of any crime. On 30 April 2003, he sent an affidavit to the Czech Police, and had his signature notarized in Belize. He stated in the affidavit that in February 1996, the shares of the Czech industrial companies from the portfolio of Sklo Union Teplice were transferred to Harms Holding LTG registered in the Republic of Cyprus for a value exceeding the market value. Harms was founded as a subsidiary fully owned by Sklo Union Teplice, which was subsequently deposited to Daventree Limited, whose shares were acquired by Sklo Union Teplice as consideration, with the newly created Harvardský průmyslový holding to hold more than fifty per cent of the shares of Daventree Limited after a merger with the Harvard funds. Daventree Limited, founded as a subsidiary to invest into shares on foreign capital markets, invested in Russia, Azerbaijan etc. However, a plan to list Daventree Limited on a foreign stock exchange failed; this company could have been used to trade Czech shares on foreign markets. In order to invest into the Russian company Sidanco Daventree Limited through its fully-owned subsidiary, Daventree Resources Ltd. registered in Cyprus, in cooperation with other entities, founded Kantupan Holding Co. Ltd which acquired the forty-five-percent share in Sidanko from the Russian Federation. After several years of effort, this share was sold for more than USD 650 million, with one fourth of the collected amount being allocated to Daventree Resiurces Ltd. Daventree Limited also invested into other Russian companies; 1.83 million coupon books from the Azerbaijan privatization were bought via other Cypriot firms. These are long-term investments returnable in several years. A public tender for the sale of the assets of Harvardský obchodní holding was organized in the fall of 1997 because following the collapse of the Russian market, the value of Russian and other East European investments was on a rapid decline, the tender was announced in a statutory manner and the assets sold for the highest bid. The purchase price by HCMW fulfilled more than the original "tenfold", i.e. the amount of the public assurance given to the coupon privatization participants for a coupon book placed in the Harvard Funds. The purchase price in the tender was paid by drafts and secured by a sufficient value of pledges/mortgages and guarantees, which were further increased in the summer of 1998. After HCMW and the guarantors were unable to honor the drafts when due (as a result of their investments in Russia and Azerbaijan having been blocked), JUDr. Pacovský, the new liquidator, filed a protest due to the failure to honor the notes. Subsequently, Ing. Boris Vostrý, as the Chairman of the Board of Directors of HPH, in cooperation with JUDr. Pacovský, were negotiateing with the debtor and the guarantors, which resulted in HPH becoming the owner of all privatization coupons invested in Baku, Azerbaijan, at the acquisition value of USD 150 million. The funds acquired by Daventree Resources Ltd. by the sale of the shares owned by Kantupan in the Russian Sidanco are now owned by the HPH shareholders trust, from which the HPH shareholders, except for the companies controlled by Viktor Koženy and the persons related to him, are being paid. The HPH assets were not diverted anywhere; these were investments into foreign projects and Ing. Boris Vostrý always performed measures apt to satisfy the shareholders of HPH with their claims for the payment of the highest possible financial share.

Other statements of defendant Ing. Boris Vostrý were prepared and signed by his defense counsel JUDr. Josef Monsport and are not signed by the defendant; however in a proceeding against fugitive from justice, the defense counsel of the defendant has the same rights as the defendant. In the statement dated 13 January 2004, sent to the Czech Police, JUDr. Monsport stated on behalf of defendant Vostrý that all suspicions pertaining to the transfer of assets from a Harvard group member and Sklo Union, a.s. to the Cypriot companies, or, to be more precise, ultimately to Deventree Limited, with the aim of injuring Czech shareholders, are entirely unsubstantiated and unsupported by any evidence.  The purpose of these operations was purely rational and commercially pragmatic, i.e. to transfer the core of business to an investment company registered in a country with incomparably better tax conditions with a concurrent acquisition of a share in this company, join financial investments with a major foreign investor in a single company in such tax favorable and liberal environment with the aim of further investments or investments and transactions on the emerging Russian market or in other territories.  The transfer of the assets to the project realized together with the Stratton group of the US business person M. Dingman was communicated to the most popular periodicals in the Czech Republic, including reasons for such decision, and this is why any intent to embezzle these assets or otherwise injure the Czech shareholders in the sense of criminal law is ruled out.  The defense counsel further pointed out that two statements of criminal charges contain the calculation of damage that allegedly occurred upon by the transfer of the shares out of the portfolio of Sklo Union a.s. on 2 February 1996 to the Cypriot company Harms Holdings, in two various amounts, while the defense counsel himself calculated the value of these shares in a different amount and pointed out that the aim of operation in question was not to receive a payment for the transfer of the shares but rather to obtain the corresponding share in the company to whose portfolio or other assets the transfer was ultimately directed.  Against the transfers of its shares which served as basis for the issue of new shares corresponding to the value of the contribution, Sklo Union, a.s acquired an equity share corresponding to 11.41% of all shares of Daventree Limited, which, as the audited financial statement reveals, had at the end of 1996 the net value worth of CZK 39,222,050,920 with the share of Sklo Union, a.s. being CZK 4,475,236,000 and with certain assets continuing to be owned by Sklo Union, a.s.  This means that in the fiscal year 1996, the net value of Sklo Union, a.s. did not diminish but rather slightly raised.  The transaction with the securities of Sklo Union, a.s. carried out on 30 and 31 May 1996 could not have given rise to any damage because on 20 June 1996, there was a merger of all entities involved in the transactions described in the statement of criminal charges, with the ratio of exchange of the shares of the absorbed companies for the shares of the surviving company to the nominal value of the registered capital of the absorbed companies being 1:1, as shown in the merger agreement.  Other two parts of the statement of JUDr. Josef Monsport, acting on behalf of defendant Ing. Boris Vostrý, related to those parts of both statements of criminal charges, which indicted defendant Vostrý of a crime of fraud in connection with the organization of a tender for the sale of assets of HPH followed by the conclusion of a purchase agreement concerning these assets on 30 December 1997 with Harvard Capital Management (WORLDWIDE) owned by Viktor Kožený.  Such conduct of defendant Vostrý is not contained in the description of the deeds in the indictment and in the ruling of the judgment, and this is why the relevant parts of the statement of the defense counsel are not quoted in this place.  In the last part of his statement, the defense counsel of the defendant questioned the fact that witness Častorál was the authorized liquidator of Harvardský

průmyslový holding a.s. and pointed out that this holding's shareholders are currently being paid out of the assets collected in Trust 1 and Trust 2. Other materials submitted by JUDr. Josef Monsport on behalf of defendant Vostrý to the authorities involved in the criminal proceedings included a request for suspension of the prosecution dated 17 February 2006 and its supplement dated 9 June 2006, which were sent to the High Prosecuting Attorney's Office in Prague, and also a motion for preliminary hearing of indictment dated 6 November 2006 filed with the Municipal Court in Prague. As regards the deeds which were dealt with in the indictment and which were quoted in the verdict of guilt, the defense counsel mostly repeated or elaborated the arguments presented in the previous filings to which he also referred.

In the course of the judicial proceeding, defendant Boris Vostrý sent an E-mail to the presiding judge containing a letter specified as being drafted "in Belize on 12 September 2008", the introductory part of which contained a request that it be read out at the trial, explaining that he wanted to opine on the theretofore course of the judicial proceeding. The defendant stated that the main witness of the prosecution, Mr. Častorál, the liquidator of HPH, did not have personal experience from 1996, he merely interpreted the documents on the Police file, although he is not a court-appointed expert. The entire case is based on his unprofessional analyses; the Police gave him considerable room in the course of the investigations, although he is an amateur in economic and financial matters. The performance of Mr. Častorál in this case is a result of a long-term personal dispute with defendant Vostrý, who appealed against a court decision of 1999 that appointed Mr. Častorál the liquidator of HPH. Subsequently, the shareholders of HPH decided to quit the liquidation, the defendant intended to pay them out of the funds acquired by the subsidiary Cypriot company of HPH "Daventree Resources Ltd." from the sale of a major investment in the Russian company Sidanco. The blocking of share trades by the Securities Commission initiated by Mr. Častorál prevented these payouts; as an alternative, two trusts were set up for HPH shareholders, from which one half of the remaining shareholders of HPH were being paid out for approx. two years. Under such circumstances, when Mr. Častorál lost the right to a substantial fee as a liquidator (which could have been very profitable), he initiated commercial disputes abroad resulting in the blocking of the payouts to shareholders; by blocking these payouts, Mr. Častorál clearly injured and is still injuring the shareholders. To retaliate, Mr. Častorál filed a number of criminal complaints against the defendant and stirred up a media campaign against him in which he called him an accomplice of Kožený and an initiator of Kožený's activities and even the owner of some very valuable firms, but without giving any evidence for such claims. The defendant is unaware of any conduct that would violate the law; the entire indictment relies on an erroneous and amateurish interpretation of accounting records and other documents by Mr. Častorál, whereas the Police and the prosecuting attorney proceeded from the assumption that the consideration for the transferred assets is equal to zero, although Daventree Limited owned very valuable investments. The defendant further questions the allegations of witness Častorál at the trial on 18 April 2008 that, in fact, HPH never owned the shares of Daventree Limited because in the Cypriot register, they were registered for the non-existent, already dissolved Harvard companies and Sklo Union Teplice only after the General Meeting following the merger. The defendant claims that Mr. Častorál did not take into account that these companies were deleted only after the entry in the Commercial Register a year later. Sklo Union and five Harvard companies were dissolved without a liquidation

procedure, the legal successor being the original HPH that existed before, into which the other Harvard companies and Sklo Union were merged, and this is why nothing could have got lost and HPH always fully owned the shares of Deventree Limited, i.e. the consideration which the Harvard funds and Sklo Union were paid for their original assets. Company Goodheart changed its business name to Deventree Limited with effect as of 18 June 1996, i.e. two days before the General Meeting on the merger, and the Cypriot commercial register only registered the change later.  As of 18 June 1996, there was a securities issue and the Harvard companies and Sklo Union Teplice were registered as shareholders of Daventree Limited. This means that at the moment of the merger, the shares of Daventree Limited were the most important assets of these companies. Witness Častorál incorrectly speculates of extensive foreign activities of the defendant that allegedly took place during the time period subject to the indictment; but the defendant did not have any relation to the investments of Daventree Limited and its subsidiaries, nor was he involved in the preparations for an investment in Cyprus, Russia and any other countries.  Witness Častorál intentionally confuses this situation with the time period after 2001, when the defendant was appointed the Chief Executive Officer of Daventree Resources Ltd. of Cyprus.  To show a typical example of the economic ignorance of witness Častorál, the defendant points out that the witness estimated the assets of Harvard funds based on the 1995 sales, although sales have no relation to assets.  In his unprofessional analyses, the witness analyzes what was sold but he does not deal with what was acquired as consideration for the individual sales.  In his analyses, witness Častorál uses only two types of prices for the publicly tradable shares, i.e. the stock exchange price and RMS price, but he did not take into account that brokers of Harvardská burzovní společnost very often traded extensive share blocks for substantially higher prices.  As regards his own position, the defendant notes that he was never in the position of a co-owner or author of any strategy, let alone with criminal intents.  In 1995, he was elected the Chairman of the Board of Directors of Sklo Union Teplice, whose majority shareholder was Mr. Michael Dingman through his company Stratton, which prepared transactions and instructed the Board of Directors of Sklo Union Teplice from the position of the majority shareholder.  In November 1995, the defendant also became a director of Harvard Cupital and Consulting, but witness Častorál is incorrect in his allegations claiming that from this position, the defendant contributed to the preparation of the transformation of the funds in April 1996 and their merger in June 1996; Harvard Cupital and Consulting only had an agreement on administration of portfolio of the funds, he did not have anything in common with the preparation of the transformation and merger.  These steps were solely in the hands of the shareholders; however, the preparation was headed by Mr. Kožený who had already held major shares in Harvard funds. If witness Častorál argues that the defendant chaired the General Meetings with the transformation and merger agenda, the defendant notes that the position of the Chairman of the General Meeting is only technical because the Chairman does not adopt any decisions.  Following the transformation of the Harvard funds to regular joint-stock companies, which took place in March 1996, the HCC administration agreement with the Harvard funds expired; until then, HCC was represented solely by Mr. Kožený by virtue of a power of attorney.  The defendant notes that he was never involved in the management of the trade in the portfolio of the Harvard funds nor was he invited to take part in the transformation or merger of the funds; in fact, there was only one person in "Harvard" who was in control – Mr. Kožený.  The positions of the defendant in HCC and Sklo Union Teplice were very formal; business strategies were developed by brokers of HBS, legal advisory

services, including the drafting of all agreements, were prepared by lawyers, and the defendant did not have any reason to distrust the business and legal professionals and also Messrs. Dingman and Koženy, who designed the strategy. Both of them were very hardworking persons and maintained contacts with Government officials and industry leaders in the Czech Republic. Having signed the agreements, defendant Vostrý did not gain any personal benefit; he was merely one of many Harvard employees who were at the same time formal members of various bodies, he did not get the overall knowledge of the Harvard group of companies – he was neither an economist nor a lawyer and had to rely on professional recommendations. He only reached a higher position after being elected a director of the Board of Directors of HPH at the General Meeting on 20 June 1996, i.e. after the period that is being dealt with by the indictment, and after one more year, he was appointed the company liquidator – only this position entailed a higher level of information. Defendant Vostrý did not get access to further information until later on (after taking over the collateral in the form of Daventree Rosources and the subsidiaries of Oily Rock on account of his managerial positions), when Mr. Koženy was unable to honor the drafts, and it was only in 2001 – 2003, when he began to better understand what was happening in 1995 — 1996 and why. The activities of defendant Vostrý as the Chairman of the Board of Directors of and the liquidator of HPH are not the subject of the indictment; in spite of this fact, the major part of the evidence deals namely with activities from that period of time. None of the witnesses who were then active in the Harvard funds and Sklo Union Teplice evaluates the activities of defendant Vostrý from 1996 as illegal or suspicious. The defendant is of the opinion that the most important witnesses are foreign persons such as Mr. Dingman (Stratton), Mr. Toufic Aboukhater (Ras Al Khaimah Gas and Oil Co.), Mr. Sarris (Daventree Ltd.), and the auditors of company Grant Thorton Cyprus. These persons may clarify the condition of the assets of HPP after the transactions that are dealt with by the indictment. As regards the indictment itself, namely items 108 — 110, defendant Vostrý noted that he had only signed agreements on the purchase of shares of the Czech companies Biocel Paskov, Moravské naftové doly and Spolana from Stratton and on their sale for the same price to Harms – this did not cause any damage to Sklo Union. The agreement on transfer of the shares from Harms to Ras Al Khaimah was executed by JUDr. Resch, and the defendant was not even informed of this fact at the time of the transfer. In spite of this, he deems the ultimate consideration for the assets of Sklo Union to be reasonable – the claimant did not furnish evidence of its being unreasonable. The ultimate consideration comprised the shares of Daventree Limited, specifically, ninety one million shares corresponding to the original assets of Sklo Union. As regards the facts listed under items 99 — 107 of the indictment, defendant Vostrý notes that the transactions were carried out before the merger of Sklo Union into HPH; he is unaware of the meaning of these transactions because he did not prepare or negotiate them. At the time, he was reassured by the employees of broker company HVS and Coilco lawyers that this would not damage the shareholders of Sklo Union Teplice. HPH, as the company that allegedly gained ten millions from the contested transactions, is at the same time the legal successor of Sklo Union who allegedly suffered a 500 million loss. Ironically, the merged company HPH, as the legal successor of Sklo Union, could therefore enforce unjust enrichment against itself on behalf of the dissolved Sklo Union. To conclude, defendant Vostrý noted that since July 2001, he had been living and working in Belize, is a Belizean citizen, wanted to travel to Prague and personally defend himself against the allegations of Mr. Častorál, but in view of an international arrest warrant, he would risk being sentenced to

prison also in the transit countries, and this is why he could not leave Belize, in order not to lose the job and not to leave his dependent family without means.  Defendant Vostrý is unaware of him having committed any illegal conduct – the indictment did not contain any clear evidence demonstrating beyond controversy how the defendant violated law and whom he damaged by his activities and to what extent.  By contrast, the claimant relied on the "analyses" and "interpretations" by Mr. Častorál, and the indictment is therefore based on distorted information, half-truth and falsehood.  The activity of the HPH shareholders' trusts serves as evidence that for years the defendant did his best to protect the HPH shareholders from damage and ensure for them legitimate payouts without delays.

        In the indictment by the High Prosecuting Attorney in Prague, defendant Kožený was indicted of a crime of fraud allegedly committed by the defendant in his capacity as the authorized representative of Harvard Capital and Consulting a.s. by having transferred securities of the leading Czech companies with value exceeding eight billion Czech crowns from the portfolio of six Harvard investment funds to companies registered in Cyprus which did not provide good and valuable monetary or other consideration therefor.  In the early 1990's, defendant Kožený was a well-known and popular prominent, he presented himself to the public and in the media as the "president of Harvard funds" but no such title existed; defendant Kožený was never a member of the Board of Directors of any of the Harvard investment funds organized as joint-stock companies.  Documentary evidence reveals that all six Harvard investment funds were established by Harvard Capital and Consulting a.s.; (now Harvard Capital and Consulting, investiční společnost a.s. v likvidaci, hereinafter referred to as "HCC").  HCC was organized as a joint-stock company at a constitutive meeting on 5 October 1990, its founders being Ing. Lubomír Pužej and Ing. František Stehlík (the grandfather of Viktor Kožený), HCC, as a joint-stock company, was represented by the Board of Directors chaired from the beginning by defendant Kožený. HCC established the individual investment funds in November 1991, namely Harvardský dividendový investiční fond, a.s. and Harvardský růstový investiční fond, a.s. (on 21 November 1991) with its registered capital in the amount of CZK 100,000, Harvardský contrarianský investiční fond, a.s., Harvardský investiční fond menších společností a.s., Harvardský diamantový investiční fond, a.s. and Harvardský arbitrážní investiční fond, a.s. were established on 27 November 1991, all four with the registered capital in the amount of CZK 1,000,000.  Pursuant to the Articles of Association of the individual funds, their aim was collecting investment points from investment coupon holders, using of the same to purchase the shares of the companies privatized in the coupon privatization pursuant to Act No. 92/1991 Coll., purchases of real estate, movables or investments, and management of the so acquired assets with the aim of securing the gradual long-term improvement of shareholders´ shares in the fund capital.  The funds were organized as joint-stock companies; their main body being the General Meeting, whereas in the period between the General Meeting sessions, the fund's affairs were managed by the three-member Board of Directors, funds had also established a three-member Supervisory Board.

        At the extraordinary General Meetings which were held by all six funds on 29 and 30 April 1996, the funds' Articles of Association were amended in relation to the scope of business and business name. Harvardský dividendový investiční fond, a.s., adopted a new

business name - Harvardský průmyslový holding, a.s.; Harvardský růstový investiční fond, a.s., adopted a new business name - Harvardská finanční společnost, a.s.; and similarly, Harvardský arbitrážní investiční fond, a.s., Harvardský contrarianský investiční fond, a.s. , Harvardský diamantový investiční fond, a.s. and Harvardský investiční fond menších společností, a.s., also adopted new business names - Harvardská arbitrážní společnost, a.s., Harvardská conrarianská společnost, a.s., Harvardská diamantová společnost, a.s., and Harvardský spolek menších společností, a.s.  Such change of the business names of the investment funds, however, was not accepted in the description of the deeds in the indictment by the High Prosecuting Attorney's Office in Prague.  As regards the deeds under items I./10 — 14, I./24 — 27, I./35-40, I./51 - 54, I./67 — 68, and I./81 — 91, in June 1996, the securities transfer agreements with Husky Trading Ltd. were not executed by the individual investment funds (as abbreviated in the indictment) but rather the newly re-named companies, holding and association, and this is why the description of the deeds in the verdict of guilt related to the above-specified individual attacks of the continuing criminal activity was changed as opposed to the indictment.

The documentary evidence further revealed that shortly after being re-named, Harvardské investiční fondy finally ceased to exist upon execution of a merger agreement of 20 June 1996.  The said agreement was entered into by and among Harvardský průmyslový holding, a.s., on the one side, and Harvardská finanční společnost, a.s., Harvardská arbitrážní společnost, a.s., Harvardská contrariánská společnost, a.s., Harvardská diamantová společnost, a.s., Harvardský spolek menších společností, a.s. and Sklo Union, a.s. Teplice, on the other side, the latter being identified in the agreement as the absorbed companies; whereas these companies were wound up without liquidation procedure by means of a merger under a decision adopted at the extraordinary General Meetings.   On behalf of Harvardský průmyslový holding, a.s. (hereinafter abbreviated as "HPH"), the merger agreement was executed by JUDr. Marie Kraliková, the Chairwoman of the Board of Directors, after the merger proposal was discussed at the extraordinary General Meeting of HPH held on 20 June 1996 at 1 p.m. in Velké Bílovice.  This session of the General Meeting was chaired by Ing. Boris Vostrý; notarial record NZ 182/96 reveals that no merger agreement was executed at this extraordinary General Meeting; it only approved a draft merger agreement.  In the course of the General Meeting, a new Board of Directors of HPH was elected and the theretofore directors (including JUDr. Kraliková) were discharged.  This means that if the merger agreement was signed only after the conclusion of the General Meeting of HPH, the agreement was executed by the Chairwoman of the Board of Directors, who had been removed from her position. On behalf of Harvardská finanční společnost, a.s., the merger agreement was executed by Ing. Jiří Bednář, the Chairman of the Board of Directors, whereas a motion for the dissolution of Harvardská finanční společnost, a.s. without liquidation procedure by merger with HPH was approved at the extraordinary General Meeting of Harvardská finanční společnost, a.s. held on 19 June 1996 at 6:30 p.m. in Velké Bílovice. This General Meeting was again chaired by Ing. Boris Vostrý, who, however, did not hold any position at Harvardská finanční společnost, a.s. On behalf of Harvardská arbitrážní společnost, a.s., the merger agreement was executed by JUDr. Miroslav Štefan, the Chairman of the Board of Directors, whereas a motion for the dissolution of Harvardská arbitrážní společnost, a.s. by merger with HPH was approved at the extraordinary General Meeting of Harvardská arbitrážní společnost, a.s. held on 19 June 1996 at 4 p.m. in Velké Bílovice.  On

behalf of Harvardská contrariánská společnost, a.s., the merger agreement was executed by JUDr. Jana Sainerová, the Chairwoman of the Board of Directors, whereas a draft merger agreement was discussed at the extraordinary General Meeting Harvardská contrariánská společnost, a.s. held on 19 June 1996 at 11 a.m. in Velké Bílovice.  On behalf of Harvardská diamantová společnost, a.s., the merger agreement was executed by JUDr. Libor Dopita, the Chairman of the Board of Directors, whereas a draft merger agreement with HPH was approved at the extraordinary General Meeting of Harvardská diamantová společnost held on 19 June 1996 at 8:30 a.m. in Velké Bílovice; this particular extraordinary General Meeting was also attended by Ing. Boris Vostrý, who was introduced as a representative of the fund's administrator.  On behalf of Harvardský spolek menších společností, a.s., the merger agreement was executed by JUDr. Petr Paciorek, the Chairman of the Board of Directors, whereas a draft merger agreement was approved at the extraordinary General Meeting of Harvardský spolek menších společností, a.s. held on 19 June 1996 at 1:30 p.m. in Velké Bílovice.  The notarial records prepared by JUDr. Václava Dvořáková, Notary Public, in respect of the deliberations of the extraordinary General Meetings of all six Harvard companies, former Harvardské investiční fondy, reveal that the extraordinary General Meetings, as scheduled, were not attended by any shareholders or by shareholders with the minimum value, and this is why the General Meetings did not have a quorum.  The notarial records all contain a further note that the Articles of Association require the attendance of shareholders with the nominal value exceeding 50 per cent of the registered capital of the company for the General Meeting to constitute a quorum, and this is why in accordance with the invitation, a substitute General Meeting with an unchanged agenda would be held in thirty minutes. This means that all the extraordinary General Meetings were opened half an hour later, none of them was attended by shareholders and agents representing shares with the nominal value exceeding 50 per cent of the registered capital – although it was mostly less than 20 per cent of the registered capital, it was stated in all six notarial records that in accordance with the Articles of Association, the substitute General Meeting had a quorum regardless of the number of attending shareholders.  On behalf of Sklo Uunion, a.s. Teplice (hereinafter abbreviated as "SUT"), the agreement was executed by Ing. Boris Vostrý, the Chairman of the Board of Directors, whereas a motion to dissolve SUT without liquidation procedure by merger with HPH was discussed at the extraordinary General Meeting of SUT held on 20 June 1996 at 10 a.m. again in Velké Bílovice.  This General Meeting was attended by nine persons, whereas registered was 26 shareholders with shares representing 67.82% of the registered capital of the companies; adoption of the motion required 66.66% of the registered assets, whereas 99.97% of the registered assets, i.e. 67.81 of the total assets, voted in favor of the motion.

The documentary evidence further revealed that on 30 December 1997, a purchase agreement was concluded by and between Harvardský průmyslový holding, a.s. — v likvidaci (hereinafter "HPH"), represented by Mr. Boris Vostrý, liquidator of HPH, and Harvard Capital Management (Worldwide) limited (hereinafter "HCMW"), represented by Mr. Viktor Kožený, president. Pursuant to Article 1 of the agreement, HPH sold, assigned, transferred and delivered all its assets to HCMW and HCMW thus acquired all the assets of HPH from HPH and undertook to pay a purchase price therefor.  Pursuant to Article 2 of the agreement, the purchase price was agreed in the amount of CZK 10,558,641,879.90, whereas HCMW was to pay the purchase price by two drafts – the first one in the amount of CZK

continued

5,419,104,000 was delivered to the HPH liquidator in accordance with the agreement on 6 December 1998 as a guarantee, whereupon HCMW was involved as a bidder in a tender for the sale of the HPH assets.  The second draft in the amount of CZK 4,461,000,000 was handed over upon the conclusion of the purchase agreement; both drafts are signed by HCMW and due and payable to HPH no later than by 31 December 1999, which proves indebtedness of HCMW vis-à-vis HPH in relation to the purchase price for the entire assets of HPH. The purchase agreement was further covered by the assumption of HPH's obligations totaling CZK 678,537,879.90.  Pursuant to Article 5 of the purchase agreement, the drafts were secured by a collateral comprising 400,000,001 shares of Daventree, which were acquired by HCMW by this agreement from HPH, and a collateral comprising further 60,000,000 shares of Daventree owned by Husky.  A director of Husky Trading also signed these drafts as an aval.  As the amounts of the drafts were not paid when due, i.e. on 31 December 1999, by HCMW, or, to be more precise, by Viktor Koženy, the conclusion of a purchase agreement with a fraudulent intent was part of the description of the deeds in the indictment of both defendants, as stated in the resolutions rendered pursuant to Section 160(1) of the Code of Criminal Procedure on 1 January 2002 in respect of both defendants.  The deeds specified in the indictment of the prosecuting attorney of the High Prosecuting Attorney's Office in Prague did not include the execution of the said agreement with fraudulent intent – the indictment is based on the concept that the criminal conduct of the defendants consisting in the transfer of the assets of Harvardské investiční fondy, or, to be more precise, the Harvard companies, holding and association after 30 April 1996, and further consisting in the transfer of assets of SUT, was completed before the merger of the Harvard companies, the association of SUT with HPH on 20 June 1996.  However, the conclusion of this agreement by the HPH liquidator, Ing. Boris Vostrý, and in particular the irregular terms of the public tender announced by the liquidator before the execution of the agreement in respect of the HPH assets, which contravened the Commercial Code as amended at the time, formed the grounds for the resolution of the Regional Commercial Court in Prague, dated 5 August 1999, Ref. 54Cm 89/99-13, recalling Ing. Boris Vostrý from the position of the HPH liquidator and replacing him by doc. Ing. Zdeněk Častoral, DrSc.  Pursuant to Section 220(1) of the Code of Criminal Procedure, the court is not bound by the description of deeds in the indictment, the court is not authorized to instruct the prosecuting attorney as to which other deeds should be covered by the indictment, even where such deed is part of the accusation communicated to the defendants at the outset of their prosecution.  In the preparatory proceeding,

Prof. Ing. Zdeněk Častorál Dr.Sc. gave an extensive testimony supported by extensive documentary evidence, he even prepared various tables and graphs.  Witness Častoral testified in the preparatory proceeding during ten calendar days in October 2003, whereas his testimony was influenced by the aftermath of the disputes between the witness and the HPH representatives and directors of HPH who refused to recognize him in the position of a liquidator, refused to provide him with the relevant documents, including books of HPH, and there were numerous efforts to manipulate with the HPH assets without the knowledge and against the will of the court-appointed liquidator.  All the lawsuits between witness Častoral and the former representatives of HPH have been finally resolved in his favor and members of the Board of Directors of HPH and the Supervisory Board cooperate with prof. Častorál, so there is no need now to run into details of such lawsuits.  This is why the court merely notes

continued                                                                          **46T 17/2006**

that prof. Ing. Zdeněk Častorál, DrSc. was finally entered in the Commercial Register as the liquidator of HPH starting from 15 December 2000. Witness Častorál testified in the preparatory proceeding that Harvardské investiční fondy (hereinafter abbreviated as "HIF") profited from the first and second wave of the coupon privatization, in total, they acquired several dozen millions shares with the nominal value of CZK 100 up to CZK 1,100, corresponding to assets with the nominal value of approx. twenty billion Czech crowns.  The portfolio of the funds was virtually identical, the most extensive one being held by Harvardský investiční fond, later transformed into HPH, and Harvardský růstový investiční fond, later transformed into Harvardská finanční společnost.  Investing into the same portfolio could have only had one meaning – it was planned to merge the HIF and to gain majority in the Czech companies whose shares were being held.  The registered capital, which served as basis for the quantity of participating securities, did not change and the price per participating security of HIF was still CZK 1,000.  The registered capital did not correspond to the net worth of the company, which varied depending on the sales of securities.  No cash appears in the books of HIF for the sale of the securities of HIF; most likely, they were sold for drafts, bonds, etc. This was the way to artificially harmonize the registered capital with the net worth, and the value of participating shares did not have to be covered by the actual assets.  In fact, upon transfer by what was called "the sale of the portfolio of the individual HIF", the funds were not received by the companies but the holders of the participating shares – the shareholders – were made believe that the registered capital was covered by the value of the securities of the Czech companies. HIF were then merged according to their registered capital and without securities of the Czech companies.  The assets in the form of profitable portfolio were being transferred to Cypriot companies in 1995 - 1996 before the HIF merger; for instance, in the period between 4 June 1996 and 10 June 1996, the most profitable shares of the Czech companies in the nominal value of CZK 3,571,742,446 were transferred to Husky Trading; between 28 September 1995 and 21 March 1996, the most profitable shares in the nominal value of CZK 4,438,750,770 were transferred from HIF to Stratton Investments Company. The Cypriot companies subsequently deposited the selected shares in Daventree Ltd., whereas no direct contribution of the HIF portfolios comprising the Czech companies into Daventree Ltd. ever occurred – the companies were merged with empty portfolios, i.e. without the shares of the Czech companies. Shareholders attending the merging General Meetings were not informed of this fact; it was communicated at these General Meetings that all assets of the companies being merged (comprising the shares of the Czech companies) were contributed to Daventree Ltd., which was untrue.  Where all assets of a company in the form of securities are to be contributed, such assets must first be appraised; however, such appraisal could not be performed because the shares of the Czech companies were no longer in the companies. The contribution into Daventree Ltd. also does not correspond to the purchase agreement of 30 December 1997. He also referred to the personal affiliation of the Cypriot companies with Viktor Kožený and Boris Vostrý, and also that various Cypriot companies were represented by the same persons, namely Linda Lojza a Polakis Sarris. Orders to perform a securities transaction were given by the funds' administrator, HCC, to a securities broker by an order ticket containing a signature of the authorized signatory, usually Viktor Kožený, and due to his permanent residence outside the Czech Republic, the form was made out in a fax copy reflecting a prior advice by telephone.  Bahamian HCMW, controlled by Mr. Kožený, had agreements in place for consultation of the transfers of the securities of the Czech companies, whereas these transfers were performed mainly to the Cypriot

continued                                                                                           46T 17/2006

companies influenced by Mr. Koženy.  HCMW charged approximately three to five billion Czech crowns for these consultations.  The witness further noted that the net worth of HPH dropped below the registered capital after 1997 and was down to almost one half although in 1993, it was twice as much.

In his testimony, witness Častorál also challenged the validity of the merger agreement dated 20 June 1996 because the amount of the monitored registered capitals did not correspond to the reality, and, in some cases, registered capitals were increased but without entry of such increase in the Commercial Register.  The merger was performed 10 days before the effect of the amendment of the Commercial Code requiring a qualified approach for mergers.  Even at the time of the merger it was impossible to merge companies according to the registered capital; companies with various ratios of net worth to registered capital were being merged and if their shares were exchanged at the ratio of 1:1, shareholders of certain companies could have been damaged. Moreover, the financial statements were only prepared in the dissolving companies as at 13 May 1997, the HPH merger was entered in the Commercial Register as of 14 May 1997, and, as of the same date, the registered capital was increased from seven billion Czech crowns to CZK 16,446,840,000.  For a very long time, shareholders of the dissolved companies did not receive the HPH shares, and there was a breach of the obligation to exchange shares of the dissolved company for the shares of the legal successor without any undue delay following deletion of the absorbed company from the Commercial Register.  As a result, shareholders of the dissolved companies could not duly exercise their shareholder rights, in particular, the voting ones.  Shareholders either remained unaware of the way the transfer of the securities of the Czech companies from the HIF portfolio was carried out or they only had incomplete or distorted information. The information from the Cypriot register of companies was unavailable for a Czech shareholder; the transfers were carried out via broker, Harvardská burzovní společnost.

Witness Častorál also commented on the course of the public tender for the sale of the HPH assets that was carried out in 1997.  He described the genesis of the tender, pointed out certain errors in the procedure of the then liquidator in the announcement of the tender terms and requirements for bidders.  As to the tender outcome, he testified that all assets of HPH were sold and therefore the sale may be deemed to constitute the transfer of assets, for which, however, the former liquidator had to obtain the consent of the General Meeting.  The witness believes that the purchase agreement of 31 December 1997 could serve to conceal the fact that HPH undergoes liquidation, does not have the securities of the Czech companies nor does it have money, but what it does have is an obligation vis-à-vis the shareholders equal to the registered capital, and any other person interested in buying the HPH assets would have immediately identified this fact and exposed the transfers from the portfolio before the merger.  HPH shareholders never received the outcome of any audit of Daventree Ltd., drafts with two-year maturity replace the shares of Daventree Ltd. in the assets of HPH, thus probably creating additional time.  After the drafts of HCMW were not honored as of 31 December 1999, no foreclosure on collateral in the form of securities Daventree Ltd. took place; this company still held the remaining shares of the Czech companies and sold the same.

As to the activities of Boris Vostrý in SUT in 1995-1996, witness Častorál testified that the assets of this company were extensively and systematically moved before the shares of the

Czech companies were transferred to Harms; they were circulated.  He also pointed out that Boris Vostrý was also the manager of Harms and that the shares transferred to this company could not have been reported using the assets of SUT.  In his testimony, the witness also described the Harvard rounds as "looping rounds" concerning the shares of the Czech companies as well as the participating shares of HIF, which were carried out mainly with the participation of the Cypriot company Zenko Trading.  The rounds can be described as follows: the fund first purchased a certain number of shares to sell it afterwards for a lower price, always against the price on the publicly organized and accessible securities markets, which caused loss to the funds estimated by the witness at several billions Czech crowns.


As to the share transfers from HIF to the Cypriot companies Husky Trading and Stratton Investments, the witness further testified that they were carried out such that in the majority of the cases, the sale and purchase was brokered by Harvardská burzovní společnost. Once securities were sold, the company was to receive funds; however, the witness did not identify any such funds in the respective accounts.  He did not rule out that funds could have been transited through these accounts or that instead of funds, the company received promissory notes or bonds, which is supported by the fact that e.g. Stratton Investments subsequently sold or transferred such notes or bonds.  The analyses performed by the witness reveal that the securities transferred to Stratton were sold below cost.  As to the amendment to the Commercial Code enacted ten days after the HIF merger, the witness stated that the appraisal of assets had to be performed with the participation of two experts, whereas the contribution in Daventree Ltd. was not appraised, the companies were not merged according to the net worth but according to the registered capital, whereas the net worth differed from the registered capital. As to Daventree Ltd., the witness further testified that the Board of Directors of HPH declared at the General Meeting that the assets of HPH had been transferred in full to Daventree Ltd. This company was registered in Cyprus on 4 October 1995, its directors being Viktor Kožený and Linda Lojzou, and secretary Polakis Sarris, and the share capital amounting to GBP 800 million and CYP 1,000.  The share capital was divided as follows: 399,999,990 shares, class A, most likely tradable shares with the nominal value of GBP 1 each; 400 million shares, class B, most likely non-tradable, with the nominal value of GBP 1; and 1,000 shares, class C, most likely some administrative securities with the nominal value CYP 1 each.  Kožený's HCMW with 400,000,001 shares, class B, Stratton Investment with 237,583,640 shares, class A, Husky Trading with 81,226,322 shares, class A, Lubyn Business with 813,190,037 shares, class A, Prontoservus ltd. with 990 shares, class C, and Maninteser ltd. with 1 share, class C, were the registered shareholders of the company.  This means that Stratton and Husky probably deposited the securities of the Czech companies to Daventree Ltd.  If it was claimed that all assets of HPH were sold in the public tender later on, the assets probably comprised the shares of Daventree Ltd., which allegedly had the appraisal of its assets available and an audit of Daventree ltd. was allegedly performed; however, its outcome was unavailable.


As to the book value of the HPH assets sold in the public tender, the witness stated that the book value of these assets relied on the financial statements of HPH v likvidaci, it concerned an amount of approx. CZK 19 bn.  He described the market price of the assets sold such that according to the financial statements, the registered capital was CZK

16,466,840,000 and net worth CZK 9,856,098,000 as at 31 December 1997, whereas as at 30 October 1997, the net worth was equal to CZK 18,706,651,000.  He arrived at the conclusion that as at 30 October 1997, the net worth was higher than the registered capital and after the sale, it dropped below one half, and if the shares of Daventree Ltd (400,000,001) transferred in the tender were pledged in favor of the seller, i.e. HPH, there was no foreclosure on the collateral. The witness further pointed out a problem with the issue of the shares of HPH following the merger on 20 June 1996, whereupon the shareholders of the dissolved companies should have received (without any delays and postponements) the shares of the successor, HPH.  This did not happen until mid-1998, whereas the shares of the dissolved companies were still traded at the time, which could have caused losses. As regards the acquisition of the voting rights by the Cypriot companies, the voting rights were transferred mainly from Harvardská burzovní společnost, whereas HBS acted both as the purchaser and seller. The major part of the participating shares was also transferred from Stratton and Husky to other Cypriot companies, very often without consideration.  The question is whether these Cypriot companies acquired the participating shares legitimately and in accordance with law. These transfers took place in the period from 20 June 1996 to mid-1998 – the Cypriot companies transferred the participating shares of HPH among themselves and, in fact, did not pursue any other activity except for the exercise of the voting rights

     As to the activities of Boris Vostrý, witness Častorál further testified that from 1995, he was a director and later on the Chairman of the Board of Directors of HCC; this is the company which organized and later on managed HIF.  There are therefore reasons to believe that after Viktor Kožený left the country, Boris Vostrý assumed a certain coordination role and at the same time served on the Boards of Directors and Supervisory Boards of various Czech companies.  He also served as the CEO of foreign Cypriot companies from their incorporation (namely Harms Holding Co. Ltd., Deneb Shipping Ltd.).  Harms Holding was registered in Cyprus on 24 January 1996, with SUT being its shareholder until 30 June 1996, whereupon it transferred its shares to Daventree Ltd.  The shares of Harms were then transferred to the Slovak company Privat Slovakia Marketing, s.r.o., whereas Daventree Ltd. acted through Boris Vostrý.  This transfer generated CZK 100 million, which is now blocked by the Police. As to the sale of the securities of the Czech companies, the witness repeated that the funds from these transactions did not arrive at the HPH accounts, which would mean that at the time of the merger, the absorbed companies did not have the shares of the Czech companies nor the funds for them, and they could not have even had the non-tradable shares of Daventree Ltd. because they had not yet been issued by Daventree Ltd.

     Witness Častorál was examined at the trial four times in total; the first time in the first main hearing held on 12 February 2008. At that hearing, the witness stated that the underlying documents for the accounting analyses that served as basis for his testimony comprised mainly deposits of Bankovní dům Skala, in whose books all share transfers were recorded, whereas the transfers were carried out via the Securities Center.  He was also allowed to inspect the documents seized by the Police in 2001 during the search of other premises at Ohradní ul. in Prague 4; in 2004, he received a portion of the books of HPH.  The witness then stated that the deeds as described in the indictment precisely correspond to his findings and he reiterated that after the securities of the Czech companies were transferred from the HIF portfolio to the Cypriot companies Stratton and Husky, no funds were received by HIF,

continued

and, at the time of the HIF merger (on 20 June 1996), they were without any security of the Czech companies. The deeds under items 93-98 of the indictment are identified by the witness as "looping rounds", and the Cypriot company Zenko was referred to by him as an allegedly private company of Mr. Kožený. According to the witness, the category of the "looping rounds" also included the deeds specified under items 99-107 of the indictment, where all purchases and subsequent sales of the securities for a lower price were carried out in two days and the damage caused to SUT exceeded CZK 500 million. The deeds under items 108-110 of the indictment are characterized by the witness as a more complex looping round with the participation of several Cypriot companies; the witness further stated that the securities of the Czech companies were transferred to Cypriot companies, mainly Stratton, Husky, but also Zenko, whereas Stratton and Husky subsequently deposited them to Daventree Ltd.; however HIF never directly deposited the shares to Daventree Ltd.   As to details, the witness further referred to his testimonies in the preparatory proceeding, which were read out *per analogium* in the presence of the witness pursuant to Section 207(2) of the Code of Criminal Procedure, and the witness responded to additional inquiries arising from the text being read out or the witness himself supplemented the text by a comment.  The *ratio decidendi* will not further contain the statements of witness Častorál impertinent to the deeds specified in the verdict of guilt. As regards the testimony given by the witness on the first day of the trial, it is worth mentioning that he stated that HIF were subject to the Ministry of Finance, inspections were carried out two to three times a year, and the funds were transformed into the joint-stock companies in April 1996 also in order to avoid such inspections.

At the main hearing held on 18 April 2008, witness Častorál presented graphs and tables to support his claims related to the individual deeds listed in the indictment.  When describing the graphs, the witness only commented what arises from the description of the deeds in the verdict of guilt, as regards the deeds under items 1-107, it is unnecessary to repeat these comments in the *ratio decidendi*.  As regards the deeds under items 108-110 of the indictment, witness Častorál stated in his testimony at the trial that the securities of Moravské naftové doly, Biocel Paskov and Spolana Neratovice were transferred to SUT in the period from 25 January 1996 to the beginning of February 1996; at the beginning of February, SUT transferred the same securities to Harms, on the same day, Harms transferred them to Ras AI Khaimah Ltd., which sold the securities of Spolana Neratovice via Harvardská burzovní společnost, the securities of Biocel Paskov were transferred back to Harvard, and the securities of Moravské naftové doly were deposited to the Cypriot company Daventree Ltd. This meant that the Harvard companies got back the securities of Biocel Paskov but they moved them to SUT and it was not until later on, 30 May, that SUT transferred them to Stratton and Stratton deposited them to Daventree Ltd.  The securities of Moravské naftové doly and Biocel Paskov were then sold by Daventree Ltd. on the stock exchange.  HIF did have certain assets, comprising the securities of creditworthy Czech companies, whereas these securities were transferred to Stratton, Stratton transferred the same to SUT for CZK 5.6 bn, but their actual market price was half of that price, i.e. CZK 2.8 bn; at the same time, obligations were transferred to SUT in the amount of CZK 5.6 bn, i.e. SUT suffered an immediate loss of CZK 2.8 bn. SUT then transferred the shares to Harms and Harms transferred these and its shares back to SUT, whereas the performing securities were not retained by Harms but transferred further on to Ras Al Khaimah for them to be immediately transferred to other companies. It is an extensive looping round – from the Harvard companies

via Stratton, SUT, Harms and Ras Al Khaimah, the securities return to Harvard, thus generating the loss of CZK 234 million.  The last individual attack No. 110 in fact comprised the transfers of individual securities to Daventree Ltd. in the total value exceeding seven billion Czech crowns.  Later on, the securities were quasi-pledged in favor of HPH but in fact, they were endorsed to the Cypriot company Daventree Resources Cyprus whereupon they were transferred to the company in Belize with the same name, Daventree Resources.  The witness further referred to the tables to summarize the organization of the six Harvard Investment Funds which acquired the performing shares of the Czech companies through the coupon privatization, which shares were then transferred to Husky, Stratton or certain other companies, such as Zenko, and only these companies deposited them to Daventree Ltd. – none of the Harvard companies deposited the securities to Daventree Ltd., and when the purchase agreement was executed in relation to the sale of the entire assets of HCMW on 30 December 1997, it did not concern the securities of the solvent Czech companies but rather the certificates in the name of the Harvard companies, which had been deleted from the Commercial Register for a year and half and did not exist.  This purchase agreement entailed the reduction of the price of HPH (in accounting terms) from twenty billion to one half, i.e. ten billion.  The drafts with the value of these ten billion were never honored.  The books of account of Daventree Ltd. and other Cypriot companies were kept in the Czech Republic and form part of the materials secured during the search at Ohradní ul.  HIF and SUT simply sold solvent securities to Cypriot companies, mainly Husky and Stratton, but no money were received for these securities – there must have been some intermediate stage, and instead, non-tradable shares of Daventree Ltd. appeared; but nobody saw them and they are only referred to in the purchase agreement which identifies them as certificates in the names of the Harvard companies (dissolved a year and half earlier).  The originals of the pledge agreements related to the purchase agreement of 30 December 1997 are still unavailable and the alleged collateral was not probably collateral at all.  When the witness tried to join certain proceeding before an Azerbaijan court, Mr. Boris Vostrý claimed that Azerbaijan coupons were never part of HPH; the same happened to the collaterals of SUT and VÚSU, which were endorsed to Daventree Resources Cyprus and subsequently to Daventree Resources in Belize.  The funds from the pledgor, i.e. Daventree Resources, did not arrive, although Boris Vostrý claimed that there were funds in the amount of USD 117 million.  Funds in the amount of USD 52 briefly appeared there (on 24 April 2002), and there was an attempt to move these funds on to trusts organized in 2002 but this transfer was not approved by the National Bank of Cyprus and the funds were returned to Daventree Resources Cyprus, and, virtually on the same day, certain amounts were transferred to Druhá strategická and a portion of it was sent to the trusts and partially also to Luxembourg, to Luxembourg funds; the transfers were carried out from the client accounts of Christina Sarris, a daughter of Polakis Sarris, the Cypriot lawyer, who was involved, on a long-term basis, in the set up of off-shore companies for Mr. Koženy and Mr. Boris Vostrý.  A portion of the funds was transferred to Slovakia via Ľudová banka and was divided into cash and securities placed in Slovak companies. When the funds from the sale of the portion of Sidanco company were to pass on to HPH, or, to be more precise, to Daventree Resources Cyprus, which was the 100 per cent shareholder of HPH, Mr. Boris Vostrý organized a new company, Clermont, in Belize, and Daventree Resources in Belize, and these companies were used to deposit certain funds in the Luxembourg funds Sica.  The witness further claimed that a portion of the funds was transferred via Ras Al Khaimah to trusts, of which some were divided among shareholders who registered themselves.  The funds

generated from the foreclosure on collaterals were transferred via Daventree Resources Cyprus to Daventree Resources in Belize and then dispersed worldwide. The witness believed that the relationship of Viktor Kožený and Ing. Boris Vostrý was a very close one, the ideas of trusts were co-authored by them.

At the main hearing held on 28 May 2008, witness doc. Častorál responded to the supplementing inquiries of the prosecuting attorney; he basically repeated his statements and allegations made in his previous testimonies. Only the following facts in his statement were new: the Harvard companies were merged on 20 June 1996, i.e. when Daventree Ltd. did not exist under this name (it did not have this name until 27 June 1996). Around the end of June 1996, shares of class B of Daventree Ltd. were issued as the second half. Not only were these shares non-tradable but they also lacked voting rights; although HPH held one half plus one of these shares, it could not have influenced any activities in Daventree Ltd. There is no document demonstrating that the Harvard companies purchased these shares, what they purchased them for or what they exchanged them for; by contrast, it is stated in the purchase agreement of 30 January 1997 that the Harvard companies held certain number of shares of Daventree Ltd. in the form of share certificates. But nobody saw these shares and there is a question as to how they got to those Harvard companies which had been dissolved. The witness further stated that they now took over Daventree Resources Kypr, a subsidiary of HPH v likvidaci, and found out that the company did not have the assets declared earlier on, and that at the time of takeover, the company was empty and indebted, and, based on bank records from Cyprus, it is possible to reliably claim that Mr. Boris Vostrý did not transfer the funds that he received from the sale of Sidanco to Daventree Resources Kypr, although this company was the lawful owner of HPH, the 100 per cent shareholder of Daventree Resources Kypr. Company Kantupan, one fourth of which was owned by Daventree Resources Kypr, was not founded until the last days of 1996 and did not acquire the shares of Sidanco until early 1997; this means that if Daventree Resources was owned by Daventree Ltd., it was there without the shares of Sidanco because it acquired them later on. Kantupan sold 5% shares of Sidanco in December 1997 for USD 299 million, although it acquired 45% of shares of Sidanco; had Mr. Vostrý initiated the sale of the entire block of shares, as early as in December 1997, he could have fully satisfied all shareholders and it would not have been necessary to enter into the agreement on the sale of all assets of HPH.

At this main hearing, witness Častorál further replied to the inquiries of JUDr. Martin Korbař, the defense counsel of defendant Kožený. When asked by the defense counsel, he expressly stated that in 1995 and 1996, he was inactive in the Harvard funds, and was not even their shareholder; he did not deal with them in detail until he was appointed their liquidator. He does not have any other information but the information that arises from the documents contained in the criminal file, and that he passed all documents that are available to him to the authorities involved in the criminal proceedings.

At the main hearing held on 16 June 2008, witness Častorál then responded to inquiries of JUDr. Josef Monsport, defense counsel of defendant Ing. Boris Vostrý. Pursuant to Article 5 of the merger agreement dated 20 June 1996, the registered capital of the surviving company, i.e. HPH, exceeded CZK 17 bn, following increase by the registered capital of the other six merged companies, the registered capital of the merged HPH should

have been equal to CZK 16,466,840,000.  When asked by the defense counsel in respect of the assets of the merged companies, witness Častorál stated that according to the Police file, there should have been certain securities of HCC in all six merged Harvard companies the total amount of which exceeded seven billion Czech crowns; however, the registered capital of HCC was CZK 80 million and net worth CZK 252 million; the annual report shows, however, that no such securities were registered – logically, the company with the net worth of CZK 252 million, could not have had securities valued at CZK 7 billion.  This being said, HCC is a company that organized all six HIF, with Boris Vostrý being one of the executives of HCC, first in the position of a director and later the Chairman of the Board of Directors. Harvardský dividendový investiční fond also held certain securities of Stratton Popper valued at approx. CZK two billion (even this market price was not ascertained), this value of the securities was not entered in the books and this is why the witness arrived at the conclusion that they lacked value.  If these securities were exchanged, they would have had to be entered in the books anyway, there would have had to be some contract (this concerns the securities of Stratton Papper and HCC).  As of the merger date, the assets of SUT (according to Article 5 of the merger agreement) amounted to CZK 4,453,090,000; when asked by the defense counsel in relation to these assets, witness Častorál referred to his testimonies given earlier on, adding that they allegedly comprised the shares of Harms and that there could also be some minor assets, namely immovable property in Teplice.  In relation to the purchase agreement of 30 December 1997, witness doc. Častorál repeated that at that time, the assets of HPH allegedly comprised the certificates of Daventree Ltd. in the name of the Harvard companies that had been dissolved more than 1.5 year before that.  However, neither the witness nor any other person ever saw these certificates; allegedly, they were deposited with some law firm in Switzerland but if they were not entered in the books, no accounting records could have been made in relation to them.  Also, there is no license of the Czech National Bank required by the foreign exchange act for the certificates of Daventree Ltd. to be passed on to a Harvard companies.


As to the additional inquiries of defense counsel JUDr. Monsport, witness Častorál repeated the claims from the testimonies he gave earlier on or referred to the contents of his earlier testimonies. The inquiries related to the facts occurring in 1997 and further on, they were not directly related to the deeds subject to the indictment, and this is why the *ratio decidendi* of this judgment does not need to deal with the additional inquiries of the defense counsels and the answers of the witness in detail.  As regards the inquiries of the defense counsel concerning the claimed compensation for the damage caused by the deeds listed under items 99-107 of the guilt of verdict, the witness admitted that there was no evidence to prove that payments were actually made for the transactions among SUT, Harvardská finanční společnost and HPH; there were no direct payments in the Harvard companies – rather than that, they performed set-offs either towards the end of the particular year or as of certain date. These set-offs are traceable from the expert opinion; the experts were provided with the books of the Harvard companies and the foreign Cypriot companies.  These deeds damaged SUT, while Harvardská finanční společnost and HPH received favorable treatment; however, the so acquired assets were diverted through other Harvard looping rounds.  When asked by defense counsel JUDr. Monsport in relation to the entitlement for compensation for damage vis-à-vis Viktor Kožený, the witness justified the claim by stating that in 1995 and 1996, the assets of

HIF in the form of securities were transferred to the Cypriot companies Stratton and Husky, which subsequently entered Daventree Ltd., i.e. the company at the time controlled by Boris Vostrý, whereas Daventree Ltd. pretended to deposit the securities in the Harvard companies.  In mid-1997, Stratton was fully taken over by Viktor Kožen후 after Mr. Dingman had stepped down from this company; Husky was also under the control of Mr. Kožený, and Zenko was a private company of Mr. Kožený.  The witness, as the liquidator of HPH, has not received the full books of account from 1996 and 1997; these books have not been reconstructed yet, it is a gradual process; what he does have are the main books and ledgers and this is why he may claim for certain that no payments have been made for the securities transfers performed in 1995 and 1996.  As regards claims, the notes used to pay for the assets of HPH under the purchase agreement of 30 December 1997 and the interest on the notes is the only thing that the witness can presently include in the books of HPH v likvidaci.

Other witnesses heard in this proceeding included the Czech shareholders of HPH, who were identified in the indictment as minor shareholders.  They held shares of HPH or shares of the earlier HIF, who subsequently filed a criminal complaint because they felt injured by the way the representatives of HPH managed the assets of this company.  JUDr. Ing. Miroslav Máslo (who and whose spouse own over 8 thousand shares together) probably held the largest quantity of shares when compared to the other "minor shareholders" and claimed them to be valued at approx. CZK 6 million; when calculating this value, the witness relied on the minutes of the General Meeting of HPH, revealing that in 1997, HPH owned assets valued at CZK 10 bn.  Witness Máslo did not file any criminal complaint against defendant Viktor Kožený or defendant Ing. Boris Vostrý; he felt injured by the conduct of the representatives of HPH, who refused to respect the resolution of the Regional Commercial Court, which appointed doc. Častorál the liquidator of HPH with effect as of 15 December 2000; the witness claims that these representatives of HPH illegitimately keep withholding his assets in spite of the fact that following the negotiations with Ing. Ševčík, the witness and his wife, as trust shareholders, received approx. CZK 1.5 million in 2003.  The witness explained at the trial that he would have been stupid not to accept CZK 1.5 million, and sought CZK 6 million.  From 1995 to 2000, the witness kept buying the shares of HPH; as to the deeds specified in the verdict of guilt, witness Máslo did not provide any relevant details.

Witness Milan Husník, a director of the current Board of Directors of HPH, on which he has been serving since 2003, filed a criminal complaint on 26 May 2000 (originally in the written form) vis-à-vis Ing. Boris Vostrý, Csc. and other persons at the time serving on the Board of Directors of HPH, Ing. Jiří Bednář, Ing. Lubomír Pužej, Ing. Pavel Gromus, Ing. Alena Kalinová, JUDr. Eva Pužejová, JUDr. Michal Pacovský; he stated in the course of his testimony in the preparatory proceeding that the shareholders of HPH were injured by the conduct of persons that created mafia.  The witness specifically pointed out defendants Kožený and Vostrý and other persons serving on the bodies of HPH, dr. Pacovský, Mr. Klimeš, Mr. Nový, dr. Sainerová, Tomáš Ševčík, Mr. Ziegler, dr. Maňak, dr. Kralik etc. Witness Husník is the owner of 67,000 shares of HPH, which he started to buy before the merger HIF into HPH; he purchased the shares gradually for lower prices in the following years.  According to the witness' estimates, before the merger, the shares of HIF were valued at CZK 1,200 up to 1,400 per share; as a trust shareholder, the witness received USD 40,000, which is CZK 200 per share.  The witness claimed that the assets of HPH were diverted by the

continued                                                                                    46T 17/2006

above-specified persons, and transferred to companies abroad; the trusts were organized by
Ing. Ševčík and Ing. Vostrý in order for the assets HPH to be diverted through them from the
reach of the court-appointed liquidator, doc. Častorál; trust shareholders only received
payments from the smaller part of the so diverted assets, this was just a fraction of the original
value of the assets of HIF and HPH.  The witness believes that there are still other assets of
HPH abroad, which were transferred to various accounts and companies; the current
liquidator has monitored it.  Witness Milan Husník attended the General Meetings when Ing.
Boris Vostrý was still the liquidator of HPH and chaired some sessions of the General
Meeting; at these sessions, defendant Vostrý refused to answer the inquiries of the
shareholders related to the assets and financial management of HPH claiming that this was
business secret not disclosable to shareholders.  It was discussed at the General Meetings that
all assets of HPH were transferred to Daventree; however, no details were given as to which
specific assets were concerned; also, as regards Daventree, no further information was
provided although the shareholders asked for it.  The witness believes that defendants Viktor
Kožený and Ing. Boris Vostrý could not have diverted the assets from HPH on their own; they
needed the assistance of other persons whom they bought, but the witness never witnessed
any corruption in relation to the defendants nor was he ever informed of any specific corrupt
conduct.  As regards the time and method of the merger of HIF into HPH in 1996 and the sale
of the assets of HPH to a company of Viktor Kožený in 1997, in his testimonies, witness
Husník provided information that is identical with or similar to the information given in the
documents referred to above and in the witness statement of doc. Častorál.  When being
examined at the trial, the witness stated that he obtained that information at meetings with
other minor shareholders, from the minutes of the General Meeting sessions, or from the
press. With a view to the fact that the representatives of HPH refused to provide minor
shareholders with information and treated them with disdain, the shareholders suspected that
the assets were being diverted, and this is why they organized "Sdružení 600" (referring to the
nominal value per share then declared), they exchanged information at meetings of this
association, obtained a great deal of information from Mr. Matějka who assisted them at first
but later started to work for Viktor Kožený.  However, as to the deeds listed in the verdict of
guilt, witness Milan Husník did not give any decisive facts in his testimonies or written
materials provided to the Police to accompany the criminal complaint.

    Václav Stehlík, Bohuslav Dvořák, Jaroslav Šír, František Vagnecht and Václav Charvát
are other witnesses who owned or still own a significant volume of shares of HPH and feel
injured because they were not paid the funds promised in the advertising campaign for the
coupon privatization or whose shares were depreciated by the sale of the assets of HPH to
Viktor Kožený in 1997 for half of the value as opposed to the value declared. When
examined, these witnesses provided information that they learned at the General Meetings
which they attended as shareholders, or information published in the press; as to the deeds
listed in the verdict of guilt, no facts were provided by them.

    The Board of Directors of HPH is currently chaired by witness Karel Staněk, the ex-
Chairman of OSMA (Protective Association of Minor Shareholders).  The witness stated that
OSMA was not intended only for the shareholders of the Harvard funds but rather for
shareholders in general; however, later on, it was focused on the activities of the Harvard
funds.  The witness was not a shareholder of HPH; at the beginning, in 1998, he attended the

General Meeting sessions of HPH as an agent of certain shareholders; later on, in 2000, he himself acquired some shares in order to be able to attend the General Meeting. In the preparatory proceeding, he provided a detailed testimony on the activities of the Board of Directors of HPH, which made it hard in 2001-2004 for prof. Častorál to act as the liquidator and which diverted the assets of HPH from his reach; the witness opined on the circumstances of the public tender, followed in 1997 by the sale of the assets of HPH to HCMW owned by Viktor Kožený. The witness further described the method of treatment of the assets of Daventree Resources Kypr, to which the share of Kantupan (in the amount of one quarter) acquired from the sale of the shares of the Russian oil company Sidanco was allegedly transferred. The witness testified to this end that these assets were never deposited to HPH; the only assets that HPH currently owns comprise approx. CZK 7 million in cash. The witness claimed that organization of the trusts from which certain minor shareholders of HPH were paid out as trust shareholders served to divert assets of HPH, circumvented Czech law, and, as the witness stated at the trial, the trusts are only empty shells today. As to the deeds listed in the verdict of guilt, witness Karel Staněk stated in the preparatory proceeding that OSMA found out that in the period from 1995 to 1996, assets were diverted from certain funds, which means that these funds were de facto empty before the merger. To illustrate how these assets were diverted, the witness stated that in 1996, the shares of the Czech companies were transferred from HIF to Husky Trading for approx. CZK 3.5 million, to Stratton for approx. CZK 4.5 million, whereupon Husky and Stratton deposited the shares to Daventree Ltd. This means that the shares of the Czech companies could not have been deposited to Daventree Ltd. as late as after the merger of these investment funds into HPH, as publicly declared by Boris Vostrý in 1998. Moreover, during the merger into HPH, the assets of HIF were not appraised (although they should have been) because they were not there. Another example of the misappropriation of the assets of HIF is the fact that Kožený's HCMW acted as consultant in relation to these transfers, for which consultations it charged at least three billion Czech crowns. Moreover, in 1995-1997, the transfers to Kožený's companies were carried out without consideration, and since no sufficient financial control was performed at HPH, it is possible that they entailed extensive tax evasion. For the transfers of securities to Husky and Stratton, HIF could have received either drafts or worthless shares. At the trial, the witness illustrated the diverting of HIF assets in 1995-1996 by using an example of the sale of shares of Telecom: Cypriot Zenko on the one part and six Harvard investment funds on the other part; the trade concerned Telecom shares. The trade on the part of the Harvard funds was controlled by Mr. Kožený, the trade on the part of Zenko was controlled by Juraj Široký, K+V's right hand in Slovakia. On the last day of March 1995, Zenko sold approx. 320,000 shares of Telecom to one of the Harvard investment funds, most likely HRF, the price per share being CZK 2,700; this took place on 31 March, whereas on 3 April, Harvardský růstový fond sold the same block of shares back to Zenko for CZK 2,200 per share. This means that the price per share was by CZK 500 lower, whereupon Harvardský růstový fond lost approx. CZK 160 million. On 4 April, other five investment funds carried out exactly the same operation – they bought Telecom shares from Zenko, two days later they sold them back and repurchased the same for CZK 2,700 and sold for CZK 2,200 per share. By these twelve trades, the Harvard holding and its shareholders were deprived of quarter billion Czech crowns. This is how the assets HPH were treated, this is how the assets of all 53 profitable and solvent companies whose shares were placed under the administration of the Harvard investment funds were treated. Messrs. Kožený and Vostrý treated the assets as their own and

continued                                                              **46T 17/2006**

the shareholders still have nothing. As to Viktor Kožený, the witness added that when entering into the agreement on the purchase of assets of HPH on 30 December 1997, he intended never to pay for the assets, whereas he used as a guarantee the assets of Daventree Ltd., which he owned with Mr. Dingman at the time; however, Kožený held more than one half so he used his property as a guarantee. In his testimony in the preparatory proceeding, witness Staněk further stated that Viktor Kožený was not number one in the entire Harvard case but rather a "white horse" of a group of ex-secret police members who designed and carried out the entire Harvard project. During his testimony at the trial, witness Staněk further clarified this allegation and explained the underlying documents and facts that served as basis for this statement. The testimony of Mr. Staněk does not show that he would draw his knowledge of the "misappropriation" of the Harvard funds in 1995-1996 from doc. Častorál; in the preparatory proceeding, witness Staněk testified that when filing a criminal complaint, he did not consult its contents with doc. Častorál but only informed him of the filing, whereas at the trial, witness Staněk stated that he had devoted ten years to study the documents related to the Harvard funds and that he learned the presented facts at the General Meeting sessions and also from public sources and other documents that he obtained.

In the preparatory proceeding and at the trial, directors and members of the Supervisory Boards of HIF and SUT, and directors and other statutory representatives of HPH serving on the board after HIF and SUT were merged into it, and also directors and statutory representatives of other companies that were part of the Harvard group and were involved in its activities, were further heard. The vast majority of these testimonies do not relate to the deeds from 1995 and 1996, which are listed in the verdict of guilt, and, if no criminal prosecution is instituted against these other persons, the court lacks jurisdiction to examine any potential criminal liability of these other persons for their cooperation and loyalty allowing Viktor Kožený and Ing. Boris Vostrý to divert the assets of HPH to foreign companies and to prevent prof. Častorál, court-appointed liquidator, from reaching these assets. This is why the court is not to further deal with detailed contents of all other testimonies but is to only focus on the testimonies of those witnesses who represented the individual HIF and SUT in 1995 and 1996 or who served on their bodies, or on the testimonies of the witnesses who should or may be reasonably believed to know something about the securities trades dealt with in the indictment.

The agreement of 14 June 1996, which is mentioned among the deeds listed under items I./10-14 of the verdict of guilt, was concluded on behalf of Harvardská contrariánská společnost, a.s. by JUDr. Jana Sainerová, who also acted on behalf of this company when concluding the merger agreement of 20 June 1996. In the preparatory proceeding, witness Sainerová testified that she had served on the Harvard companies since 1991, from 1991 to 1996, she worked for COILCO, which provided legal advisory services to the Harvard companies. She was the Chairwoman of the Board of Directors of Harvardský contrariánský investiční fond (hereinafter "HCIF") from when it was organized, i.e. from 1992, until it was transformed into Harvardská contrariánská společnost. In later years, the witness also held various positions at various Harvard companies, virtually until she was examined during the preparatory proceeding on 10 February 2005. When asked about the HCIF portfolio and the value of its shares, she basically only referred to the 1996 annual report. As to the inquiries concerning the securities trades, the witness vaguely stated that these trades were carried out

by service companies, professionals and specialists whom she trusted. The witness admitted that on 31 January 1996, she granted a power of attorney to Viktor Kožený to trade in the securities from the HCIF portfolio; she also admitted that she executed the agreement of 14 June 2006 but was unable to provide further details of this agreement; she only stated that she did not attend any meeting concerning the share trades.  The witness also did not provide any facts of other agreements that were executed on behalf of HCIF (or Harvardská contrariánská společnost) when she served as the Chairwoman of the board, which she either signed or which contained a note that she was the representative of HCIF. As to all specific questions relating to the securities trading strategy, grounds for execution of the individual agreements and whether the transferred shares were paid for, the witness replied either "I do not know" or "I do not remember", when asked about the financial management of HCIF and Harvardská contrariánská  společnost, the witness referred to the respective audits. The testimony of witness Sainerová at the trial was similarly vague; she pointed out that the securities trades were carried out by Harvardská burzovní společnost and the fund's Board of Directors was informed of these trades by the representatives of this company, Ing. Wendelová and JUDr. Pužej. The witness was not at all willing to accept the fact that Harvardská burzovní společnost was not the owner of the securities traded, she was not authorized to decide whom and for what price the securities would be sold – this was subject to a decision of the contracting parties; as required by law, Harvardská burzovní společnost carried out the trades only technically and coordinated the stock exchange that intermediated these trades.  When asked whether she knew any Cypriot companies, witness JUDr. Sainerová stated at the trial that due to lapse of time, she no longer remembered their names and claimed that she did not learned of the existence of these companies until after 1999, when she was a member of the Supervisory Board and registered them as shareholders of HPH; however, JUDr. Sainerová executed at least the agreement of 14 June 1996 with the Cypriot Husky Trading, and her name, as the representative of HCIF or Harvardská contrariánská společnost, is stated even on other agreements concluded before 20 June 1996 with other Cypriot companies. As regards the General Meetings of HIF, witness JUDr. Sainerová testified that they were first held separately, only later on did they hold joint General Meetings where they were informed of the securities trading strategy, whereas this information was provided at the joint General Meetings also by Viktor Kožený.

Other officers of HCIF heard in the preparatory proceeding included JUDr. Jaroslav Oehm, a director, whereas his testimony from the preparatory proceeding was read out at the trial upon the consent of the parties; JUDr. Jan Josl, CSc, the Chairman of the Supervisory Board, and Ing. Stanislav Holejšovský, a member of the Supervisory Board, were heard both in the preparatory proceeding as well as at the trial; RNDr. Jiří Rambousek, the third member of the Supervisory Board, was heard only in the preparatory proceeding and his testimony was also read out upon the consent of the parties at the trial.  None of these witnesses confirmed any knowledge of the securities trades, JUDr. Oehm only stated that was orally informed by JUDr. Sainerová, who was in contact with the center; the trades were decided by somebody "from the top", somewhat centrally.  The Board of Directors met irregularly, only to approve financial statements, no written materials were discussed at the board meetings.  Witness JUDr. Oehm chaired the extraordinary General Meeting of HCS, which approved the merger; this was surprising for the witness because the merger was voted for by approx. eighteen large shareholders, whereas ordinary shareholders did not have any chance; also Ing. Vostrý took

the floor at the General Meeting, he explained the further existence of the fund and HPH.  Ing. Vostrý also attended the joint meeting of directors and members of the Supervisory Board of all funds preceding the extraordinary General Meetings that approved the merger of the funds (at the time, they were probably no longer funds but companies, association and holding). Also witnesses doc. JUDr. Jan Josl, CSc., Ing. Stanislav Holejšovský, CSc. and RNDr. Jiří Rambousek, the members of the Supervisory Board of HCIF, identically testified that the Supervisory Board was not informed of these trades at all; the trades were subject to a decision by somebody in the center, only witness Josl stated that JUDr. Sainerová, the Chairwoman of the Board of Directors, informed them orally that she had signed certain agreement with SUT.  This witness also described the method of set up of the Supervisory Boards of the individual funds; he stated that he worked as a lawyer at COILCO, at one point, he was contacted by dr. Kralik, who was in charge of this company and who stated that by the following morning, he needed the names of approximately thirty members of the Supervisory Board for the commercial court; he assumed that all employees of COILCO would accept the office and also bring in one to two persons from among their acquaintances.  Only witness Ing. Holejšovský stated that he was interested in the portfolio of securities that were purchased by the fund; upon his request, JUDr. Sainerová provided him with written materials which contained this information.

The agreement of 14 June 1996, which is included in the deed under items I/24-27 of the verdict of guilt, was signed on behalf of Harvardský spolek menších společností by Ing. Petr Paciorek, who represented this association also when signing documents related to the association merger into HPH on 20 June 1996.  In his testimony given in the preparatory proceeding, Petr Paciorek stated that Viktor Kožený personally proposed him as a candidate for the Chairman of the Board of Directors of Harvardský investiční fond menších společností, the respective bodies accepted this proposal, and Mr. Paciorek entered into the office when the fund had already existed, he "got on the bandwagon" as he described it. When asked about the financial management of the fund, the securities trades, the foreign companies, etc., the witness only provided vague answers, he did not know or did not recollect, when confronted with specific agreements bearing his signature, he admitted that he had signed them but did not attend any meetings preceding them; the trades were only subject to the decision of the portfolio administrator (being HCC), whereas the witness only received the agreements to sign them.  In his testimony at the trial, witness Paciorek testified that the agreements were signed after the secretary to Viktor Kožený had called him to inform him that there were some agreements to be signed in her office.  This was also when Viktor Kožený had already moved to Bahamas; the witness did not know who drafted the agreements in the Czech Republic and whether Viktor Kožený gave his instructions to prepare the drafts. The testimony given by witness Paciorek at the trial reveals that in his position as the Chairman of the Board of Directors of the fund (to be later transformed into an association), he did not at all enquire whether the trades carried out by virtue of the agreements that he had signed would be for the benefit of the fund and its shareholders, whether and how these trades would be paid for, and he absolutely unreasonably trusted that the person who arranged for these trades did so for the sake of the further expansion of the fund.  He assumed the same position also on the merger agreement dated 20 June 1996.  The fact that witness Ing. Petr Paciorek exercised his office only formally can be supported also by the fact that at the same time, he held the position of a member of the Supervisory Board of four other Harvard

companies, including Harvardský contrariánský investiční fond and Harvardský diamantový investiční fond, a.s.  At the trial, the witness stated that he was mainly the manager of Credit Management that focused on debt enforcement.  He described himself has being an employee of the Harvard funds.

Prof. Ing. Vladimír Roubíček, CSc., was another director of Harvardský investiční fond menších společností, who was heard as witness in the preparatory proceeding.  His testimony reveals that at the time he held the position, he was not at all informed of the securities trades described in the deeds contained in the verdict of guilt, and he assumed that the trades were decided on by Viktor Kožený; the witness could not imagine anybody else to make such decisions.  The Supervisory Board of Harvardský investiční fond menších společností comprised RNDr. Radoslav Smetana (whose testimony given in the preparatory proceeding was read out at the trial) and Ing. Eduard Hazuka and JUDr. Zdeněk Karfík, CSc. (who were heard both in the preparatory proceeding as well as at the trial).  The testimonies of these three witnesses reveal that also the Supervisory Board of Harvardský investiční fond menších společností was not informed of the trades in the securities from this fund's portfolio; witness Karfík stated that the trades were designed by somebody from HCC; the witness believed the operations of HCC at the time to be controlled by Viktor Kožený.

As regards the deeds under items I/35-40 of the verdict of guilt, there is no agreement signed by a representative of Harvardská arbitrážní společnost; at the time, the Board of Directors of this company was chaired by JUDr. Miroslav Štefan, who also signed the documents pertaining to the company merger on 20 June 1996. In the preparatory proceeding, witness Štefan testified that the fund's board did not make decisions on any acquisition/sale of securities; he assumed that such decisions were adopted by a group of economists whom he cannot allocate to any specific company and who submitted agreements to the Board of Directors to sign them.  Witness Štefan named one specific person out of these economists, Ing. Gromus; when the witness in the preparatory proceeding was confronted with certain agreements signed on behalf of Harvardský arbitrážní investiční fond or Harvardská arbitrážní společnost, which, however, were not signed namely by the witness, witness Štefan testified that he had never encountered the agreements.  At the trial, witness Štefan testified that he did not remember how many agreements he exactly signed in his position as the Chairman of the Board of Directors, he did not even remember their contents; when signing the agreements, he only checked the share prices against the schedule to the *Hospodářské noviny* daily; if in any doubt, he consulted Ing. Gromus, whom he knew from the General Meeting sessions where he provided consultations related to financial statements; however, his answer was vague.  The witness did not disclose the contents of the agreements to other Directors; he was convinced that by investments into the portfolio, the fund had acquired a very good capital; HCC had secured a very reasonable and regular fee and the witness could not see why to suspect any acts aimed at corrupting the interests of the fund and its shareholders.  He was convinced that any such acts were out of question; the witness also pointed out that he is not a professional economist and could not have sufficiently evaluate the effects of the execution of such agreements.

Ing. Radomír Volek, one of the members of the Supervisory Board of Harvardský arbitrážní investiční fond, was also examined as witness.  He testified in the preparatory

proceeding that he was unable to opine on the condition and development of the portfolio; he was also ignorant as to who decided on the acquisition/sale of securities for or from the company portfolio.  Witness Volek had never met Viktor Koženy and Ing. Boris Vostrý and did not know anything about their involvement in these trades.  Ing. Volek testified at the trial that in his capacity as a member of the Supervisory Board of Harvardský investiční arbitrážní fond, he only attended the joint meetings to which all directors and members of the Supervisory Boards of all six investment funds were invited; at these meetings, they received, from the "management" the summary information and also written materials, final reports on financial management prepared by an international auditor company, which he considered correct.  At the time, the witness was even ignorant as to how the Supervisory Board should function.

The securities transfer agreement, as specified in the deeds under items I/50-54 of the verdict of guilt, was signed on behalf of Harvardská diamantová společnost, a.s. by the Chairman of its Board of Directors, JUDr. Libor Dopita, who also signed the documents pertaining to the merger agreement dated 20 June 1996.  JUDr. Dopita was heard as witness only in the preparatory proceeding; his testimony given in the preparatory proceeding was read out at the trial after the witness made a written apology for his absence from the trial. The testimony of witness JUDr. Dopita in the preparatory proceeding is very vague, the witness either did not recollect or did not know anything, he did not attend any meetings concerning the purchase/sale of securities, at the time, he did not know any of the Cypriot companies when confronted with their names.  When confronted with an agreement that he signed on behalf of Harvardská diamantová společnost with the Cypriot company Husky Trading, he admitted that the signature on the agreement looks like his own, but he did not recollect the circumstances of the execution of this agreement and remained ignorant as to the contents of the agreement and the name of Polakis Sarris (who signed the agreement on behalf of the Cypriot company Husky Trading).  The witness made a similar comment on the power of attorney, which was granted on 31 January 1996 by Harvardský diamantový investiční fond to Viktor Koženy; witness JUDr. Dopita stated that the signature on the power of attorney appeared as his own but he did not recollect signing any such power of attorney; when confronted with other agreements or documents of Harvardský diamantový investiční fond or Harvardská diamantová společnost, which he did not sign, the witness mostly stated that this was the first time he saw these documents and did not know anything about them. The witness' replies to additional questions related to the merger of the Harvard companies into HPH were largely vague and unspecific.  Although witness JUDr. Libor Dopita did not opine on the facts that would be less important in relation to the description of the deeds in the indictment, but his answers in the preparatory proceeding were so vague and unspecific that it was impossible to expect the witness to change his attitude during the examination at the trial and provide any details of import for the court decision. This is why the court did not consider it necessary to hear him at the trial and his testimony was read out upon the consent of the parties.

Another director of Harvardský diamantový investiční fond, Ing. Vlastimil Šrůma, was heard as witness only in the preparatory proceeding; he testified that the portfolio was administered by HCC; the witness attended three meetings convened by this company, the last of them being held before the merger into HPH.  The witness claimed that decisions

concerning the sales/purchases of the securities were adopted by HCC, the witness did not participate in the decision-making process. As regards the defendants, Ing. Šrůma stated that Mr. Koženy was the founder and the majority owner of the center —HCC, and Boris Vostrý was the executive manager of HCC; the witness saw Boris Vostrý at two General Meetings where he communicated certain information. Prof. Ing. Jiří Tůma, DrSc., a member of the Supervisory Board of Harvardský diamantový investični fond, was also heard as witness. According to the testimony given by the witness in the preparatory proceeding, the Supervisory Board did not participate in designing the strategy of the securities trading; the witness was ignorant as to who specifically decided on the method of treatment of the fund's assets; he did not know the names of the Cypriot companies when confronted with them – he only learned of Stratton from the press later on. In his testimony given at the trial, witness Tůma added that he had never seen the agreements presented to him when he was being examined by the Police, he was not in contact with Viktor Koženy and Boris Vostrý and did not know which one of them managed the individual companies within the Harvard funds and how. Ing. Miroslav Vorel, a member of the Supervisory Board of Harvardský diamantový investični fond, was another person heard in the preparatory proceeding; even he did not provide any relevant details of the securities transactions described in the deeds in the verdict of guilt. Although this witness gave information on the securities portfolio or its assets, he draw this information from the written materials that he obtained during the discharge of his office in the Supervisory Board; when confronted with specific securities transfer agreements, he stated during the Police examination that he saw them for the first time. As regards the defendants, witness Vorel stated that Viktor Koženy was the president of Harvardská společnost and Boris Vostrý was its vice-president; the witness claimed ignorance as to their involvement in the securities transactions on behalf of Harvardský diamantový investični fond.

The purchase agreement referred to in the deeds under items I/67-68 of the verdict of guilt was signed on behalf of Harvardská finanční společnost by Ing. Jiří Bednář, who represented this company also when signing documents pertaining to the merger agreement dated 20 June 1996. The testimonies given by witness Ing. Jiří Bednář in the preparatory proceeding and at the trial revealed that during the period in question, 1995-1996, he held the position of the Chairman of the Board of Directors of one of the funds and also acted as the Chief Financial Officer of Harvard Group and HCC. This position also entailed close cooperation with Viktor Koženy; the witness controlled the cost items of all Harvard companies (wages, payment of rent, car lease installments, etc.); at first, he also provided assistance in obtaining of a bank loan. Witness Ing. Bednář maintained personal contact with Viktor Koženy even after Mr. Koženy left the country; he first travelled to meet him in Switzerland and later on at Bahamas where he informed Viktor Koženy of the matters falling under his duty. The witness made admiring comments on Viktor Koženy – he mentioned that Mr. Koženy was very successful in the first and second round of the coupon privatization, his portfolio was the best out of all funds and was able to generate extensive property. The witness further stated that Viktor Koženy became a trendy and successful phenomenon very popular among politicians, he also made himself visible among the wide public and this is why he had to leave the country because politicians were afraid of the influence that he could potentially win in the Czech Republic. As to the deeds listed in the verdict of guilt, Ing. Bednář stated that as the Chairman of the Board of Directors of Harvardský růstový investiční

fond (and later on of Harvardská finanční společnost), he was not involved in the securities trades, he did not make any decisions on the individual transactions, and did not attend any meetings preceding such trades. The testimony given by witness Ing. Bednář at the trial, the position of a member the Supervisory Boards or Boards of Directors were more or less formal; immediately after the formation of the funds, powers of attorney were signed, whereupon the funds were managed by the administrator, i.e. HCC, which also completed the entire business strategy. There was a delegated power under powers of attorney for Mr. Kožený; the witness stated that Harvardský růstový investiční fond was not the only fund that granted such power of attorney; it was a general trend – all chairmen of the funds signed such powers of attorney. The witness further stated that the power to transact was also delegated to the broker, Harvardská burzovní společnost, whose professionals carried out the instructions of the funds' administrator. HCC provided a service in terms of portfolio administration, whereas strategic instructions could have been given by Mr. Kožený.  If witness Ing. Bednář signed any agreements on behalf of Harvardský růstový investiční fond or Harvardská finanční společnost, it was part of his job; he relied that such agreement had been drafted by lawyers, met all the requirements and specified its relevant parties, he did not have any reason to doubt that something was wrong, he trusted the people in charge. He believed that the professional knowledge of Mr. Kožený was on a very good level, the witness signed the agreements in good faith. When asked during his examination at the trial about the assets of the individual companies upon their merger as of 20 June 1996, he stated that "claims are also assets". Additional inquiries revealed that the witness was aware that at the time of the merger, the funds had no longer contained securities but only claims for the sold securities; the witness explained that he only wanted to challenge what was presented to him – that the funds were merged as empty shells.

Also other directors of Harvardský růstový investiční fond (later Harvardská investiční společnost) were heard as witness, namely Josef Brýdl and Ing. Karel Růžička, and also members of the Supervisory Board of this fund, Ing. Jiří Vrzala, Ing. Ladislav Seidl and Ing. František Kulhánek, CSc. Witnesses Karel Růžička and Josef Brýdl testified at the trial that they worked for HCC as early as in 1991; this was a consulting company gathering materials for the first wave of the coupon privatization.  Ing. Boris Vostrý, as one of the first employees of the Harvard companies, also worked there at the time. Witness Josef Brýdl testified as early as in the preparatory proceeding that all securities trades were decided on by Viktor Kožený alone; at the trial, the witness described in detail the relationships in the Harvard group and stated among other things that Viktor Kožený himself, as the company president, was in charge of the tactic, sale and the trades, but what exactly was to be sold and purchased, was decided on by a group of people of Yale, Boston; whereas Viktor Kožený held out the existence of these people.  The witness further stated that Kožený's tactic was to buy up all financial markets away from the minister of finance; they all worked to build a single large organization to influence decisions in this country. Viktor Kožený, as the president, behaved as if having title to anything; he was a very severe boss and treated friendly only those who did exactly what he wanted. During the coupon privatization, Viktor Kožený kept saying that we all had to work hard for two years and then we would roll in sand and the country would work for us. He was a player and was very intelligent but he started to feel he wanted even more. When he left the country, his influence was arranged via a number of intermediates; the witness referred to some lawyers from the Netherlands, the mother of Viktor Kožený; later

on, Koženy's instructions were conveyed also by Ing. Bednář, the chief finance officer. Witness Brýdl also testified about the reasons of Koženy's investment in Azerbaijan; he stated at this occasion that he diverted the money required for this investment via Daventree. As regards defendant Ing. Vostrý, witness Josef Brýdl testified that he had known him for 25 years from when they used to work for the ex-secret police before 1989; Boris Vostrý was a technician, they were in charge of the protection of the Government-related documents, money, vouchers (in Czech: *bony*), and passports against forgery.  The witness claimed that the siphoning off money from the Harvard funds was not the initiative of Ing. Vostrý; Viktor Koženy was the clear leader in these matters and considered others "simpletons". The witness does not assume that Ing. Vostrý siphoned off SUT; the witness also does not think that Harvard was controlled from the secret police, that Ing. Vostrý would manipulate Viktor Koženy. The witness further testified that Viktor Koženy was not financially liable; it was Boris Vostrý, who was often liable, he was something like a "white horse". In a number of things, property, which is outside the Czech Republic, Boris Vostrý will be one of the persons liable for the organizations, for investments, which Mr. Koženy carried out abroad, whereas the money which Viktor Koženy invested abroad, are inaccessible to him, it is Boris Vostrý who has the access and dividends from the foreign investments will be in Belize. As to the investments funds, the witness further testified that when Viktor Koženy acquired 50% and transferred it to Cyprus, the General Meetings became a mockery; only a fraction of shareholders from the Czech Republic came; however, but there was an 18-year-old girl from Cyprus who attended and who was empowered by 50% shareholders – she voted for something and then left again. As to the Cypriot Daventree, the witness testified to be officially aware that Harvard became part of Daventree, the money kept coming from Daventree when the witness paid out the promised tenfold from the coupon privatization to the shareholders.  To conclude his testimony, witness Brýdl stated that he did not expect Boris Vostrý to gain anything from the siphoning-off; he probably pursues asset management and takes something for this job.

The securities transfer agreement of 6 June 1996, which is referred to next to the deed under items 81-92 of the verdict of guilt, was signed on behalf of Harvardský průmyslový holding by JUDr. Marie Kraliková, the Chairwoman of the Board of Directors of this company, the ex-Chairwoman of the Board of Directors of Harvardský dividendový investiční fond.  JUDr. Marie Kraliková was the spouse of JUDr. Ivan Kralik (he passed away before the judicial proceeding was instituted), who was the closest colleague of Viktor Koženy; according to witnesses' testimonies, JUDr. Kralik was in charge of COILCO, which provided legal services; after Mr. Koženy left the country, JUDr. Kralik was also in charge of HCC. Witness Kraliková may therefore be expected to have been introduced in detail into the activities of the entire Harvard group; in spite of this, when compared to the testimonies of other witnesses, the testimonies given by this witness are brief, vague, the witness responded equivocally and her answers were not plausible. Just like the other witnesses, JUDr. Kraliková testified that the Chairmen of the Boards of Directors of HIF (later transformed into companies, association and holding) did not decide on the individual purchases and sales of the securities from their portfolio; the witness testified that she granted powers of attorney to HCC, the funds' administrator, as well as to Harvardská burzovní společnost, i.e. to stock exchange brokers, and also to Harvard Group and Mr. Koženy.  Although the witness together with her husband and dr. Maňák drafted the agreements because they were lawyers, they only

dealt with formal legal issues; as the witness claimed at the trial, the individual trades were decided on by stock exchange brokers. When confronted with the fact that the brokers merely carried out the securities trades under the agreements, which they had executed but for which they allegedly received the strategic decision before their execution from the Chairmen of investment funds or from HCC, as the funds' administrator, the witness was unable to say who exactly made such strategic decisions; she only claimed that it was not her husband or dr. Maňák.  The witness testified that in 1995-1996, she visited Viktor Koženy twice at Bahamas and also in Dublin, Ireland; they discussed the merger of the funds.

JUDr. Vratislav Oehm, another member of Harvardský dividendový investiční fond, and Ing. Jiří Bastl, a member of the Supervisory Board, were also heard in the preparatory proceeding and also at the trial.  The testimonies of these two witnesses also revealed that the discharge of their offices was more or less formal; they were not informed of the deeds specified in the verdict of guilt and they were not able to provide any relevant information on the deeds.

Witness Ing. Lubomír Pužej, who held the position of the chief executive officer of Harvardská burzovní společnost at the time, was another person questioned as to the securities trades referred to in the deeds under items I/1-92 and II/93-98 of the verdict of guilt.  He testified in the preparatory proceeding that securities trades are based on the client principle, i.e. that all instructions to the purchases, sales, money transfers must be received by Harvardská burzovní společnost from the client who opens an account with this company but the company does not have the right of disposal over this account. Harvardská burzovní společnost received instructions for trades only from somebody acting under a power of attorney – from directors of the funds or the funds' administrator – all was controlled by the Ministry of Finance, the Securities Center, and, later on, the Securities Commission. The powers of attorney to perform the trades were granted to Viktor Koženy; the witness could not think of any other name in connection with the funds. As regards SUT, an instruction to carry out certain trade could have been given by Ing. Boris Vostrý. As the Chairman of the Board of Directors, however, the witness is of the opinion that Ing. Vostrý could not have done this in his own will.  Even after Viktor Koženy left the country, trades were performed according to his instructions given by fax and signed by Mr. Koženy, whereas more extensive trades were verified by telephone by long-distance calls to Mr. Koženy abroad, or agreements were required. Witness Pužej testified at the trial that when Viktor Koženy left the country and stayed abroad, the witness did not know whether there was someone else deciding on the securities purchases and sales or whether Mr. Koženy consulted them with somebody else. As opposed to his testimony in the preparatory proceeding, witness Pužej stated that at one point, all operations and orders were coming from Stratton; the witness did not know whether there was any written or oral agreement in place, this was in 1995-1998, and it appeared to the witness that at that time, everything was managed by Mr. Dingman and that Mr. Koženy was out of game. When asked by the defense counsel at the trial about this part of the testimony from the preparatory proceeding, the witness stated that, at certain point, whenever they wanted to ask Mr. Koženy about something abroad, they were told that they had to wait because Mr. Koženy had to discuss it with Mike (first name of Mr. Dingman).  At one point, the witness got the impression that it was not Mr. Koženy but someone else who was in

charge of affairs in the Czech Republic but this impression was attributable to how the communication was maintained at the time.

Also the testimony of witness Ing. Zdeněk Voráček reveals that when trading in securities, Harvardská burzovní společnost, a.s. only effected decisions of other bodies and persons, and the brokers employed by Harvardská burzovní společnost or working for this company under a mandate agreement could not have carried out any trades at their own initiative. In the preparatory proceeding, witness Ing. Voráček testified that in his capacity as a broker, he usually received instructions to carry out trades via the CEO of Harvardská burzovní společnost, a.s. (i.e. first from Ing. Vendelová, who was later replaced by Ing. Pužej). The instructions were given in written form, which meant that the particular instruction had been approved by the manager of the relevant investment company. The witness recollected that he received such instructions from Ing. Chroustovský, he had already forgotten which fund acted through him; he also received instructions from some Slovak person whose name he could not remember, and also directly from Viktor Kožený, who always gave them by virtue of a power of attorney. The vast majority of HIF trades were carried out via the stock exchange; Harvardská burzovní společnost a.s. was even a significant shareholder of the stock exchange.  A broker placed a written instruction of the customer in the stock exchange system, the instruction then contained information as to which account kept with the Securities Center the securities of the specific issuer were to be credited and for what amount – a broker was not in charge of the financial settlement of the transactions.  At the trial, the witness testified in a similar way; when asked by the defense counsel, he added that whenever there were instructions from Viktor Kožený coming from abroad, they were sent by fax on standard forms used by Harvardská burzovní společnost at the time. The witness worked as a broker for Harvardská burzovní společnost only until June 1995; he was not informed of any trades performed beyond that year. Ing. Zdeněk Voráček has been the liquidator of HCC a.s. v likvidaci since 2001; this is why in other parts of his testimony, he opined on this company's assets but only in relation to the period after 2001 – as regards the deeds specified in the verdict of guilt, witness did not provide any details from his position of the company liquidator.

Ing. Alena Kalinová, who was a director of Harvardská burzovní společnost from 29 August 1995, and a member of the Supervisory Board of HPH from 20 August 1997 to 26 August 1999, also testified as witness.  The witness only generally stated that Harvardská burzovní společnost was a securities broker and that HIF was one of its clients; Harvardská burzovní společnost acted by virtue of the filed orders for purchase and sale, whereas the orders were processed by a trading department broker; at Harvardská burzovní společnost, there was no person in charge of HIF. Witness Kalinová did not provide any close details of the securities trades performed by HIF via Harvardská burzovní společnost; when confronted with the facts arising from the deeds under items I./1.) — 92) of the verdict of guilt, the witness referred to the records of the system of the Stock Exchange and the Securities Center or to the funds' books of account. Witness Kalinová further testified that as a member of the Supervisory Board of HPH, she viewed the audit of HPH for 1996, which also audited Daventree; at the merger, the assets of the individual Harvard companies also included the shares of Daventree, whereas the book value of the assets of the absorbed companies

corresponds to fifty per cent shares of Daventree and amounted to approx. CZK 40 bn; the witness did not now that the shares of Daventree owned by the merged HPH would be traded.

When describing the deeds contained in part I of the verdict of guilt, it is necessary to reflect the testimony of witness JUDr. František Maňák given at the trial.  As regards the power of attorney dated 7 February 1995, which was granted by JUDr. Maňák jointly with JUDr. Králík to Viktor Kožený as the representatives of the Board of Directors of HCC, witness Maňák testified at the trial that such power of attorney could only relate to what representatives of HCC were entitled, i.e. trading in securities of mutual funds for which the Board of Directors of HCC was liable (namely garanční násobkový fond and approx. thirteen other mutual funds, which were not legal entities and were not merged into HPH because they terminated business in the meantime and were settled upon the consent of the Securities Commission).  The assets of HPH have nothing in common with the assets of these mutual funds; the other powers of attorney must have been granted to Viktor Kožený by the Chairmen of the Boards of Directors of the individual investment funds, which were legal entities.  The fact that such powers of attorney to trade in securities were granted to Viktor Kožený on behalf of the individual investment funds were expressly confirmed by witnesses JUDr. Marie Králíková and Ing. Jiří Bednář, the latter also adding that a similar power of attorney was granted to Viktor Kožený by all Chairmen of the Boards of Directors of HIF.  In her testimony given at the trial, JUDr. Jana Steinerová admitted that although the other three Chairmen of HIF did not recollect the granting of such power of attorney, in their testimonies, they did not expressly deny the granting of such power of attorney to Viktor Kožený.

Due to the contents of the testimony of witness JUDr. František Maňák, the description of the deeds was modified as opposed to the indictment such that in part I./ in the introductory phrase for the individual attacks under items 1.) - 92.), it was omitted that when entering into the individual trades, Viktor Kožený acted as a "*general agent*"; instead, the indictment contained a note that "*as a person acting under a power of attorney granted to him by the Board of Directors of Harvard Capital & Consulting a.s., now "v likvidaci", which empowered him without any restrictions*", it is stated in the description of the deeds in the verdict of guilt that he acted as a person with powers of attorney, which authorized him to….  Furthermore, as regards the deed consisting in an individual attack specified under item I./1 the following part of the sentence was left out: "*by virtue of a power of attorney dated 7 February 1995*", and, in respect of other deeds under items
I./2, 3, 4, 5, 6, 7, 8, 9, 15, 16, 17, 18, 19, 20, 21, 22, 23, 29, 30, 31, 32, 33, 34,
41, 42, 43, 44, 45, 46, 47, 48, 49, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79 and 80, as opposed to the indictment, the following part of the sentence describing the deed is left out in the verdict of guilt: "*by virtue of the above-specified power of attorney*".

Witness JUDr. František Maňák further testified, that he joined HCC as of 2 January 1991 as a lawyer, and that he served on the board of this company until October 1996.  The other testimonies reveal that next to JUDr. Ivan Králík, JUDr. Maňák was the second lawyer who acted for the Harvard companies since their incorporation and who should be best acquainted with the operations in these companies and with the activities of Viktor Kožený.

The witness testified that he was in charge of the general legal issues, excluding business issues; together with JUDr. Králík, he was even told that trading in securities was not their business. Such trading was controlled by Viktor Koženy and handled by Harvardská burzovní společnost. At first, securities were traded because during the coupon privatization, the individual funds acquired more shares than permitted by the statutory limit, and this was resolved by transferring the shares from one fund to another.  Witness JUDr. Maňák further testified that at the peak, the Harvard association comprised 27 legal entities, including six investment funds, whereas defendant Kožený was considered the leader of this group and this is why he called himself the "president of the Harvard funds"; he considered this title to be the inherent part of his image but, in legal terms, it did not mean anything. As regards the relationship between the two defendants, JUDr. Maňák testified at the trial when asked by the defense counsel of defendant Ing. Vostrý that Viktor Kožený was basically the only decision-making and managing body; after he left the country, the witness tried to build some management structure, however, negotiations with Viktor Kožený totally failed. Ing. Boris Vostrý was one of directors, and, in the section he was in charge with, carried out the instructions of Viktor Kožený until 2002, when they split; he was a subordinate vis-à-vis Mr. Kožený.

As regards the deeds under items I./ and II./ of the verdict of guilt, Ing. Juraj Široký was heard as witness in the preparatory proceeding by the Police authority in Bratislava.  The witness testified that he first met defendant Ing. Boris Vostrý in Prague where they were neighbors in the same house; in 1991, Ing. Vostrý introduced him to Viktor Kožený, who worked as a consultant at HCC.  The witness further testified that he could not give any details on the trades allegedly carried out with the Cypriot companies in 1995 and 1996 because he had left the country and from 1992, he had been living in Slovakia.  When asked by the Police officer in charge of the examination for details concerning Zenko Trading, witness Ing. Široký claimed no recollection of them; however, when confronted with the agreements of 6 March 1995 on the loan of the securities of SPT Telecom, which he had signed on behalf of Zenko Trading, the witness confirmed that the signature was his own, that he had signed the agreements together with Viktor Kožený at Bahamas, but he did not know why Viktor Kožený acted on behalf of the Harvard investment funds.  The witness testified that the management of Zenko Trading had granted a direct power of attorney for him to execute the agreement.  When further confronted with the agreements of 16 March 1995, which are referred to in the deeds under items II./93 — 98. of the verdict of guilt, the witness confirmed having signed the agreements but did not recollect any details. According to the testimony of Ing. Široký. Dorothi Mc Namara, who acted on behalf of Zenko Trading on 23 March 1995 when signing the agreements whereby Zenco Trading returned the loaned securities of SPT Telecom back to the six Harvard funds, was the secretary or assistant to Viktor Kožený, but the witness was ignorant of that particular agreement. Witness Široký further testified about being a protector in Trust 1, in which capacity he signed the founding deed on 4 December 2002, and also in Trust 2, where he signed the founding deed on 6 February 2003. Witness Ing. Široký stated identically to the statement of witness JUDr. Maňák that Viktor Kožený and Ing. Boris Vostrý had planned to set up the trusts together but they split up in 2002 and the trusts were then organized by Ing. Boris Vostrý alone.

In her testimony during the preparatory proceeding, witness Zlatica Široká, the spouse of Juraj Široký, did not provide any details on the deeds in the verdict of guilt.  She only gave

an account of the financial transactions carried out in 2003 – funds were sent to the shareholders of Trust 1 via 2. Strategická.

In the preparatory proceeding, Cyprus citizens, Polakis Sarris, Iro Petsa and Linda Loizou were also examined. The counsels to the defendants argued that the testimonies of these witnesses could not be used in evidence in the judicial proceeding because the defense counsels had not been advised of the date of the examination in advance, had not been able to attend and pose  supplementary questions to the witnesses. The court sustained the objection as founded, and requested that the Cyprus court conduct a new examination of the three witnesses. When preparing the request for international legal assistance, both defense counsels and the prosecuting attorney submitted a list of questions to be posed to the witnesses at the examination. The request for the examination of the witnesses was made through the Ministry of the Justice of the Czech Republic; upon receipt of the information concerning the date of the witness examination from the Ministry of Justice, the chairman of the tribunal immediately informed the defense counsels and the prosecuting attorney accordingly. It is true that the defense counsels had been advised merely of the date of the examination, rather than the precise hour, address of the court, name of the examiner or number of the room wherein the examinations were held. The defense counsels then argued that they had not been duly advised of the date of witness examination even in the judicial proceeding, and that the evidence was not admissible. It needs to be added in this context that the same information was provided to the prosecuting attorney, JUDr. Jaromír Jindřich, who attended the witness examination in Cyprus in person. JUDr. Jindřich requested a clarification of the information from the chairman of the tribunal, the chairman did not have the information at his disposal and referred the prosecuting attorney to the respective staff member of the Ministry of Justice of the Czech Republic who had processed the request for legal assistance and was in contact with the Cypriot side. Therefore, it can be noted that had the defense counsels, JUDr. Josef  Monsport and JUDr. Martin Korbař,  truly wished to attend the witness examination in person, they could have obtained such information by telephone from the Ministry of Justice the way the prosecuting attorney did; the court thus deems their second objection unfounded.

It was established from documentary evidence that Polakis Sarriss is a Cypriot attorney-at-law, with the registered seat of his law firm located at Leoforos Vyronos 36, Nicosia, at which address majority of other Cyprus companies and firms whose names had been established in connection with the trading of HIF, SUT and HPH securities have their registered seats. In the verdict of guilt part of the Judgment, Polakis Sarris is indicated as a representative of a Cyprus company, Husky Trading, on whose behalf he signed agreements referred to in connection with deeds listed under items I./10, 11, 12, 13, 14, 24, 25, 26, 27, 50, 51, 52, 53 and 54. The Municipal Court views the testimony provided by witness Polakis Sarris before the Cyprus court as highly evasive and general, the witness responded to most of the questions by saying that he did not know, that he would need to view the file that he did not have on him. He stated several times that had he known what kinds of questions would he posed to him, he would have brought the respective file; the defense counsels proposed in response that the examination of Polakis Sarris in the proceeding before the Cyprus court be repeated after the witness prepares for the examination. The court did not uphold the motions; before appearing before the Cyprus court, the witness Sarris presumably inquired what the examina-

tion would concern, and moreover, given the great number of questions prepared by the pros-ecuting attorney and defense counsels for the witness, the examination was conducted over a period of three days. After the first day, the witness knew what the questions posed to him by the court concerned, and had he wanted to provide proper answers, he could have brought the respective files to court on the second and third days of the examination and consult them while answering. However, he did not do so, and it is obvious that he did not wish to provide any specific information.

According to documentary evidence produced in the preparatory proceeding, witness Sarris was a secretary or other official of a total of twelve Cyprus companies save for Husky Trading; for instance, he was also the secretary of Daventree Ltd. and Daventree Resources Ltd. During the examination, the witness stated that as an attorney, he had been involved with a total of three thousand companies, and that as regards the companies concerned, they are companies that invest in the Czech Republic. The companies had their registered seats at the offices of the witness, and had no employees on Cyprus. As regards the defendants, the wit-ness testified that he never got to know Viktor Koženy but that his law firm acted in Koženy's name in cases of certain companies of which Koženy was a director. The witness personally knows Boris Vostrý who was a liquidator and executive director of HPH and the person issuing the main instructions for the activities of the companies concerned. Boris Vostrý was also director of certain Cyprus companies but the witness does not recall which. There were some other persons from the Czech Republic as well but the witness does not re-call their names. If the witness had signed any documents concerning trading in securities from HIF portfolio, those, according to the witness's general statement, were documents is-sued by Harvardská burzovní společnost and the witness would receive trading instructions from the Czech Republic, he no longer recalls from whom. In response to questions posed by the defense counsel to the defendant Ing. Vostrý, the witness stated, *inter alia,* that Daventree Ltd. had three or four directors whose activities are regulated by the company, the directors cannot undertake any activities in connection with shares in the company as decisions on such activities are made by shareholders at the General Meeting.

The witness Linda Lojzou also responded to an overwhelming majority of questions by saying "*I don't know*", "*I don't recall*", "*I would have to view the file*", or "*I would have to consult the archives*", or "*I am not a lawyer*". It was established from the testimony of this witness that she is a secretary at the law firm of Polakis Sarris, she did not answer the ques-tion concerning her education. Although the witness was a mere secretary, she served as a director of many companies; however, the witness was unable to answer any question con-cerning the specific activities of such companies. She did not recall if she had been a director of Deventree Ltd. As to the defendants, the witness stated that she did not know Viktor Koženy, and saw Boris Vostrý once or twice when he flew to Cyprus, and they had merely exchanged greetings before Boris Vostrý entered the office of her superior. The witness was shown a copy of a document of Harvardská burzovní společnost according to which Deven-tree Ltd. gives an instruction for the transfer of CZK 700,000 from its account for the benefit of HCC. The witness did not deny having signed the document but stated she had acted on the instructions of her superior, whereby most documents to be signed had been presented to her by Mr. Polakis Sarris, and she had signed many documents of whose content and purpose she has no knowledge in this manner. It was established from documentary evidence avail-

able in the Czech Republic that the witness Linda Lojzou was an executive director (secretary) of Cyprus companies Husky Trading and Calutta Holdings, and at the same time, she was the director of the two companies and of Deventree Ltd and Norkema Holdings. In response to a question posed by the defense counsel to the defendant Ing. Vostrý, the witness stated that she also served as the director of Deventree Resources Ltd., and at some point also as the director of Kantupan.

The witness Irou Christodoulou Petsa testified that she had been working at the law firm of Polakis Sarris for thirty two years, from age eighteen, and had completed her secondary education. She was involved in many companies, although only fictitiously, those were offshore companies where all employees of the firm were fictitious shareholders, directors, without having any relationship at all with the company concerned. The witness Petsa further testified that she had never managed any company, and only worked according to instructions received from Mr. Sarris; as for any further questions, the witness kept answering "*I don't know*", "*I don't recall*", *or* "*I cannot know that*", or "*I am not a lawyer*". In response to the questions posed by the defense counsels, the witness stated that she knew neither Viktor Koženy nor Ing. Boris Vostrý, she had never met them.

Witnesses who served on the bodies or as statutory representatives of Sklo Union, akciová společnost Teplice (hereinafter "SUT") were also examined in the proceeding. The witness doc. Ing. Miroslav Dopita, CSc., who served as a member of SUT's Board of Directors from mid-1994 till October 1995, entered into office at Viktor Koženy's personal request. The witness further testified that in October 1995, Ing. Pužej, Ing. Vostrý and Ing. Gromus, whom the witness got to know previously in connection with involvement in Harvard companies, became members of the Board of Directors. In the same month, a representative of Stratton visited the Board of Directors and advised the Board that he had been authorized by Harvardská burzovní společnost to oversee the management of any and all activities of SUT; this was Mr. Arbes, an American or a Canadian who only spoke English. Mr. Arbes issued regulations that the Board of Directors was unable to influence and that had to be complied with. He also issued orders for payments to the state and employees, other payments were conditioned on Ing. Pužej or Ing. Vostrý's signatures. On Mr. Arbes's order, an Extraordinary General Meeting was convened and a new Board of Directors elected: Ing. Pužej and Ing. Vostrý remained on the Board, while the old members were recalled at Mr. Arbes's request. The witness was shown an agreement on the assumption of a debt dated 25 January 1996 by virtue of which SUT represented by Boris Vostrý and Radko Resch as the party assuming the debt assumed a debt vis-à-vis six Harvard investment funds from the debtor, Stratton Investments Ltd.; however, the witness did not know anything about the agreement. The witness did not know anything about the acquisition of shares from Stratton and their subsequent sale to Harms, either. The witness Dopita also served as a member of the Board of Directors of HPH – v likvidaci from March 1996 till May 1997, but did not know anything about the circumstances of consolidation of the individual funds into HPH and about HPH's assets. The witness Dopita further testified that he had known Viktor Koženy since 1991 when Koženy showed interest in the glass industry in which the witness had spent his entire working life; in 1997, the witness visited Koženy in the Bahamas.

Another member of SUT's Board of Directors, the witness Ing. Lubomír Pužej, testi-

fied in the preparatory proceeding that he had been proposed for office by someone from the circle around the majority shareholder of SUT but could no longer recall who had been a majority shareholder at the time. The witness Ing. Pužej testified that SUT had many outside advisors, in addition to Stratton, he also mentioned White&Case, Patria finance. Board meetings were attended by Mr. Arbes on behalf of Stratton, any and all steps were taken upon his recommendation. SUT's assets were worth billions at the time and consisted mostly of financial assets and subsidiaries. A majority of shares in SUT was held by the Harvard group or foreign companies, Stratton or other Cyprus firms. The Board of Directors in fact did not decide on anything, whatever was submitted by advisors was also approved. While the witness did sign the agreement on the assumption of debt dated 25 January 1996 (mentioned in the preceding paragraph), he did not provide any further information thereon. He did not provide any information concerning Harms, either. During the trial, when the witness Pužej testified with respect to said company he merely stated that it was one of the clients of Harvardská burzovní společnost and its registered seat was at Cyprus. The witness Pužej signed the memorandum of association of HCC, and was therefore involved in the Harvard companies from the beginning and held important posts, and obviously must have been well informed about their activities; the court deems the testimonies provided by the witness both in the preparatory proceeding and during the trial as highly evasive and vague. Nevertheless, the witness stated during the trial that if anyone in the Czech Republic had signed any agreement, such agreement must have been approved either by Stratton or by Kožený, and whoever signed any such agreements had not participated in any negotiations preceding the execution, having been told that it had been agreed like that, that was how it was, and that was that. When the witness was asked about other Cyprus companies during the trial, he stated that there had been many, and when they dealt with them and anything was required, they would generally approach Swiss lawyers; the witness therefore believes that the companies were managed by Viktor Kožený.

The witness Ing. Milan Bubeníček served as a member of SUT's Board of Directors since the beginning of 1996 till the end of 1996 when his employment with Harvardská burzovní společnost was terminated; at the same time, the witness resigned from offices held in statutory bodies of other Harvard companies. The testimony provided by this witness both in the preparatory proceeding and during the trial was very evasive and general, the witness merely stated in a general manner that strategic decisions on asset disposals fell under the province of shareholders and the General Meeting. The witness also confirmed that SUT's decisions were influenced by Mr. Arbres as a representative of an important shareholder; unlike the other witnesses, the witness Ing. Bubeníček testified that Arbes only attended General Meetings, rather than meetings of the Board of Directors. When the witness Ing. Bubeníček was shown, in the preparatory proceeding, individual agreements pertaining to transactions with securities from SUT's portfolio with Cyprus companies, the witness testified in most cases that he saw the agreements during his examination by the police for the first time. During the trial, the witness Ing. Bubeníček testified that Viktor Kožený had presented his strategy – to invest in foreign markets, in particular in Russia, to take part in the privatization process in Azerbaijan - that is why the companies were merged; the involvement of Cyprus companies was explained as due to the fact that Cyprus was generally recognized as a place through which investors enter the region of Russia, with tax aspects also playing a role, together with the fact that accounting in Cyprus is governed by British stan-

dards; however, the strategy was to float the shares so acquired on the London market once the investments in the former Soviet Union are implemented.


The witness JUDr. Radko Resch, deputy chairman of SUT's Board of Directors at the relevant time, testified in the preparatory proceeding that he did not recall who had proposed his appointment, it could even have been Viktor Kožený himself. SUT's Board of Directors was changed on 7 February 1996 due to a change of ownership. As regards Stratton Investments, the witness testified that Mr. Dingmann was the company's director, the company had its seat in the Bahamas and Mr. Dingmann was supposed to be somehow involved in advisory activities concerning the improvement of efficiency of companies owned by the Harvard companies. In the Czech Republic, the company was represented by Mr. Daniel Arbes. Stratton probably became a SUT shareholder by purchasing shares; at General Meetings, Swiss or U.S. lawyers were authorized to act on Stratton's behalf. As regards seven agreements on debt assumption dated 25 January 1996, signed by the witness on behalf of SUT together with Ing. Boris Ostrý, the witness stated that as this was a long time ago, he no longer recalled why SUT assumed Stratton's debt vis-à-vis the Harvard funds, and could not recall further details of the case, either. The witness further testified that the agreements for Stratton had been drafted by a U.S. law firm, that he had seen a number of such agreements and did not recall any details concerning the individual agreements. The witness confirmed that he had been one of the directors of Harms Holdings Ltd., the other directors having been Dr. Pužejová and Ing. Vostrý, he was appointed to office by virtue of a decision of SUT's Board of Directors because SUT's Board of Directors exercised the powers of the General Meeting of the Cyprus company Harms. Harms was wholly owned by SUT, was acquired for tax reasons, when SUT traded in securities through Harms it did not have to pay any taxes, or only taxes at Cyprus at a minimum rate. As regards the agreement on transfer of shares in SUT to Harms dated 2 February 1996, the witness Resch merely confirmed that this was a transfer of assets to a wholly owned subsidiary, and claimed he did not recall any further circumstances surrounding the execution of the agreement. He did not recall another agreement of the same date by which shares from SUT's portfolio were transferred to a Cyprus company, Ras Al Khaimah Oil, and voiced a conviction that advisors from Stratton presented information about the company at meetings of SUT's Board of Directors. As regards shares in Daventree Ltd., the witness Resch stated that it was customary for Cyprus companies to have a high number of shares denominated in Cypriot pounds. The share value in pounds did not express the actual value of the share capital, and served more to express the equity stake in the company. The witness expressed the opinion that the shares were not publicly traded, he believes that the company name would have to include the appellation PLC (Public Limited Company) for the company's shares to be publicly traded. At the time when HPH held shares in Daventree, the value was derived from assets contributed to Daventree by HPH, this probably included assets contributed into the company by Stratton which owned the other fifty per cent block of shares. As regards shares in Stratton Paper, he stated that they were not publicly tradable, and as regards the valuation of a share in Stratton Paper at CZK 16,600,000, he assumed this was based on the calculation of value of the company's assets. As regards the circumstances of the consolidation of SUT with HPH, the witness JUDr. Resch testified in the preparatory proceeding that the logical outcome of a successful strategy in the coupon privatization process is to transform investment funds into holding type companies, which compa-

nies then narrowed down their portfolios from fifty companies to roughly six companies, and following entry onto international capital markets, it appeared appropriate to form a company that would carry adequate weight. During his examination during the trial, the witness Resch pointed out in particular that a long time had elapsed since the events concerned, and basically referred to his testimony provided in the preparatory proceeding; his testimony was read during the trial. The witness then added that legal regulations governing the activities of investment funds were such that it was necessary to run away from them, funds were only allowed to purchase and sell the maximum of ten per cent shares in individual companies, and numerous other conditions had to be complied with as well. The witness deemed it logical that funds were transformed into companies of such type so as to be able to buy and sell shares without restrictions, and that conditions enabling the companies to trade on foreign markets were created. One of the reasons was that the Czech Republic is fairly well known for its inability to protect foreign investment. He commented on the agreements in a general vein to the effect that as a lawyer, he had drafted thousands of them, some had not even been executed, and further pointed out that he was involved in the Harvard companies first and foremost as a lawyer and did not understand economic matters. There are few companies where the Board of Directors decides expressly on specific transactions: however, there is a certain strategy; the witness is unable to say whether such strategy was conceived by Viktor Koženy by himself or in collaboration with Dingman, or whether they developed the strategy in collaboration with some advisors; the witness doubts he knew that even when he was involved in the Harvard companies.

The witness Ing. Ludmila Petráňová served as Chairwoman of SUT's Board of Directors up to 5 December 1995 when the company's representatives were replaced at the General Meeting in connection with the entry of a new shareholder, Stratton. The witness testified that during her involvement, she was an employee of Spořitelní investiční společnost a.s. which owned less than ten per cent of shares in SUT at the time. Harvard funds with 19.1 per cent of shares, PPF a.s. and the Fond národního majetku (National Property Fund) were the other shareholders of SUT. The witness did not know how Stratton acquired majority in SUT but believed that Stratton had purchased the shares of Spořitelní investiční společnost a.s. and other shareholders. At the General Meeting held on 5 December 1995, Ing. Vostrý and Ing. Pužej became members of SUT's Board of Directors; they had been nominated for office by Stratton's representative, Mr. Arbes. The witness Ing. Petráňová was therefore no longer involved at SUT at the relevant time in 1996, and as such was unable to provide any relevant facts concerning the deeds outlined in the indictment. In her testimony provided during the trial, the witness Ing. Petráňová contested the authenticity of her signature on a power of attorney purportedly granted by her in her capacity as Chairwoman of the Board of Directors to Ing. Vostrý on 19 December 1995 because she had no longer been in office when the power of attorney had been granted.

The witness Mgr. Milan Zuna was a holder of a general power of attorney (*prokurista)* in SUT till the end of 1995, and served as the head of the legal department at the same time. SUT was a holding company, its assets were mainly in subsidiaries on whose bodies the witness also served. The witness testified in the preparatory proceeding that at the end of 1995, Ing. Vostrý came to SUT, told all the employees that those who would leave by the end of 1995 would receive extra severance pay, the equivalent of seven salaries, and offered to

several employees that they could transfer to a subsidiary, Intest Union a.s. Teplice, as of January 1996, without severance pay. As of 15 January 1996, SUT had no employees. In his testimony during the trial, Ing. Zuna stated that he was useless as a witness because he had tried to erase everything from his memory. As regards Dingmann, Ing. Zuna stated that he had been the CEO of Stratton, threw a party in Prague for the management of companies he had bought, it was held at the National Museum, and at that party, he smiled at them in the American fashion, shook their hands and told them he was looking forward to working with them; within two months, they were all out of their jobs. It was generally rumoured in SUT that they had been bought by Viktor Kožený.

Experts further stated that SUT's accounting records were incomplete, and they were thus unable to comment on issues pertaining to the provision and clearance of consideration for the sale of securities of Czech issuers from SUT's portfolio to Harvardská burzovní společnost or the Cyprus companies. The experts further examined transactions with securities from SUT's portfolio that were registered with the Securities Center, and concluded that selling and purchase prices had been identical in some cases but had been well above the market value. SUT did not sustain any loss as a result of such transactions realized above value as it served as mere intermediary in transfers between other companies. In other transactions where SUT also acted as an intermediary, purchase prices greatly exceeded market prices, selling prices then roughly corresponded to market prices, and the total loss that was suffered by SUT and that was caused by the deviation from market prices amounted to over half a billion crowns. A table prepared by the experts shows that on 29 May 1996, SUT purchased securities of seven Czech issuers from Harvardská finanční společnost, a.s. for prices well exceeding their market value, and on 31 May 1996, it sold the same quantity of securities to HPH for a price close to market prices; SUT sustained a loss of CZK 508,061,273 in these securities transactions carried out over a period of three days.

The experts were further asked to assess the book value and fair market value of HPH's assets that were transferred by virtue of an agreement of 31 December 1997, concluded by and among HPH and HCMW. The experts stated that in the financial statements compiled as of 31 October 1997, the value of HPH's assets as of the date of announcement of a public tender was CZK 19,857,071,000 according to the balance sheet, yet the book value, i.e., the sum of all the assets of the company, was CZK 8,292,793,000 according to the balance sheet compiled as of 13 May 1997; of that, shares in Daventree Ltd. accounted for CZK 7,994,413,000. It is impossible to determine their market value but their nominal value was obviously greatly overvalued. At the same time, accounting records do not indicate how HPH arrived at asset value in excess of CZK 19.8 billion. Schedules to extraordinary financial statements show that between 13 May 1997 and 30 October 1997, the number of shares in Daventree Ltd. held by HPH had increased. The book value as reported in the balance sheet compiled as of 31 December 1997 is CZK 10,119,143,000, of that, CZK 9,890,076,000 is represented by short-term accounts receivable - probably notes by means of which the purchase price for HPH's assets was paid. Further, the balance sheet does not report shares in Daventree Ltd. in the value of CZK 18,949,161,000 which were transferred to HCMW by virtue of a purchase agreement of 31 December 1997 which shows that the accounting unit probably reflected the new value of shares in Daventree Ltd. as of 31 December 1997, setting it at approximately one half of its book value. As regards the market value of HPH's assets,

the experts point out that according to a foreign audit conducted by Grant Thornton, the valu-
ation of shares in Daventree Ltd., i.e., the main part of HPH's assets, is well below the re-
ported book prices. A statement of HPH's account maintained by the Securities Center can
only be used to determine the value of publicly traded shares as of 31 December 1997, which
was CZK 836,442,911.

Representatives of the expert institute Bohemia expert, s.r.o. confirmed the content of
their expert opinion during an examination at the trial on 23 October 2008, and subsequently
responded to supplementary questions. Supplementary questions posed by the defense coun-
sel to Ing. Boris Vostrý, JUDr. Josef Monsport, were directed in particular at the question un-
der what conditions the market value of shares in Daventree Ltd. could be determined; in that
context, JUDr. Monsport pointed out the activities of Daventree Resources Ltd., a wholly
owned subsidiary of Daventree Ltd., on the Russian market. JUDr. Monsport further submit-
ted an auditor's report of HZ Praha on the economic condition and financial statements of
Daventree Ltd., which report was provided to the experts who were requested to supplement
their expert opinion in writing. Further questions posed by JUDr. Monsport concerned in par-
ticular that part of the expert opinion that describes SUT's securities transactions between 29
May and 31 May 1996, which led to a loss in excess of CZK 508 million according to the
experts. The experts admitted that the transactions concerned did not necessarily have to be
reflected in SUT's accounting balance which is usually compiled for a period of one calendar
year, if such loss was compensated by other profits over the same accounting period. The ex-
perts further stated that no receipt was available to show that such transactions had been paid
for in cash. In response to JUDr. Monsport's question, the expert stated that when SUT and
five other Harvard companies were consolidated into HPH, mutual obligations and claims of
the merging companies were set off, and as such it was not possible for HPH to gain an ad-
vantage through those transactions, and to sustain damage as a legal successor of SUT at the
same time. In response to a question posed by the chairman of the tribunal, the expert stated
that the fact that SUT only held shares in Harms at the time of the consolidation does not
mean that it had previously sold all its securities to Harms: what happened was that it sold
shares to affiliates, a receivable arose and was paid by means of shares in Harms.

In a written amendment to the expert opinion, the expert institute Bohemia expert
s.r.o. stated that it insisted on its conclusion as drawn in the original expert opinion, i.e., that
the experts did not have enough information to be able to determine the market value of
shares in Daventree Ltd. which are not publicly tradable. The amendment was drawn up fol-
lowing the review of a copy of Daventree Ltd.'s annual report for 1996 dated 4 July 1997,
which annual report consists of basic information, directors' reports, an unsigned statement
of the auditors, Grant Thornton International, and further, accounting records compiled for
the purposes of financial statements dated 31 December 1996, and a copy of auditor's report
with respect to Daventree Ltd. for 1996 dated 29 July 1997 and elaborated by HZ Praha spol.
s r.o.  The two documents referred to above are identical in terms of content, and virtually
identical in terms of form. It is stated in the statement rendered by the auditors, Grant Thorn-
ton International, that a larger part of the company's assets consists of untradeable financial
investments in developing markets of Eastern Europe, these are reported in NAV amounts
estimated by the directors, and the auditor was unable to obtain adequate independent evi-
dence in support of such estimates; audited accounts of subsidiaries were not available. It is
stated in the statement rendered by the auditors HZ Praha that most of the company's assets

are represented by stakes in various companies, in particular in the Czech Republic, Russia and Cyprus, and as audited financial statements of the main Russian companies in particular were not available as of the date of compilation of the statements, the company's directors used the NAV method for their valuation in the balance sheet of Daventree Ltd. The experts went on to say that the market value of shares which are not publicly traded is as a rule estimated by means of a revenue, market comparison or asset value approach; as this is a holding company, the assets value method does not seem appropriate. While a simplified valuation of the company's shares can be performed (e.g., using the method of accounting, liquidation or substance value), such valuation would carry no information value in terms of market value, as the relevant characteristics of the main value generators are not known – that is supposed to mean annual and auditor reports of all the subsidiaries and affiliates of Daventree Ltd. as of 31 December 1996.

Two more expert opinions were submitted to the court: an expert opinion rendered by Ing. Mgr. Petr Tůma on 22 March 2010, commissioned by HPH, a.s. "v likvidaci", in which opinion the expert addresses questions posed to him by the company's liquidator, Prof. Ing. Zdeněk Častorál, DrSc., and an expert opinion rendered by expert institute Česká znalecká, a.s. on 30 September 2009, commissioned by the defense counsel to the defendant Ing. Boris Vostrý, JUDr. Josef Monsport.

When asked by the defense counsel whether the market value of shares in Daventree Ltd. in 1996 can be deemed equal to zero only because they were not publicly traded, the expert institute Česká znalecká, a.s. responded that the market value of shares did not depend solely on the fact whether the shares are tradable and publicly tradable. Public tradability of shares undoubtedly is one of the factors taken into account in the valuation of shares; nevertheless, it is not the only factor that determines whether the market value of a share is or is not greater than zero. The fact that a share is or is not publicly tradable by itself cannot lead to the conclusion that its market value is equal to zero. If a share is not publicly tradable, its value derives in particular from the value of the company as a whole. The value of the company may be established by means of a number of valuation methods, and it is possible to state that the market value of the shares is equal to zero only if none of them provides a substantiated positive valuation, i.e., a positive equity of the company, on the basis of relevant and requisite underlying information and documents. The defense counsel then asked what the value of shares in Daventree Ltd. was in 1996, and was told that the book net asset value as of 31 December 1996 amounted to CZK 39,222,050,925, and given that 18,001,000 shares were issued, the book value of assets per share, rounded, equalled CZK 49. In light of the absence of any underlying information and documents required to determine the market value of several categories of assets, it is impossible to determine the market net asset value of Daventree Ltd., and it is equally impossible to determine the market value of its shares as of 31 December 1996. This conclusion is identical with the conclusion drawn in the expert opinion rendered by the expert institute Bohemia expert s.r.o. The expert opinion Česká znalecká a.s. moreover adds that the value of Daventree Ltd.'s equity stakes in other companies was determined, which equity stakes were valued on the basis of the reported book value of equity, and further, the value of equity stakes consisting of shares tradable on the Prague Stock Exchange was determined, as was the market value of moneys; the value of total obligations was subtracted from that amount, the resultant amount being in excess of CZK 2 billion; it

**46T 17/2006**

needs to be stressed with respect to this finding that the difference does not include all the assets owned by Daventree Ltd. as of valuation date: it does not include in particular equity stakes in foreign companies, claims and short-term equity stakes. The expert institute therefore notes that the value of Daventree Ltd. undoubtedly was greater than zero as of the valuation date. Any other conclusions directed at the determination of the company's market value, or the market value of its shares, would be pure speculation given what underlying information was available.

Upon the defense counsel's question whether actions described under items 108 — 110 of the indictment could have caused damage to SUT, and in what amount, the expert institute Česká znalecká, a.s. responded that it is impossible to state unequivocally on the basis of the information and documents available that the transactions in question caused damage, and further, it is impossible to determine its amount, if any. A number of quantified values of the property items being transferred is lacking in the transactions, and the specific amounts of such unascertained values influence the outcome of the transactions so much so that in several cases, they may have several different impacts on the assets and obligations of SUT, whereby it is impossible to draw an unequivocal conclusion without their knowledge. The last question of the defense counsel concerned the deed described under items 99 — 107 of the indictment. The expert institute Česká znalecká a.s. notes that SUT sustained a loss of CZK 470,810,704 as a result of the transactions. As HPH and Harvardská finanční společnost, a.s. were the counterparties in  the transactions and gained benefit corresponding to SUT's minimum loss, it can be noted that following the consolidation of all the companies, the transaction will not be reflected in any way in the results of their operations. The only loss that could result from the transactions in question would be a loss caused by a drop in the price of shares between the date of their acquisition by Harvardská finanční společnost, a.s. and the moment of their sale by HPH. However, the transactions under consideration had no impact on the assets, obligations and results of operations of HPH as the legal successor of the consolidated companies.

When asked whether as of 14 June 1996, the Harvard companies suffered damage due to the fact that in consideration for the securities of domestic companies taken out,  shares in HCC and Stratton Paper were contributed, the expert Ing. Tůma responds to the injured party's question by saying that the acquisition of shares in HCC caused damage in the amount of CZK 2,388,544,672 constituted by the difference between the acquisition price and their actual value, and the acquisition of shares in Stratton Paper caused a total damage of CZK 7,227,740,770; the total damage therefore equals CZK 9,616,285,442. As regards shares in HCC, the expert assumes that the shares comprised 100 per cent of the company's registered capital, the book net asset value as of 31 December 1995 was CZK 69,416,000, i.e., CZK 1,157 per share, which corresponds also to the book value of owner's equity. The fair market value of HCC's assets as of 14 June 1996 thus, even with a view to the 1996 losses, could not have been higher than the company's equity as of 31 December 1995, yet both the purchase and selling prices of shares in the Harvard companies totalled CZK 2,457,960,672, whereby the shares in HCC were overvalued by a minimum of CZK 2,388,544,672 upon their contribution into the Harvard companies. According to the information obtained, Stratton Paper Company Ltd. was founded on 20 September 1995 with registered capital of CYP 1,000, 1,000 shares in the nominal value of 1 CYP per share were issued. According to the submit-

ted extract from the Cyprus Companies Register, there had been no changes in the registered capital. Changes in the shareholders as entered in said register do not indicate at all that any Harvard companies or Daventree Ltd. became the company's shareholders at any time. It can thus be reasonably assumed that the value of the company's shares as of 14 June 1996 corresponded to their par value, i.e., CYP 1 per share, and the fair value of 435 shares in the company, at the exchange rate of CZK 58 per CYP 1, thus equals CZK 25,230. If the shares were purchased for CZK 7,227,766,000, the total damage suffered was CZK 7,277,740,770. In response to the injured party's question whether SUT suffered damage due to its assumption on 2 February 1996 of shares in Harms Holding Ltd. in consideration for shares in domestic joint stock companies, namely, Moravské naftové doly, a.s., Spolana Neratovice, a.s., and Biocel Paskov a.s., the expert first notes that a mere week earlier, on 25 January 1996, SUT acquired said shares in exchange for unspecified obligations from Straton Investment Ltd. for an identical price, i.e., CZK 5,635,719,640 in total. SUT acquired the shares for a price that was *de facto* twice the market price at the time of transfer. On the same day, 2 February 1986, Harms Holding Ltd. transfers the securities to Ras Al Khaimah oil and Gas Holdings Co. Harms Holding obtained 49% of shares in Ras Al Khaimah, specifically, 161,700,000 shares in said company, as consideration. Ras Al Khaimah subsequently transfers the securities in the course of 1996 back to the Harvard companies or to Daventree Ltd. at a total loss of CZK 1,283,335,130, 49% of which is for the account of Harms Holdings Ltd., and subsequently also SUT, and which is quantified at CZK 628,834,214. The total damage was suffered by SUT and is constituted by the difference between the acquisition price and the price on the public market which equals CZK 2,826,818,356.40, plus CZK 628,834,214, i.e., CZK 3,455,550,930 in total. As the purchase price for the sold shares in Daventree Ltd. was not paid on 30 December 1997, the actual consequential damage is close to CZK 5,635,719,640. The third question posed by the injured party to the expert Ing. Tůma was whether SUT, or its legal successor HPH, as the case may be, suffered damage due to the fact that SUT transferred shares referred to in the description under item 110 of the indictment to Daventree Ltd. The expert stated that the value of shares in Daventree Limited is the criterion to be applied to assess the origination and amount of the damage; when quantifying this amount, the expert assumed that Daventree Limited was incorporated on 4 October 1995, its original business name having been Goodheart Trading Ltd. A total of 1,000 shares with a par value of CYP 1 per share, subsequently designated as Issue C, were issued at incorporation. In June 1996, the company's registered capital was increased through a share issue, Issue A, comprising 352,499,999 shares in total, with a par value of GBP 1 per share, and Issue B, comprising 352,500,001 shares in total, also with a par value of GBP 1 per share. Class B shares were acquired by companies in the Harvard group by virtue of agreements dated 30 June 1996 when shares in Daventree Ltd. were provided in consideration for the sale of shares in HCC, or in Stratton Paper Ltd., as the case may be, and for the sale of claims of all six Harvard companies arising from the transformation of six Harvard investment funds. According to the statute of Daventry Limited, Class B shares were not voting shares, and such shares were thus substantially less valuable than Class A shares. As of 31 December 1996, further shares of Daventry Limited were issued, specifically, 47.5 mil. Class A shares, and the same number of Class B shares, both with a par value of CYP 1 per share. Class B shares were acquired in 1997 by HPH, and the total number of 400,000,001 shares was subsequently sold by virtue of an agreement dated 30 December 1997 to HCMW. The expert relies on the selling price of CZK 10 billion and assumes that the selling price of the shares was CZK 25 per share. And

yet, the acquisition price had been CZK 49.36, and the shares were transferred to the Harvard companies by agreements dated 30 June 1996 for that value. According to further calculations made by the expert, the loss per share in the sale was 49.35%; 49.35% out of CZK 4,506,402,654.22 equals CZK 2,223,909,710. According to the expert, that amount represents the minimum damage suffered by SUT in consequence of the acquisition of shares in Daventree Ltd. through the deed referred to under Item 110 of the indictment. As the purchase price for the shares in Daventree Ltd. sold by virtue of the purchase agreement dated 30 December 1997 was not paid, the actual consequential damage is close to the acquisition price of shares in Daventry Ltd., i.e., CZK 4,506,402,654. The expert quantifies the damage caused by individual attacks referred to under Items 99 through 107 of the indictment as follows: as regards transactions described under Items 99, 100, 101, 102, 104 and 107, the expert quotes the same damage as that indicated in the indictment, as regards the deed pursuant to Item 103 of the indictment, the expert puts the damage at CZK 39,441,875, as regards the deed pursuant to Item 105 of the indictment,  the expert puts the damage at CZK 180,749,320, and as regards the deed pursuant to Item 106 of the indictment, at CZK 205,103,515; according to the expert, the total damage thus equals CZK 470,808,441. The expert further indicates market prices of the shares in connection with every deed but does not rely on same, relying on the difference between the purchase and selling share prices instead as those were pre-agreed transactions conducted over a very short time period.

As regards documentary evidence, it needs to be noted that the trial was mainly conducted prior to the amendment of Section 213 (1) of the Code of Criminal Procedure, and the chairman of the tribunal was thus unable to present documentary evidence to parties for viewing but had to read it. The reading of the evidence was complicated not only by its sheer volume but also the fact that there is no summary overview of the file, whereby each of the 131 volumes attached to the indictment had its own separate overview starting from 1; yet, a part of the documentary evidence is repeated in the individual volumes, often in several copies, and a great part of the documentary evidence does not directly relate to deeds of which the defendants were found guilty. However, due to time constraints, the tribunal of the Municipal Court was unable to familiarize itself with the evidence in detail prior to its presentation at the trial, which, moreover, was not held continuously on consecutive days because the chairman of the tribunal was at the same time serving as judge in appellate tribunals of the Municipal Court in Prague at the time of the trial, whereby the trial was held only when the chairman of the tribunal was not attending to tasks related to his involvement in the appellate tribunals. Moreover, the file on the inquiry includes 39 large paper boxes, each of which contains 10 or more stiff folders, referred to as binders in the indictment; these contain documentary evidence seized during searches of other premises conducted on 6-7 September 2001. At the trial, documentary evidence pertaining to the individual attacks comprising criminal acts referred to in the indictment under Items 1-110 according to the list based on Art. 56-71 of the indictment was read out first, followed by documentary evidence proposed for reading in Art. 72-78 of the indictment. For the sake of completeness, it is hereby added that some of the documentary evidence proposed for reading in the indictment is cited inaccurately: the securities transfer agreement dated 4 January 1996 and pertaining to the individual attack ad Item 6 of the indictment, is internally designated as S2271 and is filed in binder No. Z 6-5, and the securities transfer agreement dated 14 August 1995 and pertaining to the individual attack ad Item 70 of the indictment is filed in binder No. 72, Art. 108 being correct.

The deeds referred to under Items I/1-9 of the verdict of guilt were committed by the defendant Viktor Kožen when in August 1995 and January 1996, he concluded, on behalf of Harvardský contrariánský investiční fond, a.s., securities transfer agreements with Stratton Investments Company Limited (hereinafter "Stratton") concerning the sale of securities of Czech companies, the selling prices were not paid by Stratton, and instead, PROMISSORY NOTES governed by the laws of the Bahamas, with 4-year maturity, were issued in seven cases and never drawn. In all nine cases, copies of the agreements were read out; the wording is virtually identical, with only the dates and specifications of the securities by quantities, issuers and purchase prices varying. All these agreements are signed by Viktor Kožen on behalf of Harvardský contrariánský investiční fond, a.s. and by Michael Dingman on behalf of Stratton. In seven cases, save for the deeds as per Items 7 and 8, the agreements include the "drafts" issued by Stratton for the benefit of Harvardský contrariánský investiční fond, a.s.; the drafts contain specifications of the numbers and types of securities and purchase prices identical to those set forth in the respective agreements. Copies of the drafts, also signed by Michael Dingman, are filed in the binders. The information and data indicated in the agreements and "drafts" were used to prepare a description of the facts of the case according to the deeds as per Items I/1-9 of the indictment, as presented by the prosecuting attorney in his proposal for criminal charges, which description was then adopted into the verdict of guilt without any amendments. Orders to sell and orders to purchase were also read in evidence in connection with said deeds. Orders to sell have the form of an ORDER TIKET, a sort of a HCC form bearing the names of the Harvard funds, not only the six investment funds but also a further seventeen funds; a cross next to the fund name indicates to which funds the order to sell pertains. The bottom part of the form indicates the date, name of securities issuer and total number of securities to which the order to sell pertains; it also indicates the price per share. The ORDER TIKET further contains an attachment with a breakdown of the total number of securities being sold by individual funds. For instance, as regards the deed as per Item I/1, on 8 August 1995, Viktor Kožen issued an order to sell 819,591 securities of Spolana a.s. for CZK 351 per share, and the total number of the securities being sold was broken down as follows: 490,625 securities would be sold from the portfolio of Harvardský dividendový investiční fond, 307,806 securities would be sold from the portfolio of Harvardský růstový investiční fond, 2,333 securities would be sold from the portfolio of Harvardský diamantový investiční fond, 629 securities would be sold from the portfolio of Harvardský arbitrážní investiční fond, 1,081 securities would be sold from the portfolio of Harvardský contriánský investiční fond, and 1,317 securities would be sold from the portfolio of Harvardský investiční fond menších společností, whereby this order to sell relates not only to the deed ad Item I/1 but also to deeds ad Items I/18, 30, 43, 61 and 72 of the verdict of guilt. The situation is similar as regards further deeds out of the first 92 deeds where securities of the same issuer are being transferred.

Purchase orders, completed and signed by Michael Dingman of Stratton, are also specified according to the securities issuer. They have the form of a Harvardská burzovní společnost, a.s. form specifying the name of the securities issuer, the total number of securities to be purchased, price per share and date. The information indicated in the orders to sell and the orders to purchase is identical, for instance, the order to purchase shares of the issuer Spolana a.s. dated 8 August 1995 specifies the number of shares being purchased – 819,591,

whereby it relates not only to the deed as per Item I/1 but also all the other deeds referred to in the preceding paragraph.

Securities transfers from Harvardský contrariánský investiční fond to Straton in quantities and of types indicated in the deeds referred to under Items I/1-9 of the verdict of guilt were also registered with the Securities Centre in Prague on 28 September 1995 (deed referred to under Item I/4), 29 September 1995 (deeds referred to under Items I/1, 2, 3), 30 January 1996 (deed referred to under Item I/9), 31 January 1996 (deeds referred to under Items I/5, 6), 20 March 1996 (deed referred to under Item I/7), and 22 March 1996 (deed referred to under Item I/8), respectively. In all nine cases, Harvardská burzovní společnost, a.s. acted as intermediary of the securities transfer.

The execution of securities transactions referred to under Items I/1-9 of the verdict of guilt is further demonstrated by accounting entries of Harvardský contrariánský investiční fond, with the amounts for which the individual securities were sold entered in the fund's main ledger as claims; the amounts indicated in connection with the deed as per Items I/1, 2, 3 and 4 were entered on 18 October 1995, the amounts indicated in connection with the deed as per Items I/5 and 6 on 29 January 1996, the amount indicated in connection with the deed as per Item I/7 on 3 April 1996, the deed as per Item I/8 on 20 March 1996, and the deed as per Item I/9 on 26 January 1996.

Pursuant to the agreements concluded in relation to the sale of securities constituting deeds referred to under Items I/1-9 of the verdict of guilt, the payment for the purchase of securities in seven cases was to have been made in such a way that a certain smaller amount would be paid in cash, and a PROMISSORY NOTE issued for the balance of the amount; in two cases, the entire consideration was to have been paid by Straton in cash. Smaller amounts which ought to have been paid in cash in addition to the promissory notes, as referred to under Items I/1, 2, 3 and 4, were paid into the bank account of Harvardský contrariánský investiční fond on 12 September 1995, cash amounts stipulated in the agreements relating to deeds referred to under Items I/5, 6 and 9 were paid into the same account on 1 February 1996; in all cases, the amounts were remitted by Harvardská burzovní společnost a.s. which, according to information on file, had an advance payment of USD 5,000,000 provided by a "foreign investor" at its disposal. As regards deed referred to under Items I/7 and 8 of the verdict of guilt, the entire purchase price for the sale of the securities was supposed to have been paid in cash, account statements of Harvardský contrariánský investiční fond do not show any such payment.

The facts outlined in the above paragraph do not correspond to the description of the facts of the case concerning the individual attacks referred to under Items I/5, 6 and 9 of the verdict of guilt as the Judgment was promulgated at the trial on 10 July 2010. At promulgation, the chairman of the tribunal read out the description of the facts of the case from the indictment, the written Judgment had not yet been drawn up and the *ratio decidendi* prepared, and only when transcribing the written *ratio decidendi,* the chairman discovered that the prosecuting attorney incorrectly registered the payments remitted into the account of Harvardský contrariánský investiční fond on 1 February 1996 as unspecified payments, and indi-

cated them in the description of the deed referred to under Item I/9 of the indictment in the total amount of CZK 438,960. The amounts of CZK 186,730, CZK 114,750 and CZK 137,500 correspond to the amount payable in cash under the agreements referred to in connection with the deeds as per Items I/5, 6 and 9 of the verdict of guilt, their sum being CZK 438,980, rather than CZK 438,960, as stated in the wording of the indictment (in the reasoning, the sum is provided correctly). The total damage purportedly caused by the defendant Kožený by the attacks outlined in Items I/1-9 of the indictment is also stated incorrectly. Based on the amounts given in all the nine agreements, Stratton was to pay the total of CZK 20,559,001 for the securities transfer, while the amount of CZK 588,547.08 in total was transferred into the account of Harvardský contrariánský investiční fond on 12 September 1995 and 1 February 1996; the difference between the two amounts is CZK 19,970,454. The total damage caused to Harvardský contrariánský investiční fond, and its successor, Harvardská contrariánská společnost a.s., through deeds outlined as per Items I/1-14 of the verdict of guilt, i.e., CZK 26,606,711, is close to the amount of CZK 25,845,239 given in the description of the deed as per Item I/9 of the indictment.

As regards the deeds outlined under Items I/10-14 of the verdict of guilt, only one securities transfer agreement was concluded, the list of securities being transferred is provided in a schedule thereto, the schedule contains a total of eight securities issues, in accordance with the indictment, only five of those were included in the verdict of guilt. The date of 14 June 1996 is not given in the agreement filed in binder Z 6-5 on page 1718, said date is only indicated in the certification stamp of the respective Cyprus authority notarizing the signature of Polakis Sarris. The signature of JUDr. Jana Sainerová in the agreement is not notarized, in light of her testimonies, she presumably did not sign the agreement in Cyprus together with Polakis Sarris but subsequently somewhere at the seat of the Harvard companies in Prague.

The only order to sell pertaining to all the five securities transactions is signed by Viktor Kožený, does not bear a date but is different than in the case of the previous nine deeds: it is a Multiple Order Ticket To Sell, printed out as a form of Harvardská burzovní společnost, and it lists all eight types of securities in accordance with the schedule to the agreement. The order to sell is issued on behalf of Harvardská contrariánská společnost, Viktor Kožený signed it by virtue of a power of attorney granted by JUDr. Jana Sainerová. Purchase orders relating to deeds outlined as per Items I/10-14 of the verdict of guilt do not bear any dates either, are made out using the form of Harvardská burzovní společnost on behalf of Husky Trading co. Ltd. and signed by Polakis K. Sarris; the information concerning type of securities, quantities and unit prices conforms to the information indicated in the schedule to the agreement. These five transfers of securities from the portfolio of Harvardská contrariánská společnost a.s. are also registered with the Prague Securities Centre, in the same quantities and for the same prices as those given in the schedule to the above-referenced agreement, on 7 June 1996 and 11 June 1996. The amounts purportedly paid for the securities transfers are also booked as claims in the accounting records of Harvardská contrariánská společnost, a.s. on 4 June 1996 and 7 June 1996.

The deeds referred to under Items I/15-23 of the verdict of guilt pertain to the sale of securities of Stratton from the portfolio of Harvardský investiční fond menších společností.

The agreements concluded in connection with all the nine transactions were also signed by Viktor Kožený on behalf of Harvardský investiční fond menších společností, and by Michael Dingman on behalf of Stratton, drafts issued by Stratton and Michael Dingman are available, and so is an order to sell issued by the defendant Viktor Kožený and purchase orders issued by Michael Dingman. These are documents of the same type as described in the preceding parts of this *ratio decidendi* concerning the deeds outlined under Items I/1-9 of the verdict of guilt. Facts concerning the sale of securities from the portfolio of Harvardský investiční fond menších společností, as outlined in connection with the deeds under Items I/15-23 of the verdict of guilt, were established on the basis of information provided in the above-referenced documents.

On page 258 of the reasoning of the indictment, it is stated that as regards the deed as per Item I/22, the order to sell was not found, and only TICKET ORDER on the purchase of securities of the issuer Česká námořní plavba a.s. was found; yet, on page 59 of the indictment, order to sell securities "T 1598, T 1599, binder No. 48, Art. 224, 225" is mentioned ad individual attack No. 22. On page 224 in binder No. 48, an ORDER TIKET (on HCC form) for the transfer of 271 thousand shares in the issuer Česká námořní plavba a.s. is filed; the ORDER TIKET details to which Harvard funds the transfer pertains. It is not apparent from the ORDER proper whether it concerns the purchase or the sale of securities, this only follows from a schedule to the ORDER in which the total quantity of shares subject to transfer is broken down by individual funds. The schedule to the ORDER is filed on page 225 in binder No. 48, which schedule indicates that the transaction concerns the purchase of shares in Česká námořní plavba as shown in the attached breakdown; all the 271 thousand shares are then broken down by the five Harvard investment funds and a further fifteen other Harvard funds. As for the number of shares indicated in the schedule, agreements on the sale of securities in Stratton were concluded on behalf of the individual Harvard investment funds, as detailed in connection with the deeds as per Items I/8, 45, 64 and 74 of the verdict of guilt, and as the sale of securities from the portfolios of the individual funds in quantities detailed in the schedule to the ORDER was also registered with the Prague Securities Centre, the court assumes that forms have been swapped by mistake and a different schedule to the ORDER completed in error, and the intention was to supply a schedule containing the same information and pertaining to the sale of shares; in fact, the words purchase and sale were merely substituted.

The transfers of shares from the portfolio of Harvardský investiční fond menších společností to Stratton were registered at the Prague Securities Centre on 12 September 1995 (the deed as per Item I/15), 28 September 1995 (deeds referred to under Items I/17, 18), 29 September 1995 (deed referred to under Item I/19), 230 January 1996 (deed referred to under Item I/21), 31 January 1996 (deeds referred to under Items I/20, 23), 20 March 1996 (deed referred to under Item I/16) and 22 March 1996 (deed referred to under Item I/22). In the accounting books of Harvardský investiční fond menších společností, the transfers were also booked in the main ledger as claims on 18 October 1995, 26 January 1996, 29 January 1996, 15 March 1996 and 20 March 1996, respectively.

Similarly to the previous case, in the case of Harvardský contrariánský investiční

fond, and also in the description of the deeds concerning Harvardský investiční fond menších společností, when compiling the indictment, the prosecuting attorney only relied on amounts remitted into the account of Harvardský investiční fond menších společností on 12 September 1995, taking no account of amounts remitted on 2 January 1996 when the amount of CZK 134,190 was credited to the fund's account, *inter alia*. Therefore, the description of the deed as per Item I/20 of the verdict of guilt ought to mention that the amount of CZK 134,190 was paid by Stratton in cash to be correct. The total amount provided in the indictment (and by oversight also in the verdict of guilt) after the deed as per Item 23 is not correct, either: the sum of amounts payable by Stratton for the transfer of securities detailed in Items I/15-23 of the verdict of guilt is CZK 13,907,787, and on 12 September 1995 and 2 January 1996, Stratton paid the amount of CZK 455,269 in total into the account of Harvardský investiční fond menších společností, the difference between the two amounts being CZK 13,452,518. If we take into consideration the total damage caused to Harvardský investiční fond menších společností, a.s. and Harvardský spolek menších společností, a.s. by the deeds as per Items I/15-27 of the verdict of guilt, such damage is calculated at CZK 17,796,573.

The transfer of securities from the portfolio of Harvardský spolek menších společností to the Cyprus company, Husky Trading, is described in deeds as per Items 24-27 of the verdict of guilt. A single agreement was concluded with respect to these securities transfer, and signed on behalf of Harvardský spolek menších společností a.s. by the chairman of its Board of Directors, JUDr. Petr Paciorek; it was signed by Polakis Sarris on behalf of the Cyprus company, Husky Trading Co., Ltd., his signature was notarized by the respective Cyprus authority on 14 June 1996, and the agreement does not bear any date. The original of the agreement is available; its schedule contains a list of shares being transferred, being shares of the total of eight issuers including Fatra, a.s., ISC MUZO a.s., SEPAP a.s. and Sklo Union a.s., Teplice. No order to sell was found among the documents seized; however, as in the other cases when securities from the portfolios of the Harvard companies were sold to Hasky Trading, a Multiple Order Ticket To Sell was presumably issued and covered the sale of the shares in all the eight issuers listed in the schedule to the securities transfer agreement. As regards these four deeds, orders to purchase securities issued by the Cyprus company Husky Trading Co Ltd., represented by Polakis K. Sarris, on the form of Harvardská burzovní společnost, a.s., are available; however, the signature of Polakis K. Sarris only features on two of the purchase orders (deeds referred to under Items I/25 and 27 of the verdict of guilt), the remaining two purchase orders are not signed but the name of Polakis K. Sarris as the representative of Husky Trading is imprinted thereon. Information concerning the type of securities purchased, their quantity and price per share conform to the information given in the schedule to the securities transfer agreement. The transfer of securities from the portfolio of harvardský spolek menších společností to Husky was also registered at the Prague Securities Centre on 5 June 1996, 7 June 1996 and 11 June 1996. The information on the quantity of securities being transferred, their type and total selling prices as entered in the records of the Securities Centre conforms to the information contained in the schedule to the securities transfer agreement. The court relied on the information in the description of deeds referred to under Items I/23-27 of the verdict of guilt.

Deeds referred to under Items I/28-34 of the verdict of guilt concern the sale of securities from the portfolio of Harvardský arbitrážní investiční fond a.s. to Stratton. In the case

of these seven deeds, agreements on the sale of securities are also available; they were concluded by Viktor Kožený on behalf of the Harvard fund, and by Michael Dingman on behalf of Stratton; promissory notes issued by Stratton, by which the company undertakes to pay amounts set forth in the agreements for the purchase of the securities which were not supposed to be paid in cash, are attached to six of the agreements. Orders to sell securities issued by Viktor Kožený, and orders to purchase securities issued by Michael Dingman, are available for all seven agreements. All these documents are virtually identical with or similar to documents concerning the sale of securities from the portfolios of the other five Harvard investment funds, the orders to sell and the orders to purchase were described in more detail in the preceding part of this *ratio decidendi* concerning deeds referred to under Items I/1-9 of the verdict of guilt. A description of the facts regarding individual attacks comprising a continuing criminal activity as per Items I/28-34 of the verdict of guilt was drawn up using the identical information on the quantity of securities being transferred, their type depending on the Czech company – issuer, the total price of the securities being transferred and what part of the price is to be paid in cash and what parts is covered by a promissory note.

Transfers of securities from the portfolio of Harvardský arbitrážní investiční fond, a.s. to Stratton were also registered with the Prague Securities Centre, specifically, on 29 September 1995 (deeds referred to under Items I/28, 29 and 30), 30 January 1996 (deed referred to under Item I/34), 31 January 1996 (deeds referred to under Items I/31 and 32) and 20 March 1996 (deed referred to under Item I/ 33). Transfers of securities to Stratton are also shown in the accounting books of Harvardský arbitrážní investiční fond, a.s.: claims vis-à-vis Stratton were entered in the main ledger on 18 October 1995, 26 January 1996, 29 January 1996 and 15 March 1996, respectively. It was also established that all the smaller amounts for which Stratton did not issue promissory notes were transferred by Harvardská burzovní společnost, a.s. to the account of Harvardský arbitrážní investiční fond a.s., specifically, on 12 September 1995 (deeds referred to under Items I/ 28, 29 and 30) and 1 February 1996 (deeds referred to under Items I/31, 32 and 34). Analogously to the other Harvard investment funds, in the promulgation of the Judgment, incorrect information was adopted from the indictment: that cash amounts related to three individual attacks comprising a continuing criminal activity had not been paid, and that the main ledger of Harvardský arbitrážní investiční fond, a.s. contains entries for partial and further unspecified payments from Stratton in the total amount of CZK 154,520. Such "further unspecified" payments correspond to the sum of three amounts credited to the bank account of Harvardský arbitrážní investiční fond on 1 February 1996, which amounts relate to the individual attacks referred to under Items I/31, 32 and 34 of the verdict of guilt.

The total amount of damage provided after the description of an individual attack under Item I/34 of the verdict of guilt does not conform, either; the securities referred to in connection with these seven individual attacks were sold from the portfolio of Harvardský arbitrážní investiční fond, a.s. to Stratton for the total price of CZK 5,786,274; on 12 September 1995 and 1 February 1996, Stratton paid through Harvardská burzovní společnost, a.s. the amount of CZK 209,268 in total, the difference between the two amounts being CZK 5,577,016. If we take into account the total amount of the damage caused by the transfers of securities from the portfolio of Harvardský arbitrážní investiční fond, a.s. and from the portfolio of its successor, Harvardská arbitrážní společnost, a.s., to Cyprus companies by way of

individual attacks comprising a continuing criminal activity referred to under Items I/28-40 of the verdict of guilt, the total amount of damage can be quantified at CZK 10,379,276.

No agreement on the sale of securities is available with respect to the transfer of securities from the portfolio of  Harvarská arbitrážní společnost to the Cyprus company Husky Trading, however, such agreement was presumably concluded in the same manner as in the case of the other five Harvard companies, the group and holding, and the signature of Polakis Sarris on behalf of Husky Trading was presumably also notarized in this agreement on 14 June 1996. The transfer of the respective securities is evidenced both by Multiple Order Ticket To Sell issued and signed by Viktor Kožený on behalf of Harvardská arbitrážní společnost, and by orders to purchase securities issued and signed by Polakis K. Sarris on behalf of Husky Trading, and in particular by statements of transactions issued by the Prague Securities Centre. Viktor Kožený issued a global order for the payment of nine securities issues in total, these included issues carried out by Czech companies, Sklo Union a.s. Teplice, SEPAP a.s., Fatra a.s., Pražská teplárenská a.s., Crystalex a.s. and ISC MUZO a.s., and Polakis Sarris on behalf of Husky Trading issued orders for the purchase of such issues, which orders contain the same specifications of the quantity of shares being purchased and the price per share as those contained in the Multiple Order Ticket To Sell. The transfer of securities of the six issuers listed above from the portfolio of Harvardská arbitrážní společnost a.s. to the Cyprus company, Husky Trading, was also registered with the Securities Centre on 11 June 1996, 5 June 1996 and 7 June 1996. Statements issued by the Prague Securities Centre show identical numbers of securities being transferred in all six business cases; the statements further indicate the price per share and the total price of all the shares sold. The price per share conforms to the specifications in the Multiple Order Ticket To Sell and the purchase orders in a total of five cases, and only differs as regards the securities of issuer SEPAP a.s. (individual attack under Item I/36 of the verdict of guilt). On 5 June 1996, the transfer of 420 shares in SEPAP from Harvardská arbitrážní společnost to the Cyprus company Husky Trading was registered with the Prague Securities Centre; the selling price was CZK 2,500 per share, i.e., the total selling price was CZK 1,050,000, while the Multiple Order Ticket To Sell and the purchase order quotes CZK 3,000 per share; in line with the indictment, the court assumed that the order to sell and the order to purchase quote the same maximum price per share which must always conform to the price for which the shares were actually sold. In the absence of a securities transfer agreement, the price per share quoted in the statement of transaction issued by the Prague Securities Centre is decisive.

Through individual attacks comprising a continuing criminal activity as per Items I/41-49 of the verdict of guilt, Viktor Kožený diverted assets of Harvardský diamantový investiční fond for the benefit of the Cyprus company, Stratton, by concluding agreements on the sale of securities from the portfolio of said fund. In these nine cases, securities transfer agreements concluded and signed by Viktor Kožený on behalf of Harvardský diamantový investiční fond and Michael Dingman on behalf of Stratton Investments Company Ltd. are also available. Drafts issued by Stratton are attached to six of the agreements; these either mature in four years, or are payable at an earlier date only if Stratton sells the securities being transferred to another third party. In addition to said agreements, orders to sell securities and orders to purchase securities applicable to all the Harvard investment funds, in some cases also for other Harvard industrial funds, are also available; these are differentiated depending

on the particular Czech company which is the issuer of the shares being transferred. The specifications of the type and quantity of the securities being transferred, the price per share and the agreed price for the total number of the shares being transferred are identical in all the above-referenced documents, and serve as a basis for the description of the facts related to the individual attacks as per Items I/41-49 of the verdict of guilt.

The transfer of securities from the portfolio of Harvardský diamantový investiční fond, a.s. to the Cyprus company, Stratton, through Harvardská burzovní společnost, a.s., was also registered with the Prague Securities Centre, specifically, on 29 September 1995 (deeds referred to under Items I/41, 42, 43 and 44), 30 January 1996 (deed referred to under Item I/49), 31 January 1996 (deeds referred to under Item I/47 and 48), 20 March 1996 (deed referred to under Item I/46) a 22 March 1996 (deed referred to under Item I/45). Statements issued by the Securities Centre contain specifications of the shares being sold identical with those indicated in the respective securities transfer agreements. In these nine cases, the transfer of securities also follows from data entered in the accounting books of Harvardský diamantový investiční fond, whereby outstanding purchase prices are booked in the main ledger as claims by virtue of entries made on 18 October 1995, 21 January 1996, 29 January 1996, 15 March 1996 and 20 March 1996. Smaller amounts payable in cash under the securities transfer agreements were transferred by Harvardská burzovní společnost, a.s. into the account of Harvardský diamantový investiční fond, a.s. on 12 September 1995 and 1 February 1996; as in the previously mentioned cases of other investment funds, since the data indicated in the indictment was not checked for accuracy before the promulgation of the Judgment, an error occurred in the promulgation of the facts concerning the individual attacks as per Items I/47, 48 and 49 of the verdict of guilt, whereby the amounts of CZK 154,800, CZK 288,260 and CZK 143,000 out of the funds provided by Stratton to Harvardská burzovní společnost, a.s. had been paid on 1 February 1996.

Both the indictment and the verdict of guilt contain an erroneous quantification of the damage caused to Harvardský diamantový investiční fond, a.s. by the individual attacks as per Items I/41-49. The sum of the nine prices for which securities from the portfolio of this fund were sold to Stratton amounts, for these nine individual attacks, to CZK 24,146,708; on 12 September 1995 and 1 February 1996, Stratton transferred, through Harvardská burzovní společnost, a.s., the amount of CZK 880,315 in total into the bank account of Harvardský diamantový investiční fond, a.s.; the difference between the two amounts is CZK 23,266,393. If we take into account the total damage caused not only to the Harvardský diamantový investiční fond, but also to its successor, Harvardská diamantová společnost, a.s., by the individual attacks as per Items I/41-54 of the verdict of guilt, such damage would amount to CZK 32,763,675.

Individual attacks comprising a continuing criminal activity as per Items I/50-54 of the verdict of guilt concern the sale of securities from the portfolio of Harvardská diamantová společnost, a.s. to the Cyprus company, Husky Trading. The facts concerning these individual attacks were established from a securities transfer agreement signed by the chairman JUDr. Libor Dopita on behalf of Harvardská diamantová společnost, a.s., and by Polakis Sarris on behalf of Husky Trading Co. Ltd.; the authenticity of the latter signature is certified by a certification stamp of 14 June 1996. Pursuant to a schedule to the agreement, Harvardská

diamantová společnost, a.s. sells to Husky Trading securities from a total of eight issues launched by Czech and Slovak companies, including SEPAP a.s., Tatra a.s., Crystalex a.s., ISC MUZO a.s. and Sklo Union a.s., Teplice. Apart from this agreement, a Multiple Order Ticket To Sell issued by Viktor Koženy is also available; it contains the same specifications of type, quantity and price of the shares being sold as the schedule to the agreement. Orders to purchase securities issued by Husky Trading, differentiated according to the securities is-suer and containing specifications identical with those contained in the Multiple Order Ticket To Sell, are also available. Transfers of securities from Harvardská diamantová společnost, a.s. to the Cyprus company, Husky Trading, were also registered with the Prague Securities Centre on 5 June 1996, 7 June 1996 and 11 June 1996, always with specifications identical with those provided in the schedule to the securities transfer agreement. The sale of securities in the case of Zenko Trading is further evidenced by the fact that as of 14 June 1996, claims vis-à-vis this Cyprus company are booked in the accounting records of Harvardská diaman-tová společnost, a.s. in an amount equal to the contractual price of the securities sold.

Twelve individual attacks of continuing criminal activity referred to under items I/55-66 of the verdict of guilt pertain to the sale of securities from the portfolio of Harvardský růs-tový investiční fond, a.s. to Statton. As in the case of other investment funds, the respective securities transfer agreements are available, these were concluded and signed by Viktor Koženy on behalf of the investment fund, and by Michael Dingman on behalf of Stratton. Promissory notes issued by Stratton are attached to ten out of the twelve agreements: by vir-tue of those, Stratton undertakes to pay the purchase price, or a part thereof, for the securities being transferred at stipulated times. Multiple Order Tickets To Sell are also available, these are differentiated according to the Czech company – issuer of the securities being transferred. No purchase order was found with respect to the individual attack as per Item I/57 of the ver-dict of guilt, however, since the respective securities transfer agreement containing identical data is available, the sale of shares issued by Spolana a.s. from the portfolio of Harvadský růstový investiční fond to Stratton was registered with the Prague Securities Centre and a copy of the order to purchase shares issued by Spolana a.s. for CZK 900 per share is avail-able, such order to sell can certainly be presumed to have been issued, in particular since the price per share is the same as that pertaining to another individual attack (deed referred to under Item I/61). Further, the review of evidence did not show that such order to sell could have been issued by any person other than the defendant Viktor Koženy. If it is also stated in the reasoning of the indictment with respect to the individual attack as per Item I/65 of the verdict of guilt that the order to sell is not available, the court hereby refers to this part of the *ratio decidendi* of its Judgment that pertains to the deed referred to under Item I/22 of the verdict of guilt, where a schedule to the ORDER was substituted by mistake, as the sale of shares in the issuer Česká námořní plavba a.s., rather than the purchase thereof, was undoubt-edly involved. Orders to purchase securities, issued by Stratton represented by Michael Dingman, are available with respect to all twelve individual attacks; the data mostly corre-sponds to the orders to sell and also quote the same price per share.

This is another case where an error in the description of the facts occurred at the promulgation of the Judgment: it stems from the fact that partial payments towards the price for the securities transfer made by Stratton through Harvardská burzovní společnost, a.s. on 1 February 1996 are referred to as further unidentified payments, instead of being subsumed

under the individual attacks as per Items I/56, 57, 58 and 65 of the verdict of guilt.

The damage of CZK 2,214,745,621 indicated with respect to the deed as per Item I/66 of the indictment is correct as total damage only if it were presented as the total damage caused by Viktor Koženy to Harvardský růstový investiční fond, a.s. and its successor, Harvardská finanční společnost, a.s., through actions referred to under Items I/55-68 of the verdict of guilt.

The transfer of securities from the portfolio of Harvardský růstový investiční fond to Stratton with the same data as that contained in the executed agreements is also registered with the Prague Securities Centre as a transfer made through Harvardská burzovní společnost, a.s. on 28 September 1995 (deeds referred to under Items I/58 and 59), 29 September 1995 (deeds referred to under Items I/61, 62 and 63), 31 January 1996 (deeds referred to under Items I/57, 58 and 66), 2 February 1996 (deed referred to under Item I/56), 14 February 1996 (deed referred to under Item I/55), 20 March 1996 (deed referred to under Item I/64) a 22 March 1996 (deed referred to under Item I/65). The securities transfer is also entered in the accounting books of Harvardský růstový investiční fond, a.s. as claims booked in the main ledger, the entries having been made on 12 February 1996, 30 January 1996, 29 January 1996 – three times, 14 August 1996, 1 August 1995, 8 August 1995, 4 August 1995, 2 August 1995, 15 March 1996 and 20 March 1996.

The commission of individual attacks comprising a continuing criminal activity as per Items I/67 and 68 of the verdict of guilt is evidenced by the content of a securities transfer agreement signed on behalf of Harvardská finanční společnost, a.s. by the chairman of its Board of Directors, Ing. Jiří Bednář, and by Viktor Koženy on behalf of the Cyprus company, Husky Trading CO, Ltd., although it is stated in the agreement that the latter company is represented by Polakis K. Sarris. The annexes to the file contain a great quantity of documents initialled either by Viktor Koženy or Polakis Sarris, and it is obvious that this securities transfer agreement bears initials identical with other initials made by Viktor Koženy, without this fact needing to be verified by a handwriting expert. Moreover, unlike the other agreements concluded with Husky Trading, this agreement does not contain the clause of a Cyprus authority of 14 June 1896 certifying the authenticity of the signature. It is apparent that the copy of the agreement filed in binder No. 38 on pp. 307-309 (including the schedule) was sent by fax to Harvard Group a.s. on 6 June 1996. Orders to sell securities, issued and signed by Viktor Koženy on behalf of Harvardská finanční společnost, are available with respect to these two securities transfers, as are two purchase orders issued by Husky represented by Polakis Sarris whose initial is missing on the order to purchase shares in Komerční banka. The transfer of shares in Sklo Union Teplice a.s. from Harvardská růstová společnost a.s. to the Cyprus company, Husky Trading, through Harvardská burzovní společnost a.s., was registered with the Prague Securities Centre on 11 June 1996, and the transfer of Komerční banka shares between the same entities, also effected through Harvardská burzovní společnost a.s., was registered with the Prague Securities Centre on 6 June 1996.  These transfers are entered in the accounting records of Harvardská růstová společnost a.s. as claims booked in the main ledger.

Through twelve individual attacks as per Items I/69-80 of the verdict of guilt, securities were transferred from the portfolio of Harvardský dividendový investiční fond, a.s. to Stratton. As in the cases of the previously mentioned five investment funds, securities transfer agreements were concluded in all twelve cases; these were signed by Viktor Kožený on behalf of Harvardský dividendový investiční fond, a.s., and by Michael Dingman on behalf of Stratton; notes issued by Stratton and signed by Michael Dingman are attached to eleven of the agreements: by virtue of the notes, Stratton undertakes to pay the balance of the purchase price after paying a portion of the price by cash (or rather by a bank transfer), or to pay the purchase price in full (see attacks as per Items I/75 and 79). Orders to sell securities are available in all twelve cases; these are signed by Viktor Kožený and differentiated by type of security, i.e., by the business name of the Czech company - issuer. These orders to sell are generally identical for the other Harvard funds as well, if the relevant type of security was transferred from their portfolios to Stratton. Further, orders to purchase securities issued by Stratton and signed by Michael Dingman are available, these contain the same specifications as the orders to sell. The description of the facts concerning these twelve individual attacks was drawn up using the information and data contained in these documents.

Similarly to the five previously mentioned investment funds, the sale of securities from the portfolio of Harvardský dividendový investiční fond, a.s. to Stratton through Harvardská burzovní společnost, a.s. was registered with the Prague Securities Centre on 28 September 1995 (deeds referred to under Items I/70 and 71), 29 September 1995 (deeds referred to under Items I/69, 72 and 73), 30 January 1996 (deed referred to under Item I/80), 31 January 1996 (deeds referred to under Items I/76 and 79), 2 February 1996 (deed referred to under Item I/77), 19 February 1996 (deed referred to under Item I/78), 20 March 1996 (deed referred to under Item I/75) and 22 March 1996 (deed referred to under Item I/74). In these twelve cases, the transfers of securities are also entered in the accounting records of Harvardský dividendový investiční fond, a.s.: claims have been booked into the main ledger on 2 August 1995, 14 August 1995, 1 August 1995, 8 August 1995, 4 August 1995, 20 March 1996, 15 March 1996, 29 January 1996, 13 February 1996, 12 February 1996, 29 January 1996 and 26 January 1996.

Similarly to the five previously mentioned cases where a portion of the purchase price which was payable in cash by Stratton pursuant to the agreements was transferred into the bank account of Harvardský dividendový investiční fond, a.s. on 1 February 1996 by Harvardská burzovní společnost, a.s., the amounts in question are referred to as further unspecified payments made by Stratton in the indictment. Therefore, the description of facts in the verdict of guilt in connection with the individual attacks as per Items I/76, 77, 79 and 80 ought to be read that Stratton paid the part of the purchase price not covered by notes in cash. The indictment and the verdict of guilt also quote an inaccurate sum of the damage caused: while the amount of CZK 5,732,329,008 is correct, it ought to be quoted after the individual attack as per Item I/92 in the description of the facts because it represents a sum of damage suffered not only by Harvardský dividendový investiční fond, a.s., but also its successor, Harvardský průmyslový holding, a.s., prior to their consolidation with five other Harvard companies, and SUT. It is a sum of selling prices for which securities from the fund's portfolio and subsequently the portfolio of the holding were transferred to the Cyprus companies Stratton and Husky Trading through deeds referred to under Items I/69-92 of the verdict of

guilt; the sum of amounts provided out of Stratton's funds to Harvardská burzovní společnost, a.s. and transferred into the account of Harvardský diamantový fond a.s. on 12 September 1995, 19 October 1995 and 1 February 1996 was subtracted from the amount.

The individual attacks as per Items I/81-92 of the verdict of guilt concern the transfer of securities from the portfolio of Harvardský průmyslový holding, a.s. (prior to the consolidation) to the Cyprus company Husky Trading. A single securities transfer agreement covering all twelve business cases was concluded; it was signed by the then chairwoman of the Board of Directors of Harvardský průmyslý holding, a.s., JUDr. Marie Kraliková; while the name of Polakis K. Sarris as the representative of Husky Trading Co., Ltd. is imprinted in the agreement, the agreement was signed by Viktor Kožený. As regards his signature, the same can be said as in connection with the agreement on the sale of securities from the portfolio of Harvardská finanční společnost, see the part of this *ratio decidendi* which pertains to deeds as per Items I/67 and 68 of the verdict of guilt. The agreement does not bear a date, either, and was sent by fax to Harvard Group a.s. on 6 June 1996. A list of securities being transferred forms a schedule to the agreement and details the name of the issuer, number of shares, price per share and total selling price; in addition to the twelve issuers referred to in connection with the individual attacks as per Items I/81-92 of the verdict of guilt, the schedule further refers to shares in Slovak companies Nafta a.s. and Slovnaft a.s. A Multiple Order Ticket To Sell was also issued for the sale of these securities; according to police records, it is designated T 1786 and T 1787 and filed on pages 776 and 777 in binder Z 1-1 Bč. 1. The Multiple Order Ticket To Sell contains the same specifications of the type of security, quantity and unit price as the schedule to the above-referenced securities transfer agreement, was issued and signed by Viktor Kožený but does not bear any date. Orders to sell referred to on page 67 of the indictment and designated in police records as T 1721, T 1722 and T 1723 are duplicates. Orders to purchase shares issued by Husky Trading with Polakis K. Sarris acting on its behalf are also available but are neither signed nor initialled.

The transfer of securities from the portfolio of Harvardský průmyslový holding, a.s. to the Cyprus company Husky Trading was registered with the Prague Securities Centre with the same specifications of the type of security, quantity, unit price and total selling price as indicated in the documents referred to above, on 5 June 1996 (deed referred to under Item I/90), 11 June 1996 (deed referred to under Item I/91) and 6 June 1996 (the remaining 10 deeds). Non-payment of the purchase price for the transfer of securities in connection with the deeds as per Items I/81-89 and 92 was also entered on 5 June into the accounting books of Harvardský průmyslový holding, specifically, as a receivable in the main ledger.

Documentary evidence is also available as regards individual attacks referred to under Items II/93-98 of the verdict of guilt; the same evidences the facts as outlined in the verdict of guilt. These six individual attacks comprising a continuing criminal activity involve "looting rounds" where the defendant Viktor Kožený in his capacity as representative of all six Harvard investment funds first issued orders to purchase shares in SPT Telecom on 16 March 1995; on the same day,  he concluded six securities transfer agreements in his capacity as representative of all six Harvard investment funds by virtue of which the individual investment funds purchased shares in SPT Telecom from the Cyprus company Zenko Trading, for a limit price of CZK 2,710 per share in all six cases. These agreements were signed on behalf of

Zenko Trading by Juraj Široký, known to have been working with Viktor Kožený at the time. Subsequently, on 23 March 1995, Viktor Kožený issued orders to sell the shares in SPT Telecom on behalf of all six Harvard investment funds, and on the same day,  in his capacity as representative of all six Harvard investment funds, concluded agreements on the sale of securities — shares in SPT Telecom – back to Zenko Trading; in all six cases, the same number of shares as that purchased on 16 March 1995 is being sold, the price per share is lower in all six cases and amounts to CZK 2,215.  These six subsequent securities transfer agreements were also concluded and signed by Juraj Široký on behalf of the Cyprus company Zenko Trading. According to the reasoning of the indictment, Multiple Order Tickets To Purchase and Sell were also issued on behalf of Zenko Trading with respect to SPT Telecom shares in the total quantity of 510,461 shares; these were issued by Eleni Kyriakou; however, on page 69 of the indictment, said Multiple Order Tickets To Purchase and Sell are not proposed for reading and were thus not presented in evidence at the trial. The securities transfer agreements and their annexes are not proposed as documentary evidence to be read in connection with the individual deeds, nevertheless, copies of the agreements and annexes are filed in Volume 16, and all documents filed in the file on the inquiry were presented as evidence one by one at the trial. It can thus be noted that aside from agreements on the transfer of securities of SPT Telecom which concerned their purchase and sale, all six Harvard investment funds and the Cyprus company Zenko Trading further concluded agreements on the loan of SPT Telecom securities and amendments thereto. The loan agreements are dated 6 March 1995, however, in the fax copies available in the file on the inquiry, the date was changed to 16 March 1995 by hand, which is also the date of the fax transmission; according to these agreements, all six Harvard investment funds lend shares in SPT Telecom – the same number thereof they had purchased and sold – to Zenko Trading for consideration in the amount of 2.5% p.a. of the aggregate price of the securities so lent up to 31 December 1995.  According to the amendments to the agreements on the loan of securities, Zenko Trading returned the full number of the borrowed SPT Telecom securities to all the six Harvard investment funds on 23 March 1995.

A transfer of securities in the same quantity and for the same price as quoted in the agreements was also registered with the Prague Securities Centre: with respect to Harvardský růstový investiční fond (deed referred to under Item I/93), on 31 March 1995 and 4 April 1995, for the other five Harvard investment funds, always on 5 April 1995 and 7 April 1995. Before the individual Harvard investment funds traded in SPT Telecom securities with the Cyprus company Zenko Trading in March 1995, they concluded, on 25 February 1995, agreements on the transfer of 510,461 securities in SPT Telecom in total for CZK 2,740 per share to Harvardská burzovní společnost a.s.; the transfer was registered with the Prague Securities Centre on 2 March 1995. On 27 February 1995, Harvardská burzovní společnost concluded an agreement on the transfer of SPT Telecom securities with Zenko Trading Ltd., the transfer concerned the same number of securities for the same price, and was registered with the Prague Securities Centre on 3 March 1995.

It was established from the accounting records of the individual Harvard investment funds that Zenko Trading had paid the price for the purchase of shares in SPT Telecom to all six Harvard investment funds gradually, through Harvardská burzovní společnost; obligations of the Harvard investment funds vis-à-vis Zenko Trading arising out of purchases of shares in

SPT Telecom were settled by way of a set-off; as Harvardská burzovní společnost did not pay the Harvard investment funds for the share transfer on 25 February 1995, the claims held by the individual funds vis-à-vis Harvardská burzovní společnost were contractually set off against payable of the funds vis-à-vis Zenko Trading. The damage caused to the individual Harvard investment funds through the individual attacks as per Items I/93-98 of the verdict of guilt is constituted by the differences between the purchase prices of SPT Telecom shares under the agreements dated 16 March 1995, and selling prices of the same shares under the agreements dated 23 March 1995.

Individual attacks as per Item III/99-107 of the verdict of guilt concern the defendant Ing. Boris Vostrý, CSc., and are analogous to the Harvard "looting rounds" to some extent. In the written indictment, these individual attacks are legally classified as the criminal act of breach of fiduciary duty pursuant to Section 255 (1), (2), (a), (b) of the Criminal Code, as amended by Act No. 152/1995 Coll.; unlike the prosecuting attorney, the court classified these eight deeds as individual attacks comprising a continuing criminal act of fraud pursuant to Section 209 (1), (5) of the New Criminal Code in force as of 1 January 2010. Other actions on the part of Ing. Boris Vostrý are classified in the indictment as the criminal act of fraud committed through deeds referred to under Items IV/108-110 of the indictment; however, in the closing statement of the prosecuting attorney, a change of classification of these three deeds to the criminal act of breach of fiduciary duty pursuant to Section 255 (1), (2), (a), (b) of the Criminal Code, as amended by Act No. 152/1995 Coll. was proposed. After reviewing the evidence referred to below, the court concluded that Ing. Vostrý had committed a continuing criminal act of fraud both by virtue of the deeds referred to under Items III/99-107 of the verdict of guilt, and the deed referred to under Item III/108 of the verdict of guilt; the actions of the defendant Ing. Vostrý which were originally classified in the indictment as three attacks comprising a continuing criminal activity were found by the court to constitute only one individual attack.

In written documents seized during the search of other premises at the seat of the Harvard companies on 6 September 2001, law enforcement agencies involved in the preparatory penal proceeding only identified orders to purchase securities for SUT's portfolio and orders to sell securities from the portfolio of SUT, all made out on letterhead paper of Harvardská burzovní společnost, as pertaining to said deeds. The purchase orders are designated as "Order Ticket to Sell", orders to sell as "Order Ticker to Purchase", and are signed by Boris Vostrý who was the chairman of SUT's Board of Directors at the time. Both the orders to sell and the orders to purchase are in English and the following information is filled in: type of security distinguished by the business name of the Czech company which is the issuer thereof, ISIN code under which the shares were registered at the Prague Stock Exchange, the number of securities being transferred which is always identical in the orders to purchase and the orders to sell, and the price per share which is always lower in case of purchase than upon the subsequent sale. The sum of the differences between the prices then represents the damage caused by the defendant Vostrý through his actions referred to as per Items III/99-107 to SUT and its legal successor, HPH. The securities transfer agreements pertaining to these sixteen business cases are not available, and it is thus noted in the description of the facts concerning the eight individual attacks comprising the continuing criminal activity that the transactions were carried out without the conclusion of a purchase agreement. In those orders to

continued                                                                                       46T 17/2006

sell and the orders to purchase that do not bear any dates, it is not even indicated from whom SUT purchased the securities and to whom it sold them subsequently at a higher price. However, account statements issued by Prague Securities Centre indicate that securities of Czech companies Crystalex a.s., ČEZ 2 a.s., Fatra a.s., ISC MUZO a.s., OSPAP a.s., Poštovní tiskárna cenin a.s., Pražská teplárenská a.s., SEPAP a.s. and Kaučuk a.s. were purchased by SUT on 30 May 1996 from Harvardská finanční společnost, a.s., and the same quantity of such securities was then sold on 31 May 1996 to Harvardský průmyslový holding, a.s.  HPH subsequently transferred the securities, save for shares in Kaučuk, a.s., to the Cyprus company Husky Trading on 6 June 1966 without paying the purchase price (see deeds referred to under Items I/86, 85, 89, 83, 87, 82, 92 and 90 of the verdict of guilt).

Documentary evidence pertaining to the individual attack as per Item III/108 of the verdict of guilt presented at the trial consists of the following: assignment agreement dated 25 January 1996, securities transfer agreements dated 2 February 1996 and 30 June 1996, and orders to purchase and orders to sell securities relating to these three agreements. The assignment agreement was concluded by the defendant Ing. Boris Vostrý on behalf of SUT, and by Michael Dingman on behalf of Stratton, the signatures of both signatories in the agreement were notarized by a Notary Public in Prague on 3 February 1996. Three orders to sell securities are available in connection with the agreement: they were issued by Michael Dingman on behalf of Stratton Investments Company Ltd. on the applicable form of Harvardská burzovní společnost; in addition to Dingman's signature, the orders to sell also include the signature of the witness Ing. Lubomír Pužej on behalf of Harvardská burzovní společnost. The order to sell shares issued by Moravské naftové doly, a.s. is dated 12 February 1996 by hand but this is clearly an error because the relevant order to sell was sent to Harvard Group a.s. by fax on 12 January 1996. As regards the transfer of shares issued by Spolana a.s., two orders to sell were issued, both are dated by hand - 25 January 1996, but these were also sent to Harvard Group a.s. by fax on 12 January 1996.  The number of shares being transferred pursuant to said orders to sell corresponds to the number of shares indicated in the assignment agreement. Three orders to purchase securities correspond to orders to sell; the orders to purchase were issued by Ing. Boris Vostrý on behalf of SUT on letterhead of Harvardská burzovní společnost, the orders do not bear any dates, the type of securities, their number and price per share are identical with the specifications set out in the orders to sell issued by Stratton. The Prague Securities Centre only registered the transfer of shares of the issuer Moravské naftové doly a.s., such registration having been made on 31 January 1996 when 193,054 shares were transferred from Stratton's account to SUT's account, and one share was transferred from the account of Harvardská burzovní společnost a.s. to SUT's account; in both cases, the price for share was CZK 2,080, which price corresponds also to the specifications in the orders to sell and the orders to purchase. By the agreement on the assignment of securities, Stratton concurrently assigns to SUT obligations arising under various Promissory Notes. The notes are not further specified in the wording of the agreement; as at the time of conclusion of the agreement, Stratton was yet to honour the obligations under the promissory notes it had issued when purchasing the securities from the Harvard investment funds, it is noted in the description of the facts of the deed that SUT acquiredobligations from Stratton under the notes referred to above under Nos. I/1-7, 9, 15-23, 18-32, 34, 41-44, 46-49, 55-59, 61-63, 66, 69, 70, 72, 73, 75-80.

**46T 17/2006**

   The agreement on the transfer of securities of issuers Moravské naftové doly, a.s.,
Spolana a.s. and Biocel Paskov a.s., by which agreement SUT transfers to Harms the same
number of shares in these three Czech companies that it had previously acquired by way of
assignment from Stratton, is dated 2 February 1996; the agreement was signed by Ing. Boris
Vostrý on behalf of SUT and by JUDr. Radko Resch on behalf of Harms. The full name of
Harms is given in the agreement as Harms Holdings Co. Ltd., with the attribute that the com-
pany was established under the laws of Cyprus; however, according to the agreement, the
company has its registered seat in the Bahamas and the address of its registered seat is the
same as Viktor Koženy's residential address. Yet, documents obtained from the Republic of
Cyprus show that Harms Holdings Co. Ltd. was established in Cyprus on 24 January 1996 at
the law firm of Polakis Sarris.

   Three orders to sell securities issued on the form of Harvardská burzovní společnost
are available with respect to this agreement; these orders to sell were signed by the defendant
Ing. Vostrý on behalf of SUT, but they bear no dates; they pertain to the transfers of shares of
the issuers Moravské naftové doly, a.s., Spolana a.s. and Biocel Paskov, in the same quantity
and for the same unit price for which they had been acquired from Stratton by virtue of the
assignment agreement dated 25 January 1996. Unlike in the case of the other orders, these
three orders contain the name of the company to whom the shares are being sold: Harms
Holdings Co. Ltd. An order to purchase securities is also available; according to the reason-
ing of the indictment, it is filed on page 10 of binder No. 27; the purchase order was issued
by Ing. Boris Vostrý on behalf of SUT, bears no date and its wording indicates that SUT is
purchasing 54,999,999 shares of the issuer Daventree Ltd. from Harms. The court concurs
with the opinion expressed in the reasoning of the indictment that this is an obvious error:
according to the wording of the agreement, the shares in the above-mentioned Czech compa-
nies were supposed to have been swapped for 55,000,000 shares in Harms. According to
documents filed in Volume 8 of the criminal file, Cyprus authorities of competent jurisdiction
certify that Harms Holdings Co. Ltd. was established with a share capital of CYP 50,000,000,
divided into 50,000,000 common shares, with a par value of CYP 1 per share. SUT was the
registered owner of 49,999,999 shares. Further, a certificate issued by the Ministry of Trade
of the Republic of Cyprus dated 29 February 1996 is available: pursuant to said certificate,
Harms's members are Manin Teser Co. Ltd., with its registered seat at the law firm of Polakis
Sarris, which owns one shares, and Sklo Union Teplice a.s. which owns 54,999,999 shares.
The order to purchase thus should have been for shares in Harms, as Daventree Ltd. did not
exist yet at the time of conclusion of the agreement and as such was not able to issue any
shares. The transfer of securities into the account of Harms maintained by the Prague Securi-
ties Centre was registered on 2 February 1996 with respect to the issuer Moravské naftové
doly, on 5 February 1996 with respect to the issuer Biocel Paskov a.s., and on 5 February
1996 (first part) and 6 February 1996 (the balance) with respect to the issuer Spolana a.s.

   The agreement on the transfer of securities of SUT's subsidiaries and shares in Harms
dated 30 June 1996 was signed by Ing. Boris Vostrý on behalf of SUT, and by Viktor Koženy
on behalf of Daventree Limited. Pursuant to the agreement, the purchase price should have
been paid by way of a mutual settlement and set off of claims, and the transfer of shares in
Daventree Ltd. to SUT as indicated in Item IV/108 of the verdict of guilt. In relation to this
agreement, orders to sell securities from the portfolio of Sklo Union Teplice to Daventree

continued

Ltd. were read as part of the evidence presented; these are six orders to sell concerning securities of Glavunion, Avirunion, Intesunion, Union Heřmanova Huť, VÚSU and Union Lesní Brána. The orders to sell are signed by Ing. Boris Vostrý but are not dated, and unlike the other orders to sell, they do not even specify the number of shares being transferred and the price per share.

The facts outlined in the verdict of guilt were proved unequivocally by means of the above-referenced documentary evidence and the content of witness testimonies. The main piece of evidence in this criminal matter is constituted by the witness testimony of the court-appointed liquidator of HPH, Prof. Častorál, who in the exercise of his duties is searching for HPH's assets and has been gradually reconstructing the accounting records for that purpose. By means of analyses, the witness Častorál arrived at his conclusion that assets had been diverted from Harvard investment funds and SUT in 1995 and 1996 for the benefit of Cyprus companies controlled by the defendants. Objections raised by the defense counsels that this is not a typical witness testimony but more of a statement akin to an expert opinion, and the witness Častorál had not been appointed in this matter in the capacity of expert witness, are substantiated to some extent. Nevertheless, members and staff of law enforcement agencies involved in the penal proceeding are not accounting experts either, and their task is not to conduct such analyses. However, it needs to be stressed that the testimony of the witness Častorál often is not the only evidence convicting the defendants of criminal activities as described in the verdict of guilt. Similar conclusions were reached also by the witnesses Karel Staněk and Milan Husník who both testified that they had obtained findings regarding the diversion of assets from the Harvard investment funds and SÚT from minutes of General Meetings, consultations with other shareholders and information published in the media at the time. Further, the expert opinion rendered by the expert institute Bohemia Expert s.r.o. states that between 1993 and 1996, the value of the portfolios of all six Harvard investment funds continued to decline, and in 1996, all the securities in their ownership had been sold. The decline in the value of portfolios was due both to developments in the market and unfavourable transactions with the Cyprus companies. It is stated in the expert opinion that at the time of consolidation, securities not traded on the stock exchange at all remained in the Harvard companies, and it was thus impossible to determine their market value. In their expert opinion, the experts employ the term "looting rounds", and actually refer to a higher number of these loss-making business operations than that quoted in the indictment and the verdict of guilt. These conclusions drawn in the expert opinion rendered by the expert institute Bohemia Expert s.r.o are not put in doubt as a result of the content of two other expert opinions commissioned by the injured party and the defense counsel to the defendant Ostrý in the judicial proceeding. The main reason why the court views the testimony provided by the witness doc. Častorál as credible is the fact that his contentions concerning the executed transactions are in harmony with the content of documentary evidence presented at the trial, the content of which is analyzed in detail in the preceding part of this *ratio decidendi* of the Judgment. The first testimony of the witness Častorál at the trial indicates that he obtained the initial findings concerning transfers of shares to the Cyprus companies from the deposit at Skala bank, and records of such transfers at the Prague Securities Centre; these findings were then confirmed by the content of documents seized during the search of other premises in September 2001 at the seat of the Harvard companies.

At the trial, virtually all persons who served on the Boards of Directors and Supervisory Boards of HIF and SUT were examined as witnesses, and the content of their testimonies can be summarized as follows: their activities related to the exercise of their respective offices were purely formal in nature, they were not kept advised of securities transactions in any way, and were not able to interfere with same in their capacity in any way. While Viktor Koženy has been permanently residing abroad since 1994, none of the testimonies obtained in the preparatory proceeding or at trial revealed that anyone else but the defendant Koženy was able to decide on the securities transactions described in connection with the deeds as per Items I./1.) - 92.) and II./93.) - 98.). The nature of documentary evidence read out at the trial in connection with those deeds conforms to this finding. Agreements concluded by Viktor Koženy in 1995 on behalf of Harvard investment funds with Stratton and the corresponding PROMISSORY NOTES, orders to sell securities and orders to purchase securities bear the same dates, were sent to the seat of the Harvard companies by fax from abroad where the agreements were concluded and the other documents completed. It is a notoriously well known fact that both Viktor Koženy and Michael Dingman who signed the agreements on behalf of Stratton owned real properties in the Bahamas at the time. While securities transfer agreements concluded with Husky Trading were concluded by chairmen of the Boards of Directors of the individual Harvard companies (holding and group), save for Harvardská arbitrážní společnost where the agreements have not been found, it was established from testimonies provided by witnesses JUDr. Jana Sainerová, Ing. Petr Paciorek, JUDr. Libor Dopita, Ing. Jiří Bednář and JUDr. Marie Kralíková that none of them attended any business meetings preceding the execution of the agreements, that they signed the agreements in good faith that the share transaction would be to the benefit of the company whose Board of Directors they chaired at the time, that they did not advise other members of the Board of Directors or the Supervisory Board of the joint stock company of the content of the agreements, and that the securities transactions were not discussed at the respective General Meetings. An analogous agreement was presumably concluded between Harvardská arbitrážní společnost and the Cyprus company Husky Trading because the testimony given by the chairman of the Board of Directors of Harvardská arbitrážní společnost, JUDr. Miroslav Štefan, is in the same spirit as the testimonies provided by the chairmen of the other Boards of Directors. In agreements that were read out at the trial, Cyprus authorities of competent jurisdiction certified the signature of Polakis Sarris where he signed the agreements on behalf of the Cyprus company Husky Trading, while signatures of the chairmen of the Boards of Directors are not notarized. It can thus be presumed that they signed the agreements somewhere at the seat of the Harvard companies, having been requested to do so by Viktor Koženy who in all cases referred to above issued the Multiple Order Tickets To Sell, and even signed the agreements concluded with Harvardská finanční společnost a.s. and Harvardský průmyslový holding a.s. on behalf of the Cyprus company Husky Trading, in Polakis Sariss's stead.

As regards the "looting rounds", i.e., transactions with SPT Telecom shares from the portfolio of all six Harvard investment funds, it needs to be stressed that pursuant to the agreements concluded, the shares in SPT Telecom were first lent by the Harvard investment funds to Zenko Trading, the same number of shares was purchased from Zenko Trading, to be sold again by the same company a week later for a lower purchase price; on the date of the sale, amendments to the loan agreement were concluded, pursuant to which Zenko Trading is returning the borrowed shares to the Harvard investment funds. All the respective agreements

were concluded by Viktor Koženýon behalf of the Harvard investment funds, and by
Kožený's close collaborator, Juraj Široký, on behalf of Zenko Trading; Viktor Koženýalso
issued and signed the orders to sell and orders to purchase the securities. It is perfectly obvi-
ous that these transactions which were loss-making at first sight, served to divert the assets of
Harvard investment funds for the benefit of the Cyprus company Zenko Trading, and as the
Harvard investment funds are represented in these transactions by Viktor Koženýwho was
neither their representative nor their officer, such transactions logically must have been initi-
ated and organized by the defendant Viktor Kožený. It is inconceivable for anyone else who
was to protect the rights of the shareholders of the respective fund to initiate and conclude
such unfavourable transactions deliberately.

      The Harvard investment funds were established by Harvard Cupital and Consulting,
a.s. in connection with the coupon privatization in the early 1990s as a vehicle for collective
investment by ordinary citizens, holders of investment coupons. The funds were to focus on
investments into companies with long-term prospects and ability to export, or companies with
stakeholders from developed foreign countries. The funds were to focus on the creation of
highly liquid assets consisting in particular of moneys and their disposable equivalents, i.e.,
other instruments with high liquidity. Within the meaning of the coupon privatization, such
liquidity could be ensured by shares tradable on markets organized in the Czech Republic and
accessible to the public: at the time when the funds were established, those were shares is-
sued by issuers among Czech companies that resulted from the privatization. Holders of in-
vestment books ("DIKs"), i.e., all the adult citizens of the Czech Republic as a result of two
waves of coupon privatization in the early 1990s, were enticed by a massive advertising cam-
paign to entrust their coupon books to the Harvard investment funds in order to become their
minority shareholders, with the promise of high and quick yields on their investments. The
increase in value was to be achieved in particular through securities transactions, and the
founding plans stipulated various limits designed to limit and spread risks, so that the fund
would hold securities issued by multiple issuers, and would hold such quantity of the securi-
ties that losses arising from a sudden loss of prices of a particular issuer's shares could be
compensated. Investment decisions were supposed to be made by a commission consisting of
members of the fund's Board of Directors and the fund manager, i.e., HCC. These investment
plans and rules were observed roughly till mid-1995 when the portfolios of the investment
funds contained shares of privatized Czech companies and the operations of the funds were
profitable in previous years. According to period news items, at the time of the coupon priva-
tization, Viktor Koženýwas a popular figure, maintained contacts with many politicians, cul-
tivated the image of a successful businessman with foreign experience from countries with
developed market economies. Testimonies indicate that within the Harvard companies, Vik-
tor Koženýenjoyed a great authority, was viewed as the leading and main figure who man-
aged the activities of the entire Harvard group, and his strategic and investment decisions
were not doubted by the employees and officers of the companies involved in any way. At
that time, Viktor Koženýused the title president of the Harvard funds although our legal or-
der *de facto* does not know this title; this title does not appear in the statutes of the Harvard
investment funds, was not entered into the Commercial Register and does not stem from the
Act on Investment Funds; contrary to that, in his capacity as chairman of the Board of Direc-
tors of HCC, i.e., the fund manager, he was able to co-decide on the investments made by the
individual funds.

continued                                                                                    46T 17/2006

When the deeds referred to under Items I./1 - 92.) and II./93 - 98.) of the verdict of guilt occurred, Viktor Kožený already resided abroad and resigned from the office of chairman of the Board of Directors of HCC at an Extraordinary General Meeting of this joint stock company on 18 August 1993. And yet, he single-handedly decided on a massive sale of performing shares of Czech companies to until then unheard of foreign companies by virtue of powers of attorney of which the minor shareholders, the original DIKs, had not been advised.

At the relevant time, not only shares from the portfolios of the Harvard investment funds, but also shares in the funds themselves, were transferred to the foreign companies; this enabled the foreign companies to attend General Meetings as shareholders. Testimonies revealed that minority shareholders, originally the DIKs, generally did not attend the General Meetings, while proxies of foreign companies usually holding a greater number of shares would turn up at the General Meetings and vote according to a pre-agreed scenario. The aforesaid General Meetings of the Harvard companies which were created by changing the names of the Harvard investment funds, held on 19 and 20 June 2006, at which the decisions on the dissolution of the investment funds, or rather their consolidation into Harvardský průmyslový holding, a.s., were adopted, are a typical example of this practice. Although the individual companies had shareholders in the range of hundreds of thousands, the General Meetings were attended by nine or twelve natural persons representing shareholders holding twenty or thirty per cent in the company. However, this number did not suffice for the adoption of the expected decisions leading to the company's consolidation at officially convened Extraordinary General Meetings; therefore, upon termination of the Extraordinary General Meetings, substitute General Meetings were held; there was no discussion and all the shareholders present voted in favour of all the items on the agenda unanimously. After assessing the content of the witness testimonies, the court has no doubt that even after his move abroad, the defendant Viktor Kožený retained his exclusive status of the "Harvard funds president" who single-handedly decided on all investments and strategic plans in all the Harvard companies, and that all the other employees, statutory representatives and other officers of the Harvard companies respected his status, frequently spoke to him on the phone, travelled abroad to consult with him, etc. That is how the minority shareholders were deceived. While Viktor Kožený was not a statutory representative of any of the Harvard companies at that time, he *de facto* managed them and had virtually unlimited powers.

For Viktor Kožený to be able to continue controlling the Harvard companies, the continued presence was required on the statutory bodies of such companies of persons who would manage the companies' activities according to the instructions and requirements of Viktor Kožený: until his move abroad in 2001, Ing. Boris Vostrý CSc. undoubtedly was that person. Witness testimonies revealed that the defendant Vostrý was employed by the Harvard companies from their inception, at the same time he served on the Boards of Directors of some of the joint stock companies within the Harvard group. According to an extract from the Commercial Register, between 23 September 1991 and the year 2005, he gradually served as a member or chairman of the Board of Directors in fourteen joint stock companies within the Harvard group (including SUT and its subsidiary Avir Union, a.s.); at the same time, mainly up to 1993, he served on the Boards of Directors of nineteen joint stock companies in the Czech Republic, which companies included those with securities in the portfolios of the

continued                                                            **46T 17/2006**

Harvard investment funds. In 1995, the defendant Vostrý became a member of the Board of Directors of HCC, i.e., the manager of the Harvard investment funds, from whose portfolio performing securities of Czech companies were being diverted into foreign companies at the time. In his capacity as HCC's representative, Vostrý organized the consolidation of the Harvard companies and SUT into HPH; the defendant Vostrý not only chaired the General Meetings of HPH and SUT on 20 June 1996, at which the decision on the consolidation was adopted, but also attended two other General Meetings of the Harvard companies, and it was established in particular from witness testimonies given by members of the Boards of Directors and Supervisory Boards of Harvard investment funds, later on Harvard companies, that the defendant Vostrý chaired a joint meeting of such statutory representatives where he informed them about the plan of consolidating the former Harvard investment funds into a single holding company. At SUT's General Meeting on 5 December 1995, the defendant Vostrý was newly elected to SUT's Board of Directors and elected its chairman at the same time; while he was officially proposed for office by Stratton's representative in the Czech Republic, Mr. Arbes, it was obviously also at the initiative of Viktor Kožený who maintained close times with the owner of Stratton, Michael Dingman, at the time.

After 20 June 1996, Ing. Boris Vostrý became the chairman of the Board of Directors of HPH, and after it was decided at the Annual General Meeting held on 20 August 1997 that Harvardský průmyslový holding, a.s. would be dissolved and liquidated, he was elected its liquidator at the same General Meeting. In his capacity as liquidator, the defendant Vostrý announced a public tender which was won by Viktor Kožený's company, HCMW, on whose behalf an agreement by which HPH sells, assigns, transfers and delivers all its assets to HCMW was concluded on 30 December 1997. The circumstances under which the public tender was announced by HPH's liquidator, Ing. Boris Vostrý, were precisely the reason for decision of the Regional Commercial Court in Prague of 29 June 1998, ref. No. 54Cm 11/98-40, by which Ing. Boris Vostrý was removed as HPH's liquidator and replaced by doc. Ing. Zdeněk Častorál, Dr.Cs. Detailed information can be found in the above-referenced resolution which entered into force on 27 November 2000. To put it briefly, the Commercial Court points out that the condition that a bond of CZK 500,000,000 be posted was not the only condition of participation in the tender; the interested parties only learned of further conditions after depositing the bond, yet the provisions of Section 282 (2) of the Commercial Code stipulate that a party holding a public tender must publish the content of all the terms and conditions in an appropriate manner. The term of 35 days from announcement until deadline is also too short for the interested party to be able to learn at all what assets are being offered by the liquidator in the first place, to be able to assess, having reviewed the information memorandum, whether it is interested in purchasing the assets on offer at all, to draft the purchase agreement and obtain confirmations of good financial standing and solvency as one of the conditions of participation in the tender. The term for the refund of the bond to unsuccessful bidders is formulated so vaguely that the bond could possibly be returned after a full one year, moreover, the invitation to tender did not address how the bond would be refunded to interested parties who would only post same to be able to review the information memorandum, and would perhaps subsequently decide against taking part in the tender. The essence of a public tender is that the tender offer is not submitted by the organizer, as was the case in this particular instance, but by the bidder, and the bidder may feel restricted in its manifestation of will if its draft purchase agreement does not fully conform to the liquidator's draft.

HPH's assets were sold well below their book value, whereby the purchase agreement con-
cluded as a result of the tender can be deemed to have been concluded without due profes-
sional care that a liquidator is obliged to exercise pursuant to Section 567 (1) and Section 66
(2) of the Commercial Code.

Immediately after his election as chairman of SUT's Board of Directors, the defen-
dant Vostrý concluded unfavourable securities transfer agreements by which SUT first as-
sumed Stratton's obligations, and subsequently all of SUT's assets were transferred to the
Cyprus companies. In the introductory sentence of Item IV. of the verdict of guilt, it is stated
that the defendant Vostrý so acted as of 1 February 1996, this is an inaccurate date adopted
by mistake from the indictment at the promulgation of the Judgment. As of 1 February 1996,
Ing. Boris Vostrý was entered as the chairman of SUT's Board of Directors into the Com-
mercial Register but had been elected to office already at the General Meeting held on 5 De-
cember 1995, and concluded the agreement with Stratton mentioned first in the description of
facts as per Item IV./108 of the verdict of guilt in his capacity as chairman of SUT's Board
of Directors on 25 January 1996, i.e., before he was entered as such into the Commercial
Register. By the agreement of 25 January 1996, SUT assumes further unspecified obligations
of Stratton, i.e., including obligations vis-à-vis the Harvard investment funds in respect of
which the PROMISSORY NOTES referred to in the preceding parts of the of the verdict of
guilt were issued. Immediately afterwards, the defendant Vostrý concludes, on behalf of
SUT, agreements on the transfer to Harms of securities acquired by SUT from Stratton; from
Harms, these performing shares in Czech companies are transferred to the Cyprus company
Ras Al Khaimah which is represented by Michael Dingman, and from Ras Al Khaimah,
shares in the issuer Moravské naftové doly a.s. are transferred to Daventree Ltd. which is rep-
resented by Viktor Kožený. The defendant Vostrý only represents SUT as the chairman of its
Board of Directors for several months, during which time SUT works as a vehicle allowing
Stratton to discharge its debt; SUT's assets are subsequently transferred to the Cyprus com-
pany Harms which is established specifically for that purpose on 24 January 1996; SUT ac-
quires shares in Harms which are not publicly tradable, and transfers same to Deventree Ltd
by an agreement of 30 June 1996, together with shares in six other subsidiaries of SUT. Said
agreement dated 30 June 1996 was concluded by Boris Vostrý as chairman of SUT's Board
of Directors although pursuant to the consolidation agreement dated 20 June 1996, SUT *de
facto* no longer existed and became a part of HPH.

On 30 May and 31 May 19996, the defendant Ing. Vostrý in his capacity as chairman
of SUT's Board of Directors further concludes unfavourable securities transfer agreements
referred to in connection with deeds as per Items III./99 - 107 of the verdict of guilt, whereby
the securities are purchased from Harvardská finanční společnost a.s. and subsequently sold
to HPH at a significantly lower price. According to the statement issued by the Securities
Centre, the securities were subsequently, on 6 June 1996, transferred to the Cyprus company
Husky Trading; according to Prof. Častorál's testimony, without the purchase price having
been paid. The purchase price presumably had not been paid for transfers on 30 May and 31
May  1996, either; the damage quoted in the description of the deed as per Items III./ 99 —
107 was sustained by SUT in its security account at the Securities Centre, and it can be noted
in conclusion that these looting rounds were designed to artificially create SUT's obligations
vis-à-vis HPH, so that such obligations could subsequently be transferred to the Cyprus com-

panies together with securities; the Cyprus companies did not pay the Harvard companies for securities in cash or by bank transfers of funds, but mainly by some kind of set offs of mutual obligations and claims. The argumentation repeatedly proposed by the defense counsel to the defendant Vostrý that no damage could have occurred because HPH into which SUT was consolidated acquired all the obligations and claims of SUT as a result, cannot be upheld. This undoubtedly was another form of the looting rounds whereby performing shares of Czech companies were transferred to the Cyprus companies without any payment of adequate consideration, and by issuing orders to purchase and subsequent orders to sell, the defendant Vostrý artificially created obligations for SÚT which were then used by the Cyprus company Husky Trading for set offs in lieu of purchase price payment.

The above thus indicates that the defendant Ing. Vostrý, when concluding securities transfer agreements or issuing instructions for the purchase and sale of securities in connection with the deeds as per Items III./99. — 107 and IV./108 of the verdict of guilt, did not act on his own as chairman of SUT's Board of Directors but acted in close coordination with Viktor Kožený, and the purpose of the actions of the defendant Ing. Vostrý was to transfer the assets of the original Harvard investment funds and the joint stock company SUT to the Cyprus companies prior to consolidation, so that Viktor Kožený, and later on also Ing. Boris Vostrý, could dispose with such assets abroad without any consideration for the interests of the original Czech shareholders. The court does not agree with the legal classification proposed by the prosecuting attorney in the indictment in connection with deeds as per Items III./99 — 107, and in the closing statement of the prosecuting attorney with respect to all the deeds committed by the defendant Vostrý. In light of the above circumstances, it could not have been the criminal act of breach of fiduciary duty because the defendant Vostrý did not stand for the office of chairman of the Board of Directors of the joint stock company SUT in order to manage its assets in accordance with legal regulations then in force and the shareholders' wishes, but in order to put forward, through his pro-active steps, a pre-agreed scenario designed to divert SUT's assets for the benefit of the Cyprus companies, whereby the joint stock company SUT would subsequently be consolidated into the newly established HPH and would cease to exist.

It was declared at the General Meetings which decided on the consolidation of the former Harvard investment funds and SUT into HPH that the consolidation was in the interest of the shareholders of the companies being consolidated, that the plan was to create a holding company with a strong capital basis, capable of collaborating with other foreign companies and investing abroad. The information published in the media at the time and in reports on the consolidation General Meetings was that all the assets of HPH would be contributed into Daventree Ltd., and investments would be made in particular in Russia and on other foreign markets through this foreign company with a strong capital basis. In this context, the defense counsel to the defendant Vostrý, JUDr. Monsport, repeatedly raised objections against the contention of the witness Častorál that the Harvard investment funds (renamed as companies, association and holding) and SUT were consolidated as empty shells devoid of assets, and that the fact that the shares in Daventree Ltd. which were transferred into HPH's portfolio after the consolidation were not publicly tradable cannot be presumed to mean that they were worthless. To that end, the defense counsel even commissioned an ex-

pert opinion from the expert institute Česká znalecká, a.s. However, the experts limited themselves to saying that the market value of shares in Daventry Ltd. was higher than zero but that it was impossible to determine it with any precision since adequate underlying information was not available. A similar conclusion regarding the impossibility of determining the market value of Daventree Ltd. shares is contained in the expert opinion rendered by the expert institute Bohemia Expert s.r.o. which merely mentions the acquisition cost of the shares – nearly CZK 8 million, and the fact that the shares in Daventree Ltd. were grossly overvalued in HPH's balance sheet compiled as of 31 December 1996. It needs to be noted with regard to the arguments proposed by the defense that shares in Daventree Ltd. only constituted HPH's assets for a period of one and a half years, from 30 June 1996 till 30 December 1997.  On 30 June 1996, the shares in Daventree Ltd. were swapped for HCC shares which were in the portfolio of the Harvard companies and were not publicly tradable, either; in the course of 1996, shares in Daventree Ltd. were swapped for shares in the Cyprus company Harms which constituted SUT's assets. On 30 December 1997, all the assets of HPH were transferred to HCMW of the defendant Kožený, and HPH's assets then only consisted of two drafts issued for the amount of CZK 9,880,104,000 in total, which draftswere payable by 30 December 1999. Neither witness testimonies nor documentary evidence shows any growth in the value of HPH's assets between mid-1996 and the end of 1997: on the contrary, following a rigged tender, the assets were sold to Viktor Kožený for a price equivalent to approximately one half of its book value. If Daventree Ltd. made any profitable investments during this period (defense counsel to the defendant Vostrý argues investments were made into the Russian paper-making combine Segeža and the glass-making combine Saratovstěklo), HPH's shareholders, the original DIKs, cannot be said to have benefitted from these investments in any way. In this context, the content of the testimony given by witness JUDr. Michal Pacovský at the trial needs to be stressed: he stated *i.a.* that he became HPH's liquidator in December 1999 and discovered that HPH did not own any assets save for the outstanding drafts; he thus went to the Bahamas to see Viktor Kožený in order to have him make a protest under the drafts prior to maturity. At the time, HPH did not even have funds to remunerate members of the Boards of Directors and Supervisory Boards, and the witness JUDr. Pacovský convinced Viktor Kožený to transfer two fibreglass plants in Teplice to HPH so that their income could be used to finance HPH's overhead costs. Class B shares in Daventree Ltd. which were in HPH's portfolio were not only not publicly tradable but were not even voting shares, and it was therefore inconceivable for any statutory representative of HPH to turn up at a General Meeting of Daventree Ltd. and wish to vote against any decisions of the owners or directors of the company. The shares in Daventree Ltd. were only issued on 27 June 2006, and as such were not in the portfolios of the Harvard companies being consolidated, and their later transfer into the portfolio of the consolidated HPH is not in conflict with the witness Častorál's contention that the Harvard companies and SUT were consolidated as empty shells, without any assets. Therefore, shares in Daventree Ltd. which were in HPH's portfolio for a year and a half, were worthless for a rank and file HPH shareholder in practical terms; the evidence reviewed does not indicate that their holding brought any benefit to HPH, whether in 1996 and 1997 or later on.

If, as some of the testimonies and the defense of the defendant Vostrý purport, the newly established consolidated HPH contributed its assets into Daventree Ltd. in order to form a company with a strong capital basis that could increase the value of its assets through

investments in Russia and some other countries of the former Soviet Union, there was no reason for HPH to enter into liquidation approximately a year later. If the defendant Vostrý argues in his statements that the shareholders were the ones to decide on the entry into liquidation, the court has no doubt that a voting majority at General Meetings was enjoyed by the Cyprus companies under the influence of both Viktor Kožen and Ing. Boris Vostrý.  In this context, one must not disregard the fact that these were offshore companies that were mostly seated at the law firm of Polakis Sarris, had no employees, and documents signed on their behalf at that time were signed either by Polakis Saris in his capacity as their secretary, or by their directors, mostly employees of the law firm of Polakis Sarris, Linda Loizou and Iro Petsa. Therefore, there can be no doubt that the decision that HPH would enter into liquidation in the second half of 1997 was actually made by the defendants, Viktor Kožen and Ing. Boris Vostrý, and that this decision was made so that a rigged public tender could be held, which tender was won by Kožen's company, HCMW.  The court views the agreement of 30 December 1997 by virtue of which HPH's assets were sold to HCMW as a document executed by the two defendants in order to "legalize" *ex post* the diversion of assets from the former Harvard investment funds and SUT for the benefit of the Cyprus companies that were under Viktor Kožen's influence.

      The conclusions concerning the active participation of the defendant Vostrý in the criminal activities outlined in the verdict of guilt are substantiated not only by his actions in 1995-1997 in his capacity as chairman of the Board of Directors of SUT, chairman of the Board of Directors and liquidator of HPH, but also his involvement in the Cyprus companies. Ing. Boris Vostrý was one of the directors of Harms Holding Co. Ltd., further, he was one of the directors of Deneb Shipping Ltd., as well as Elnath Shipping Ltd. since its inception in 2000; however, of decisive importance is his involvement in companies whose name includes the word Daventree. Daventree Limited was established on 27 June 1996 by a change of the business name of a Cyprus company, Goodheard Trading Limited, the first directors of the company were Michael Dingman, Viktor Kožen and Linda Loizou. Despite that, the content of the witness testimony provided at the trial by Ing. Michal Donath who represented a public relations agency cannot be disregarded. The witness Donath testified that the agency first worked for Viktor Kožen in 1991 and 1992, later on he worked for Straton Investments, and when Dingman and Kožen parted ways and Daventree Ltd. was established, the witness was approached by Ing. Boris Vostrý with the request that the agency work for Daventree Ltd. The defendant Vostrý himself acted as a director of Daventry Resources Limited, this company was established on 30 August 1996 by a change of the name of a Cyprus company, Perbatim Holding Co. Ltd., and is presented as a subsidiary of Daventree Ltd. On 6 June 2002, another company, Daventry Resources Limited, was established, this time with its registered seat in Belize; while its founding deed was signed by Mr. Santiago Gomez as manager, there is no doubt in fact this was a company of the defendant Vostrý who is entered in the Belize companies register as its investment consultant. The witness Ing. Tomáš Ševčík is currently a director of Daventree Resources Limited Belize, and he testified at length on the activities of trusts (trust 1 established by an agreement dated 4 December 2002), whose funds were later used to pay distributions to the original shareholders to the Harvard investment funds. The witness Ševčík testified that the funds required for the operation of the trusts were procured by Ing. Boris Vostrý as the director of Daventree Ltd. Kypr, and one of the members of Kantupan.

It was established from the content of documentary evidence that Kantupan, in which Daventree Resources Limited, with its registered seat in Cyprus, held one quarter, acquired a 45% share interest in a Russian oil company, Sidanco, in 1996; in December 1997, it sold a 10% interest to one of the affiliated companies of BP Petroleum. In May 2001, the remaining shares in Sidanco were sold for USD 600 million to companies affiliated with Alfa bank. Of the first instalment of USD 90 million deposited by the purchasers, Daventry Resources Ltd. was entitled to USD 22.5 million, of which USD 21.7 million was remitted into the account of JUDr. Jaromír Bayer at Raiffeisenbank in Prague. According to the testimony of Mgr. Josef Nový who was the CEO of HPH at that time and who concluded, on behalf of HPH, a mandate agreement on the administration of the funds with JUDr. Jaromír Bayer on 24 August 2001, these were funds to be distributed to minority shareholders. It was not established from testimonies or documentary evidence that any distributions were made to shareholders in 2001; after all, neither the then Board of Directors of HPH nor its CEO had any power to do so under the law as a final and enforceable appointment of doc. Častorál as HPH's liquidator by the Commercial Court had been made by then. If his authorization to dispose with HPH's assets was contested in light of the fact that at HPH's General Meetings, decisions on HPH's exit from liquidation were adopted repeatedly, one can only point out that such decisions of General Meetings were subsequently declared null and void by final and enforceable decisions of commercial courts. If some of the witnesses argued that HPH did  not have to be in liquidation because there were its assets originating from Viktor Kožený's investment in Azerbaijan, and further assets provided to HPH  by its subsidiary, Daventry Resources Ltd., as a shareholder of Kantupan, it needs to be noted that the extensive file compiled during the preparatory proceeding does not contain a single document suggesting that vouchers acquired by Viktor Kožený in the Azerbaijan privatization were provided by Kožený to HPH so that HPH could liquidate them for the benefit of its shareholders. On the contrary, the file contains minutes of a meeting between HPH's representatives – chairman of the Board of Directors, Boris Vostrý and the liquidator Michal Pacovský and the director of HCMW,  Viktor Kožený, held on 30 December 2000 in the Bahamas, according to which HCMW will not create any legal obstacles in the takeover of assets in Azerbaijan but will stop financing this investment in any way and will permit the assumption of a pledge in relation to the investment in Russia, and will lend assistance as soon as HPH's exit from liquidation is entered into the Commercial  Register  (see Art. 226 – 227, Volume 2/125). The defendant Kožený conditioned the provision of funds to HPH, which he undertook to make by concluding pledge agreements attached to the agreement on the sale of assets of HPH to HCMW dated 30 December 1997, by the fulfilment of facts which would circumvent the decisions of Czech commercial courts. However, the court conducting the criminal proceeding has no doubt that the defendant Kožený was well familiar with the content of such decisions of commercial courts, and knew that his conditions were virtually impossible to fulfil. HPH's exit from liquidation never took place, and moreover, most witnesses testified that the vouchers from the Azerbaijan privatization became virtually worthless. As regards the amount of USD 22.5 million provided to HPH through Daventry Resources Ltd. Kypr, this amount was not deposited into HPH's current account and the court-appointed liquidator thus could not dispose with it; moreover, it  is apparent that the defendants did not intend to provide this amount to HPH on a permanent basis. On 12 October 2001, Mgr. Josef Nový in his capacity as HPH's CEO sent a letter to JUDr. Bayer, confirming that the funds entrusted to him were not HPH's property but belonged to the subsidiary Daventry Resources Ltd. Kypr instead, and the defendant Bo-

ris Vostrý in his capacity as director of Daventree Resources Ltd. requested by a letter of 28 November 2001 that JUDr. Bayer transfer the funds into the bank account of Daventree Resources Ltd. in Cyprus. By virtue of a resolution of the Czech Police dated 10 December 2001, the balance of the funds in the amount of USD 20,126,440,000 in the account administered by JUDr. Jaromír Bayer was seized after a police investigator was alerted by the Financial and Analytical Department of the Ministry of Finance to the fact that this instruction had been placed, whereby the execution of the order for financial transfer abroad was postponed by the Ministry of Finance by five days.

Copies and a Czech translation of documents provided by the witness Pacovský to the investigator on 13 February 2002 indicate that for the defendant Vostrý to become a chairman of the Board of Directors of the Cyprus company Daventree Resources Ltd., a single letter sent by Viktor Kožený by fax and addressed to Linda Loizou was sufficient. Ing. Boris Vostrý became a director of Daventree Resources Ltd. in Cyprus by virtue of a written "election instruction" that he himself sent to Linda Loizou. The same letters from the defendants Kožený and Vostrý also contain a decision of the existing shareholder that HPH is to become a new shareholder of Daventree Resources Ltd., with its registered seat in Cyprus. While these letters from the defendants bear no dates, they can be presumed to have directly preceded the letter of 26 June 2001 by which the statutory representatives of Daventree Resources Ltd., Iro Petsa, Boris Vostrý and Polakis K. Sarriss, advise Michael Dingman, member of the Board of Directors of Kantupan Holding Co. Ltd., that Boris Vostrý was appointed member of the Board of Directors of Kantupan Holding C.O. Ltd. (see Art. 176, 178, 179, 180 and 261-263 of Volume 2/125). According to the statement of the defendant Vostrý and to the content of witness testimonies, Daventree Resources Ltd. Kypr is a subsidiary of the original Daventree Ltd. which was established on 27 June 1996. Daventree Resources Ltd. owns a quarter of Kantupan Holding Co. Ltd. which purchased shares in the Russian company Sidanco in December 1996. As in 1996, both defendants supplied information to the mass media to the effect that the newly established HPH contributed assets into Daventree, it is obvious that the funds by which Daventree Resources Ltd. Kypr participated in the purchase of shares in Sidanco within Kantupan were obtained from the assets of the Harvard investment funds and SUT, which assets had been transferred to Daventree Ltd. and subsequently also to Daventree Resources Ltd. without consideration by Stratton Investments and Husky Trading. It was further established from documentary evidence that on 28 August 2001, members of the Board of Directors of Daventree Resources Ltd. decided that a greater part of the funds corresponding to a one-quarter share of Daventree Resources Ltd. in the revenues of Kantupan under the agreement on the sale of shares in the Russian oil company Sidanco dated 25 May 2001 would be transferred into JUDr. Jaromír Bayer's escrow account at Raifansbank a.s. in the Czech Republic. According to witness testimonies given by members of HPH's Board of Directors, or its then CEO, this is money which belonged to HPH under pledge agreements pertaining to the agreement on the sale of assets of HPH to HCMW dated 30 December 1997, and for the money to be provided to HPH, they had to grant the defendant Vostrý a power of attorney for acting on behalf of HPH. If Ing. Boris Vostrý was appointed director of Daventree Resources Ltd. shortly before that in line with Viktor Kožený's instruction, it is obvious that the funds transferred into JUDr. Jaromír Bayer's escrow account on 5 September 2001 were provided out of the resources of Daventree Resources Ltd., with its registered seat in Cyprus, based on an agreement between the two defendants, and that the

defendant Vostrý was a close collaborator of the defendant Kožeńy and they acted in concert even later than indicated in the preceding parts of this *ratio decidendi*. This fact is also confirmed by the content of a document entitled decision of the sole shareholder of Daventree Resources Ltd. dated 8 April 2002 and signed by Boris Vostrý. In the decision, the defendant Vostrý states that *the shareholders approved a resolution authorizing Daventree Resources Limited and its directors to make any and all decisions at their discretion and without any liability vis-à-vis property held for the benefit of HPH. It was further decided that HPH and its directors and officers and any successors thereof shall indemnify and hold harmless the directors, officers and agents of Daventree Resources Limited, as well as the company itself, in full. In the event that any claim, proceeding, investigation, litigation or any form of supervision of inquiry is brought by anyone against Daventree Resources Limited and persons associated with its activities, HPH represents and warrants to provide in advance the maximum possible amount towards legal representation of the aforesaid persons and entities. The shareholders further resolved to make a binding and irrevocable assignment of any and all assets of HPH in consideration for the preservation of full ownership of Daventree Resources Limited. HPH as the sole shareholder further decided that once and for all, in final and absolute terms, it waives and surrenders any and all statutory rights it may have as a shareholder, creditor or otherwise, including any and all actions, claims, investigations and court orders it may be entitled to before any court. In light of full satisfaction of the warranties of HCMW, it was resolved unanimously and irrevocably that HPH and its directors and officers, managers or their successors waive any and all current, potential, past, existing or future claims in the broadest sense of the word against HCMW, Daventree Limited, Daventree Resources Limited, Husky Trading Limited, Mr. Viktor Kožeńy and all other affiliated natural persons (*pp. 276-278 of Volume 118/125). This decision of the defendant Ing. Boris Vostrý who was *de facto* the only representative of Daventree Resources Ltd. at the time, was issued at a time when both defendants were undoubtedly aware of the existence of a resolution dated 1 February 2002, issued pursuant to Section 160 (1) of the Code of Criminal Procedure, by virtue of which their criminal prosecution was officially initiated, and it goes to show that the defendant Ing. Boris Vostrý tried to avoid criminal prosecution both for himself and Viktor Kožeńy by promising to provide funds to HPH. The provision of funds into JUDr. Jaromír Bayer's escrow account in the second half of 2001 needs to be viewed in the same light: by then, even the general public was aware that the police were gathering information in order to be able to bring criminal charges against Viktor Kožeńy and Ing. Boris Vostrý. Moreover, some two and a half months later, the defendant Vostrý attempted to recover the funds by issuing an instruction for their transfer into the account of Daventree Resources Ltd. in Cyprus.

The court views the agreement dated 4 December 2002, on the establishment of Trust 1, and subsequent distributions to shareholders – the original shareholders of the Harvard investment funds and HPH - from the same perspective. According to the testimony given by the witness Klimeš at the trial, the power of attorney granted to Ing. Boris Vostrý for the representation of HPH in 2001 had to be revoked because Ing. Vostrý failed to honour oral agreements made when the power of attorney was granted. If the trusts were established so that distributions could be made to HPH's shareholders, the defendant Vostrý *de facto* admits without any legal basis, he is disposing with assets only the court-appointed liquidator of HPH is authorized to dispose with. Moreover, the agreement on the establishment of the trust does not make it clear where the funds contributed into Trust 1 came from: however, it can be

presumed with almost a 100% certainty that the funds originated from the actions of the two defendants in 1995-1996 as outlined in the verdict of guilt. Although certain witnesses claim that in 2002, some kind of a breakup occurred between the defendants Kožený and Vostrý, the court concludes that the establishment of the trusts and subsequent distributions to shareholders represent an effort on the part of both defendants to prevent a further continuation of the criminal proceeding already pending against them at the time. This conclusion is supported not only by the formerly close cooperation between the two defendants, their common interest in avoiding criminal liability, but also by the content of the testimonies given by the witnesses Častorál, Maňák and Široký who testified, *inter alia,* that they were convinced that the trusts were established following mutual agreement of the two defendants. The information provided by the defendant Vostrý and witness Ševčík as to how many original shareholders of the Harvard funds and HPH became shareholders of the trusts and what the amount of the total distributions made was are not completely identical; moreover, no credible documentary evidence that could be used for verification purposes is available. However, it is possible to agree with the opinions of witnesses Máslo and Husník that the amount of USD 6.9 per share offered to the shareholders was set in such a way that the parties potentially interested would be paid an amount that would in aggregate represent only a fraction of the value of the assets acquired by the defendants through their earlier actions to the detriment of the Harvard investment funds and SUT. The court thus views the distributions only as an additional compensation of shareholders for damage caused by the defendants through their actions seven or eight years ago, and they cannot absolve the defendants of liability for criminal acts completed in June 1996.

By giving instructions for the conclusion of securities transfer agreements, or by concluding such agreements themselves – the defendant Kožený by virtue of powers of attorney granted by the Harvard investment funds, and the defendant Vostrý in his capacity as the statutory representative of SUT, the two defendants practically diverted the assets of the Harvard investment funds and SUT to Cyprus companies without adequate consideration where only some sort of notes or set offs of mutual obligations and claims were used to pay for performing securities of Czech companies. When he concluded securities transfer agreements with Stratton as an agent of Harvard investment funds, the defendant Kožený did not consult such business plans with the Boards of Directors of the funds, and shareholders were not advised of business plans at the General Meetings of the individual funds. Later on, in 1996, the investment funds were renamed as Harvard companies, group and holding so as to circumvent the provisions of the Act on Investment Funds stipulating transaction limits for the purpose of spreading the risk of unsuccessful investment. Afterwards, upon the defendant Kožený's instructions, further agreements on the transfer of securities to the Cyprus company Husky Trading are concluded; while these are signed by chairmen of the Boards of Directors of the Harvard companies, according to their testimonies, they are not duly informed about the purpose and consequences of such securities transfers by the defendant Kožený. The defendant Vostrý concludes securities transfer agreements in his capacity as chairman of SUT's Board of Directors; he was formally proposed for this office by Stratton's representatives for the sole purpose of diversion of the assets of the joint stock company SUT for the benefit of the Cyprus companies, and so that Stratton's obligations vis-à-vis the Harvard investment funds could be transferred to SUT. The timing whereby the defendant Vostrý signs the securities transfer agreements on behalf of SUT shortly after his election to office, which agree-

continued

ments are clearly unfavourable and tantamount to liquidation for SUT, shows beyond any doubt that on the part of the defendant Vostrý, this was part of fraudulent actions committed in collaboration with the defendant Koženy, where each of the defendants committed several deeds which had been committed with a uniform intent and common objective: to transfer the assets of the Harvard investment funds and companies, including the assets of SUT, to the Cyprus companies.

At manipulated substitute General Meetings which do not require the presence of a qualified majority of shareholders for the adoption of resolutions, it was decided that the Harvard companies and SUT would be consolidated into a single company, HPH; mass media are subsequently informed by both defendants that the newly created Harvard company is contributing its assets to Daventree although no such transfer agreements were concluded. Viktor Koženy also announced that the shares in Daventree would be listed and traded at New York and London or Prague Stock Exchanges, however, no such registration with said stock exchanges was ever even attempted. The shares contributed to HPH were virtually worthless shares in Daventree Ltd which were not publicly tradable. Therefore, through the joint actions of the two defendants, not only the shareholders of the Harvard investment funds but also their statutory representatives were misled, as was the general public through the mass media, and press releases were undoubtedly directed at government agencies as well. Moreover, by their actions, the defendants deliberately and knowingly circumvented the applicable legal regulations. Both defendants undoubtedly acted with the intent of enriching themselves, the transfer of performing securities of Czech companies to the Cyprus companies enabled them to acquire assets they could subsequently use for risky foreign investments, something that legal regulations in force in the Czech Republic at the time did not permit. However, the investments were not made in the interest of the original DIKs and rank and file shareholders of the Harvard investment funds: the purpose was for the defendants to enrich themselves as much as possible even with the significant risk of return on their investment in mind. The allocation of such risks enabled them to acquire assets worth several dozen billion crowns at the expense of the original shareholders of the Harvard investment funds with ease. Therefore, by their actions, both defendants met the definition of the criminal act of fraud, and further caused substantial damage.

As the Judgment was only promulgated in 2010, i.e., when the New Criminal Code entered into force, the court, within the meaning of Section 16 (1) of the Criminal Code in force at the time of commission of the crimes, and within the meaning of Section 2 (1) of the Criminal Code in force at the time promulgation of the Judgment, considered which act was more favourable to the defendants, and concluded, by a comparison of sentencing guidelines stipulated in Section 250 (4) of Act No. 140/1961 Coll., and Section 209 (5) of Act No. 40/2009 Coll., that the latter act in force at the time of promulgation of the Judgment was more favourable to the defendants. Both defendants were therefore found guilty of gross fraud pursuant to Section 250 (1), (5) (a) of the Criminal Code.

When considering the punishment, the court concluded that it is appropriate to impose a sentence in the form of a prison term on both defendants at the upper limit of the sentencing range provided for in Section 209 (5) of the Criminal Code despite the fact that fourteen

years have elapsed since the completion of the criminal act. This conclusion is supported in particular by the extent of the damage caused which greatly exceeds the extent of damage in other comparable cases in the judicial practice of the Czech Republic. Moreover, the criminal activity was highly organized, planned and committed over a period of several years, and even after the criminal acts were completed, both defendants spent nearly five years taking measures, with the assistance of many other persons, to prevent the discovery of their crimes. Even after his move abroad in 1994, the defendant Kožený enjoyed considerable authority among the employees and statutory representatives of all the Harvard companies, and used the same not only to commit crimes but also to cultivate, over a period of several more years, the image of a successful businessman who is managing the considerable assets acquired by the Harvard funds in the coupon privatization in the interest of the shareholders of those funds. The defendant Vostrý who still lived in the Czech Republic for nearly five years after the completion of the crimes and who served as the chairman of the Board of Directors and liquidator of HPH, used his offices and his personal influence over the other statutory representatives and officers of the Harvard companies in order to prevent the discovery of the diversion of assets of the Harvard investment funds and SUT abroad, out of reach of the shareholders and their statutory representatives. The defendant Vostrý was also an officer in the Cyprus companies, and following his move abroad in 2001, he is the person who *de facto* disposes with the assets diverted abroad through the criminal activity committed jointly with Viktor Kožený. Where any assets were returned to the Czech Republic by way of transfer into the escrow account of JUDr. Jindřich Bayer or through distributions to shareholders of the trust, the court does not view such actions on the part of the defendant Vostrý as an effort to mitigate the harmful consequences of his crimes but rather as a measure designed to prevent criminal prosecution and subsequent conviction of himself and the defendant Kožený for their unlawful activities. By their actions, both defendants abused not only the trust of the employees, officers and statutory representatives of the Harvard funds and other Harvard companies, shareholders of the Harvard investment funds, but also the trust of the general public, especially by grossly discrediting the idea and expectation that economic changes related to the change of the political system after 1989 in the Czech Republic will be carried out in accordance with applicable laws and to the benefit of all the residents, not in a way where only a small group of people would take advantage of the changes for their unlawful enrichment.

As regards the prison sentence, both defendants were sentenced to serve their terms in a security prison in accordance with Section 56 (2)(c) because the sentences are imposed for deliberate crimes and for terms in excess of three years. No extraordinary grounds were found to exist for the application of the moderation provision of Section 56 (3) of the Criminal Code.

Harvardský průmyslový holding, a.s. - v likvidaci joined the criminal proceeding as the injured party in a due and timely manner, and its legal counsel attended the entire trial and proposed prior to the promulgation of the Judgment that the defendants be ordered to pay damages quantified in accordance with the description of the facts of the case as presented in the indictment, including default interest at the statutory rate. Both defendants were found guilty of deeds which include the causation of damage as quantified in the indictment, and there is no doubt that there is causal nexus between their deliberate actions spanning several

continued                                                                   46T 17/2006

years and the causation and extent of the damage; both defendants were therefore ordered to pay compensation for damage pursuant to Section 228 (1) of the Code of Criminal Procedure in line with the relief sought by the injured party.

Notice:  This Judgment may be appealed within eight days of delivery of the written form to the High Court in Prague through this court. An appeal may be filed by the prosecuting attorney on the grounds of incorrectness of any dictum, by the defendant for incorrectness of any dictum directly concerning the defendant, and by the injured party who claimed compensation for damages for incorrectness of any dictum on compensation for damages; all of the above may further file an appeal on the grounds of a violation of provisions on the proceeding preceding the judgment where such breach could have made any dictum incorrect or missing. Further, an appeal may be filed on behalf of the defendant by parties so authorized pursuant to Section 247 (2) of the Code of Criminal Procedure, i.e., direct relatives of the defendant, siblings, adoptive parents, adopted children, spouse and common law spouse. The prosecuting attorney and the injured party may further file an appeal even to the detriment of the defendant. The prosecuting attorney must state whether the appeal is filed, even if only partly, to the benefit or detriment of the defendant. Reasoning must be provided for the appeal within a statutory term clearly indicating which dicta of the judgment are being contested, and what defects in the judgment or the proceeding preceding the judgment are claimed, otherwise the appeal may be rejected without review pursuant to Section 253 (3) of the Code of Criminal Procedure. An appeal filed in a timely manner and by an authorized person has a suspensive effect.

Prague, 9 July 2010

JUDr. Dušan Paška
Chairman of the Tribunal

*round stamp:*  MUNICIPAL COURT IN PRAGUE

For accuracy:  *illegible signature*